**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

The Estate of Yaron Ungar, et al.,

        *Plaintiffs-Judgment*
        *Creditors*,

        v.

Orascom Telecom Holding S.A.E.,

        *Defendant-Garnishee*.

Civ. Action No. 07 CV 2572
(CM) (LMS)


**MEMORANDUM OF LAW IN SUPPORT OF ORASCOM TELECOM HOLDING**
**S.A.E.'S MOTION TO DISMISS THE COMPLAINT IN ITS ENTIRETY**


**WHITE & CASE** LLP
701 Thirteenth Street, NW
Washington, DC  20005

May 30, 2007

*Counsel for*
*Orascom Telecom Holding S.A.E.*

# TABLE OF CONTENTS

Page

BACKGROUND ...................................................................................................................1

    A.    The *Ungar* State And Federal Enforcement Proceedings.......................................2

        1.    June 2005:  The *Ungar* Plaintiffs File New York State Court Enforcement Proceedings Against Orascom ....................................................................................2

        2.    June – August 2005:  The *Ungar* Plaintiffs Issue Federal Discovery To Orascom And Its Representatives ..............................................................................3

        3.    September 2005:  The *Ungar* Plaintiffs File A Duplicative Federal Turnover Action Against Orascom ....................................................................................4

        4.    November 2005:  This Court Rules That It Lacks Personal Jurisdiction Over Orascom........................................4

        5.    November 2005 – March 2007:  The *Ungar* Plaintiffs Obtain Discovery From Orascom Representatives In Their Individual Capacities And Stay Their State And Federal Turnover Proceedings ..................................5

        6.    March – May 2007:  Upon Completion Of Discovery, The *Ungar* Plaintiffs File The Instant Federal Action And Voluntarily Dismiss Their State And Federal Turnover Proceedings ...........................................6

    B.    The Related *Knox* Proceedings ..............................................................7

ARGUMENT...................................................................................................8

I.    THE COURT LACKS PERSONAL JURISDICTION OVER ORASCOM.....................................................................................8

    A.    Plaintiffs Have Failed to Establish That Orascom Is "Doing Business" In New York Under § 301's "Simple Pragmatic" Test.................................................................9

    B.    Plaintiffs Have Failed To Raise Any Other Jurisdictionally Sufficient Contacts........................................11

       1.      This Court Has Already Concluded That New York Financial Services Contacts Are Jurisdictionally Insufficient .................................................................11

       2.      This Court Has Already Held That Attendance At Meetings Is Jurisdictionally Insufficient.....................................................16

II.     THE COURT LACKS SUBJECT-MATTER JURISDICTION .......................................18

III.    THE COURT LACKS JURISDICTION OVER THE ASSETS AT ISSUE .........................................................................................................21

IV.    THE COMPLAINT FAILS TO STATE A CLAIM FOR TURNOVER...............................................................................................23

    A.     The Complaint Only Contains Conclusory Allegations Regarding The Ownership Of The Assets At Issue ................................23

    B.     Plaintiffs Have Not Shown That The Complaint Was Served On The Judgment Debtors .........................................................24

CONCLUSION.....................................................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES                                                    PAGE(S)

*Alliance Bond Fund, Inc. v. Grupo Mexicano de Desarrollo,*
    *S.A.*, 190 F.3d 16 (2d Cir. 1999) ........................................................23

*Beatie and Osborn LLP v. Patriot Scientific Corp.*,
    431 F. Supp. 2d 367 (S.D.N.Y. 2006) ...................................................13

*Clarke v. Fonix Corp.*, No. 98 Civ. 6116,
    1999 WL 105031 (S.D.N.Y. Mar. 1, 1999),
    *aff'd*, 199 F.3d 1321 (2d Cir. 1999) ...............................................14, 17

*Crucible Ventures, Inc. v. Futuresat Ind.*,
    No. 88 Civ. 4251, 1990 WL 16140 (S.D.N.Y. Feb. 15, 1990) ................16

*Daniel v. American Bd. of Emergency Medicine*,
    988 F. Supp. 127 (W.D.N.Y. 1997) ......................................................14

*De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65 (2d Cir. 1996) ...................23

*Doron Precision Sys., Inc. v. FAAC, Inc.*,
    423 F.Supp. 2d 173 (S.D.N.Y. 2006) ...................................................22

*Epperson v. Entm't Express, Inc.*,
    242 F.3d 100 (2d Cir. 2001) ...........................................................18, 19

*Estate of Ungar v. Palestinian Auth.*, 325 F. Supp. 2d 15 (D.R.I. 2004),
    *aff'd*, *Ungar v. Palestine Liberation Org.*, 402 F.3d 274 (1st Cir. 2005),
    *cert. denied sub. nom.*, 126 S. Ct. 715 (2005) .........................................2

*Estate of Ungar v. Palestinian Auth.*, 396 F. Supp. 2d 376
    (S.D.N.Y. 2005) .................................................................................3

*Estate of Ungar v. Palestinian Auth.*, 400 F. Supp. 2d 541
    (S.D.N.Y. 2005) .................................................................... *passim*

*Estate of Ungar v. Palestinian Auth.*, 412 F. Supp. 2d 328
(S.D.N.Y. 2006) ........................................................................................................5

*Estate of Ungar v. Palestinian Auth.*, 451 F. Supp. 2d 607
(S.D.N.Y. 2006) ........................................................................................................5

*Fidelity Partners, Inc. v. Philippine Exp. & Foreign Loan
Guarantee Corp.*, 921 F. Supp. 1113 (S.D.N.Y. 1996) ................................ 21, 22-23

*Freeplay Music, Inc. v. Cox Radio, Inc.*, No. 04 Civ. 5238,
2005 WL 1500896 (S.D.N.Y. June 23, 2005) ................................................... 15-16

*Grendene, S.A. v. Brazam Int'l Trading Corp.*, No. 83 Civ. 0782,
1986 WL 10709 (S.D.N.Y. Sept. 24, 1986) ...................................................13, 17

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
466 U.S. 408, 104 S. Ct. 1868 (1984) .............................................................11, 13

*Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*,
763 F.2d 55 (2d Cir. 1985) ..............................................................................10, 11

*In re R.H.N. Realty Corp.*,
84 B.R. 356 (Bankr. S.D.N.Y. 1988) ....................................................................20

*In re Ski Train Fire*, No. 1428, 01 Civ. 7342,
2003 WL 1807148 (S.D.N.Y. Apr. 4, 2003) ............................................... *passim*

*Jazini v. Nissan Motor Co.*, 148 F.3d 181 (2d Cir. 1996) ............................. 4, 8, 17-18

*Klonis v. National Bank of Greece, S.A.*, 05 Civ. 6289,
2007 WL 959257 (S.D.N.Y. Mar 28, 2007) ..........................................................12

*Knox v. Orascom Telecom Holding S.A.E.*,
477 F. Supp. 2d 642 (S.D.N.Y. 2007) ..............................................................7, 18

*Knox v. Orascom Telecom Holding S.A.E.*, 06 Civ. 6824,
2007 WL 1225545 (S.D.N.Y. Apr. 19, 2007) ................................................. 7-8, 20

*Knox v. Palestine Liberation Org.*, 442 F. Supp. 2d 62 (S.D.N.Y. 2006) .......................2

*Koehler v. Bank of Bermuda*, No. M18-302, 2005 WL 551115
(S.D.N.Y. Mar. 9, 2005) ................................................................................ 21-22

*Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.*,
918 F.2d 1039 (2d Cir. 1990) ...................................................................9-10, 15, 17

*Manway Constr. Co., Inc. v. Housing Auth. of the City of Hartford*,
 711 F.2d 501 (2d Cir. 1983)...................................................................................................19

*Mende v. Milestone Tech., Inc.*,
 269 F. Supp. 2d 246 (S.D.N.Y. 2003)....................................................................................16

*Metropolitan Life Ins. v. Robertson-Ceco Corp.*,
 84 F.3d 560 (2d Cir. 1996)........................................................................................................9

*Mones v. Commercial Bank of Kuwait, S.A.K.*,
 399 F. Supp. 2d 310 (S.D.N.Y. 2005).....................................................................................21

*Motorola Credit Corp. v. Uzan*, 388 F.3d 39 (2d Cir. 2004).........................................................21

*Nat'l Westminster Bank U.S.A. v. Cheng*,
 751 F. Supp. 1158 (S.D.N.Y. 1990)........................................................................................19

*Nordic Bank PLC v. Trend Group, Ltd.*,
 619 F. Supp. 542 (S.D.N.Y. 1985)............................................................................. 11, 12, 14-15

*Peacock v. Thomas*, 516 U.S. 349, 116 S. Ct. 862 (1996)...................................................... 18-19

*Phoenician Trading Partners LP v. Iseson*, No. CV-04-2178,
 2004 WL 3152394 (E.D.N.Y. Dec. 11, 2004) .........................................................................24

*Pieczenik v. Cambridge Antibody Tech. Group*, No. 03 Civ. 6336,
 2004 WL 527045 (S.D.N.Y. Mar. 16, 2004) ..........................................................................12

*Saudi Arabia v. Nelson*, 507 U.S. 349, 113 S. Ct. 1471 (1993)............................................... 20-21

*Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*,
 751 F.2d 117 (2d Cir. 1984).......................................................................................................9

*Williams v. Pfeffer*, 117 F. Supp. 2d 331 (S.D.N.Y. 2000)...........................................................19

## STATE CASES

*Bergdorf Goodman, Inc. v. Marine Midland Bank*,
    97 Misc. 2d 311, 411 N.Y.S. 2d 490 (N.Y. Civ. Ct. 1978).....................................24

*Oil City Petroleum Co. v. Fabac Realty Corp.*,
    70 A.D.2d 859, 418 N.Y.S.2d 51 (N.Y. App. Div. 1979) .....................................24

*Palestine Monetary Authority v. Strachman*, No. 107777/05,
    2007 WL 1063867 (N.Y. Sup. Ct. Apr. 2, 2007)....................................................22

*Robbins v. Ring*,
    9 Misc. 2d 44, 166 N.Y.S. 2d 483 (N.Y. Sup. Ct. 1957) ................................12, 15, 17

## FEDERAL STATUTES

Anti-Terrorism Act, 18 U.S.C. §§ 2333, 2338 (2000) .............................................2, 19

Rule 12(b)(6) of the Federal Rules of Civil Procedure .................................................24

Rule 45 of the Federal Rules of Civil Procedure ..........................................................5

Rule 201(b) of the Federal Rules of Evidence ...............................................................23

Foreign Sovereign Immunities Act,
    28 U.S.C. §§ 1330, 1391, 1602-1611 ...................................................................21

Walsh Act, 28 U.S.C. § 1783 (1958) .............................................................................5

## STATE STATUTES

N.Y. C.P.L.R. § 301 (McKinney 1997)............................................................... *passim*

N.Y. C.P.L.R. § 5222 (McKinney 1997) ........................................................................2

N.Y. C.P.L.R. § 5225 (McKinney 1997) ..............................................................2, 3, 22, 24

N.Y. C.P.L.R. § 5227 (McKinney 1997) ............................................................ *passim*

This Complaint marks the *Ungar* Plaintiffs' second attempt to cure their jurisdictionally deficient allegations against Defendant-Garnishee Orascom Telecom Holding S.A.E. ("Orascom") in this Court.  In the eighteen months since this Court held that it lacked personal jurisdiction over Orascom, *see Estate of Ungar v. Palestinian Authority*, 400 F. Supp. 2d 541 (S.D.N.Y. 2005), the *Ungar* Plaintiffs have obtained extensive jurisdictional discovery from Orascom's representatives relating to Orascom's purported jurisdictional contacts with the State of New York — including the deposition of Orascom's Chairman and CEO.  That discovery yielded only more details about contacts that this Court already held to be jurisdictionally insufficient.  *See id.* at 549-52.

Accordingly, in the interest of finally bringing these lengthy and protracted proceedings to a close, Orascom hereby waives service of process and moves to dismiss the Complaint in its entirety with prejudice on the following grounds: (i) this Court lacks personal jurisdiction over Orascom; (ii) this Court lacks subject-matter jurisdiction over this turnover action; (iii) this Court lacks territorial jurisdiction over the assets at issue; and (iv) Plaintiffs fail to state a claim for turnover pursuant to N.Y. C.P.L.R. § 5227.

## **BACKGROUND**

Orascom, an Egyptian corporation with its principal place of business in Cairo, is a telecommunications company operating Global System for Mobile Communications ("GSM") networks in emerging markets in the Middle East, Africa, and South Asia.  Orascom does not operate or own any assets in the State of New York.

Orascom is not alleged to have engaged in any wrongdoing in connection with the deaths of Yaron and Efrat Ungar or otherwise.  Rather, Orascom is being pursued only as a garnishee alleged to owe assets "nominally titled" to the Palestine Investment Fund ("PIF") — but

allegedly belonging to the Palestinian Authority ("PA"), Plaintiffs' judgment debtor — in connection with an overseas 2005 share-buyback transaction. The Complaint seeks an order requiring Orascom to turn over those assets to the *Ungar* Plaintiffs pursuant to N.Y. C.P.L.R. § 5227.

Over the course of the past two years, Orascom has faced multiple, parallel garnishment proceedings virtually identical to this one in state and federal court in New York arising from judgments obtained against the PA under the Anti-Terrorism Act ("ATA"), 18 U.S.C. §§ 2333, 2338, by two sets of plaintiffs represented by the same counsel (hereafter the "*Ungar* Plaintiffs" and the "*Knox* Plaintiffs"). *See Estate of Ungar v. Palestinian Authority*, 325 F. Supp. 2d 15 (D.R.I. 2004), *aff'd Ungar v. Palestine Liberation Organization*, 402 F.3d 274 (1st Cir. 2005), *cert. denied sub. nom.*, 126 S.Ct. 715 (2005) ("*Ungar* Judgment"); *Knox v. Palestine Liberation Organization*, 442 F. Supp. 2d 62 (S.D.N.Y. 2006) ("*Knox* Judgment"). The key issue in each of these multiple proceedings is whether the court may exercise personal jurisdiction over Orascom. Now that jurisdictional discovery is complete and the *Ungar* Plaintiffs have elected to pursue Orascom exclusively in this federal action, the issue of personal jurisdiction is squarely before this Court and this motion should be litigated to final disposition.

### A.    The *Ungar* State And Federal Enforcement Proceedings

#### 1.    June 2005:  The *Ungar* Plaintiffs File New York State Court Enforcement Proceedings Against Orascom

Two years ago, in June 2005, the *Ungar* Plaintiffs commenced judgment-enforcement proceedings in New York State court in New York County against Orascom through several enforcement devices — a restraining notice pursuant to N.Y. C.P.L.R. § 5222, a turnover petition pursuant to N.Y. C.P.L.R. §§ 5225 and 5227, and a sheriff's levy and execution. *See Estate of Ungar v. Palestinian Auth.*, No. 105521/05 (N.Y. Sup. Ct.) (restraining notice); *Estate of Ungar*

*v. Orascom Telecom Holding S.A.E.*, Index No. 108090/05 (N.Y. Sup. Ct.) (turnover petition). The *Ungar* Plaintiffs' state court turnover petition against Orascom alleged that Orascom owed property or debt to the PIF and the Palestine Pension Fund for the State Administrative Employees ("PPF"). Plaintiffs claimed these funds are "aliases" or "shell funds" of Plaintiffs' judgment debtor, the PA. To support their allegations, Plaintiffs appended to their turnover petition Orascom press releases that described an overseas share-buyback transaction between Orascom and the PIF. *See* Pls.' Turnover Pet. Pursuant to N.Y. C.P.L.R. §§ 5225, 5227, *Estate of Ungar v. Orascom Telecom Holding S.A.E.*, Index No. 108090/05 (N.Y. Sup. Ct. June 9, 2005) (appending Orascom Press Releases) (excerpt attached hereto as Erb Decl. Attach. A). Orascom promptly moved to dismiss or vacate Plaintiffs' various state court enforcement devices on the principal ground that the court lacked personal jurisdiction over Orascom.

 2.  **June – August 2005:  The *Ungar* Plaintiffs Issue Federal Discovery To Orascom And Its Representatives**

Simultaneous with the filing of their state court enforcement proceedings against Orascom, in June 2005 the *Ungar* Plaintiffs issued federal subpoenas directed to Orascom and its board member Khaled Bichara under this Court's miscellaneous docket in *Estate of Ungar v. Palestinian Authority*, 18 MS 0302 (S.D.N.Y.) (hereafter "Miscellaneous Action" or "Miscellaneous Docket"). This Court quashed those subpoenas because Mr. Bichara was immune from service of process. *See Estate of Ungar v. Palestinian Auth.*, 396 F. Supp. 2d 376 (S.D.N.Y. 2005). In August 2005, the *Ungar* Plaintiffs directed identical subpoenas to Orascom and its representatives Hatim El Gammal and Zouhair Khaliq in their official and personal capacities. Orascom promptly moved to quash those subpoenas for lack of personal jurisdiction, among other grounds.

3

### 3. September 2005: The *Ungar* Plaintiffs File A Duplicative Federal Turnover Action Against Orascom

In September 2005, the *Ungar* Plaintiffs filed a duplicative federal turnover action in this Court that was virtually identical to the pending *Ungar* New York State court turnover proceeding. *See Estate of Ungar v. Orascom Telecom Holding S.A.E.*, 05-CV-7765 (S.D.N.Y.) (*Ungar I*). The *Ungar* Plaintiffs filed this civil action despite being well aware of the underlying complaint's infirmities with respect to subject-matter jurisdiction. *See* Hr'g Tr. 23, Sept. 13, 2005 (explaining that Plaintiffs brought the turnover proceeding in New York State court because "the law seems clear to us in the Second Circuit that there is no subject matter jurisdiction to bring [an alter-ego] claim here" in federal court).

### 4. November 2005: This Court Rules That It Lacks Personal Jurisdiction Over Orascom

After extensive briefing and a hearing on the *Ungar* Plaintiffs' discovery issued under the Miscellaneous Docket, in November 2005, this Court held that it lacked personal jurisdiction over Orascom, ruling that only New York contacts were relevant to its jurisdictional analysis and concluding that the *Ungar* Plaintiffs had not met their prima facie burden of establishing personal jurisdiction over Orascom or that personal-jurisdictional discovery was warranted. *See Estate of Ungar*, 400 F. Supp. 2d at 548 (rejecting Plaintiffs' argument that the Court may consider jurisdictional "contacts with the United States as a whole, rather than with the forum state"); *id.* at 549-52 (holding that five categories of jurisdictional contacts alleged by Plaintiffs were individually and collectively insufficient to establish a prima facie showing of personal jurisdiction); *id.* at 549 (recognizing that if the judgment creditors "cannot make out a prima facie case for personal jurisdiction, they cannot take any discovery — even jurisdictional discovery — from a foreign corporation") (citing *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185-86 (2d Cir. 1998)).

5.    **November 2005 – March 2007:    The *Ungar* Plaintiffs Obtain Discovery From Orascom Representatives In Their Individual Capacities And Stay Their State And Federal Turnover Proceedings**

Although concluding that it lacked personal jurisdiction over Orascom, this Court in its November 2005 Decision permitted discovery relating to Orascom's jurisdictional contacts from Orascom representatives Messrs. El Gammal and Khaliq in their individual capacities.  *See id.* at 553-54.  In January 2006, Magistrate Judge Lisa Margaret Smith permitted individual-capacity discovery from Orascom's Chairman and CEO, Naguib Sawiris, a United States citizen, pursuant to the Walsh Act, 28 U.S.C. § 1783, which permits a federal court to issue a subpoena to a United States citizen residing abroad.  *See Estate of Ungar v. Palestinian Auth.*, 412 F. Supp. 2d 328 (S.D.N.Y. 2006).

The Court subsequently ruled that Messrs. El Gammal and Khaliq could not be compelled to sit for depositions under the 100-mile rule of Rule 45 of the Federal Rules of Civil Procedure, and ordered them to provide responses to information subpoenas instead.  *See Estate of Ungar v. Palestinian Auth.*, 451 F. Supp. 2d 607 (S.D.N.Y. 2006).  In December 2006, Messrs. El Gammal and Khaliq duly complied with their discovery obligations and submitted their responses to the information subpoenas.  Mr. Sawiris duly complied with his discovery obligations by sitting for his deposition via video-conference on March 15, 2007 and producing documents held in his personal capacity, including shareholder documents, beforehand.

In light of their ongoing personal-jurisdictional discovery in the Miscellaneous Docket in federal court, in January 2006, Plaintiffs sought and obtained a stay of briefing on personal jurisdiction in their New York State court proceedings pending completion of their federal discovery.  Notwithstanding this stay, the New York State court permitted Orascom to move to dismiss on **non**-jurisdictional grounds, which resulted in an order vacating the *Ungar* sheriff's levy and execution.  *See* Order, *Estate of Ungar v. Orascom Telecom Holding S.A.E.*, Index. No.

5

108090/05 (N.Y. Sup. Ct. Aug. 15, 2006) (vacating sheriff's levy and execution issued to Orascom because "[t]he attachment here targets no property located in New York, but rather was issued in anticipation of finding some property belonging to the respondent") (appeal pending) (attached hereto as Erb Decl. Attach. B).

In March 2006, the *Ungar* Plaintiffs also obtained a stay of the *Ungar I* proceedings in this Court likewise pending completion of their personal-jurisdictional discovery underway in the *Ungar* Miscellaneous Action.  *See* Endorsed Memorandum, *Estate of Ungar v. Orascom Telecom Holding S.A.E.*, 05-CV-7765 (S.D.N.Y. Mar. 3, 2006).

Subsequently, on February 8, 2007, the New York State court authorized the *Ungar* Plaintiffs to take individual-capacity discovery from Orascom representatives Rodolphe Aldo Mario Mareuse and Emad Farid in their state court enforcement proceedings.  *See* Order, *Estate of Ungar v. Palestinian Auth.*, Index No. 105521/05 (N.Y. Sup. Ct. Feb. 8, 2007).  Messrs. Farid and Mareuse duly complied with their discovery obligations by sitting for their depositions on March 13 and 14, 2007, respectively, via video-conference from Orascom's headquarters in Cairo, and by producing documents held in their individual capacities — including as shareholders — in advance of the depositions.

> **6.    March – May 2007:  Upon Completion Of Discovery, The *Ungar* Plaintiffs File The Instant Federal Action And Voluntarily Dismiss Their State And Federal Turnover Proceedings**

Within two weeks of concluding their personal-jurisdictional discovery of Orascom representatives on March 15, 2007, the *Ungar* Plaintiffs filed the instant federal action on March 28, 2007.  The *Ungar* Plaintiffs then voluntarily dismissed their state and federal turnover proceedings against Orascom in favor of the instant federal action (*Ungar II*).

On April 11, 2007, by letter to all counsel, this Court dismissed *Ungar I* as to Orascom. On May 17, the New York State court issued an order discontinuing the state court turnover

proceedings. *See* Order, *Estate of Ungar v. Orascom Telecom Holding S.A.E.*, Index. No. 108090/05 (N.Y. Sup. Ct. May 17, 2007) (attached hereto as Erb Decl. Attach. C). Further, on May 3, 2007, the state court restraining notice directed to Orascom in June 2005 expired pursuant to an order of the New York State court made on the record on February 8, 2007. The *Ungar* Plaintiffs no longer have any restraint in place as to Orascom.

B.    **The Related *Knox* Proceedings**

After the *Ungar* proceedings were well underway in state and federal court, the *Knox* Plaintiffs, who share the same counsel with the *Ungar* Plaintiffs, filed a federal turnover action against Orascom in this Court, seeking turnover of the very same assets under the very same theories at issue in the *Ungar* federal and state turnover proceedings. *See Knox v. Orascom Telecom Holding S.A.E.*, 06 Civ. 6824 (S.D.N.Y.) (VM). The *Knox* Plaintiffs also filed New York State court proceedings against Orascom in Kings County, which remain pending. *See Knox v. Orascom Telecom Holding S.A.E.*, Index No. 3631/07 (N.Y. Sup. Ct.). Notably, counsel for the *Knox* Plaintiffs leveraged the then-extant *Ungar* state court restraining notice to issue federal and state court restraining notices on behalf of the *Knox* Plaintiffs, thereby improperly extending to their advantage the time period during which Orascom was restrained.

In the *Knox* federal action, Judge Victor Marrero stayed personal-jurisdictional discovery pending completion of the then-ongoing *Ungar* federal discovery (*see* Order, *Knox v. Orascom Telecom Holding S.A.E.*, 06 Civ. 6824 at 2-3 (S.D.N.Y. Nov. 7, 2006)), but ultimately dismissed the complaint for lack of subject-matter jurisdiction, *see Knox v. Orascom Telecom Holding S.A.E.*, 477 F. Supp. 2d 642 (S.D.N.Y. 2007) (appeal pending) (holding ancillary jurisdiction lacking because complaint raised alter-ego claims that require an independent basis of federal jurisdiction); *see also* Decision and Order, *Knox v. Orascom Telecom Holding S.A.E.*, 06 Civ.

6824, 2007 WL 1225545 (S.D.N.Y. Apr. 19, 2007) (appeal pending) (denying *Knox* Plaintiffs' motion for reconsideration).

*     *     *

In the interest of finality and to bring these protracted proceedings to a close, Orascom hereby waives service of process of the Summons and Complaint in *Ungar II* and moves to dismiss the Complaint in its entirety with prejudice.

## ARGUMENT

## I.     THE COURT LACKS PERSONAL JURISDICTION OVER ORASCOM

Notwithstanding this Court's November 2005 decision that it lacked personal jurisdiction over Orascom and could not subject Orascom to personal-jurisdictional discovery, the *Ungar* Plaintiffs have effectively obtained jurisdictional discovery of Orascom — depositions from three Orascom representatives, including its Chairman and CEO; responses to information subpoenas from two other Orascom representatives; and thousands of pages of shareholder documents.  Rather than yielding any new, jurisdictionally significant contacts with New York, however, the *Ungar* Plaintiffs' recent discovery efforts have merely gathered more details about contacts that this Court has already found jurisdictionally insufficient.  *See Estate of Ungar*, 400 F. Supp. 2d at 549-52 (holding five categories of alleged New York contacts insufficient to establish a prima facie case of general jurisdiction pursuant to  N.Y. C.P.L.R. § 301 and the due process clause of the U.S. Constitution); *see also id.* at 549 (recognizing that if the judgment creditors "cannot make out a prima facie case for personal jurisdiction, they cannot take any discovery — even jurisdictional discovery — from a foreign corporation") (citing *Jazini*, 148 F.3d at 186).

Whether this Court applies the prima facie standard or the preponderance standard, the *Ungar* Plaintiffs have failed to demonstrate that this Court has personal jurisdiction over

Orascom under N.Y. C.P.L.R. § 301. *See Landoil Resources Corp. v. Alexander & Alexander Svcs., Inc.*, 918 F.2d 1039, 1043 (2d Cir. 1991) ("Since the district court allowed the parties to conduct discovery on the jurisdictional issue, Alexander & Alexander bears the burden of proving by a preponderance of the evidence that personal jurisdiction exists.") (citing *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984)); *Metropolitan Life Ins. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996) (holding that after discovery but in the absence of an evidentiary hearing, the plaintiff must make a prima facie showing of personal jurisdiction). Thus, the Complaint should be dismissed in its entirety with prejudice.

### A. Plaintiffs Have Failed to Establish That Orascom Is "Doing Business" In New York Under § 301's "Simple Pragmatic" Test

Under N.Y. C.P.L.R. § 301, general personal jurisdiction exists over a foreign corporation if it is "engaged in such a continuous and systematic course of 'doing business' here as to warrant a finding of its 'presence' in this jurisdiction." *Landoil Res. Corp.*, 918 F.2d at 1043; *accord Jazini*, 148 F.3d at 184. The "doing business" element requires "presen[ce] in New York not occasionally or casually, but with a fair measure of permanence and continuity." *Landoil Res. Corp.*, 918 F.2d at 1043. Thus, the "'doing business' standard is not satisfied by the occasional contact or simple collateral activity which is included," but instead "relate[s] to the ordinary business the corporation was organized to do." *In re Ski Train Fire*, No. 1428, 01 Civ. 7342, 2003 WL 1807148, at *2 (S.D.N.Y. Apr. 4, 2003). This standard is a "stringent one because a corporation which is amenable to the Court's general jurisdiction may be sued in New York on causes of action wholly unrelated to acts done in New York." *Id.* at *2. Furthermore, under this standard, the Court "analyzes a defendant's connections to the forum state ***not for the***

*sake of contact-counting*, but rather for whether such contacts show a continuous, permanent and substantial activity in New York." *Landoil Res. Corp.*, 918 F.2d at 1043 (emphasis added).

The "doing business" inquiry consists of a "simple pragmatic" test in which courts examine various "indicia of jurisdiction", including: "[1] the existence of an office in New York; [2] the solicitation of business in New York; [3] the presence of bank accounts or other property in New York; and [4] the presence of employees or agents in New York." *Landoil Res. Corp.*, 918 F.2d at 1043; *accord Hoffritz for Cutlery, Inc. v. Amajac, Ltd*, 763 F.2d 55, 57-58 (2d Cir. 1985). Jurisdiction will not be found if none of these factors is implicated. *See Hoffritz for Cutlery, Inc.*, 763 F.2d at 58 (discussing "the pragmatic test for section 301 jurisdiction" as being focused on several factors). The deposition testimony from several Orascom representatives and the accompanying Declaration of Amr Esmat Abaza dated August 3, 2005 establish that this Court lacks personal jurisdiction over Orascom because none of these factors has been satisfied.

This Court has already held that the relevant jurisdictional nexus is with the State of New York, not the United States as a whole. *See Estate of Ungar*, 400 F. Supp. 2d at 548 (rejecting Plaintiffs' argument that the Court may consider jurisdictional "contacts with the United States as a whole, rather than with the forum state"). Orascom, a mobile telecommunications company organized under the laws of Egypt and having its principal place of business in Egypt, operates in emerging markets in the Middle East, Africa, and South Asia. Compl. ¶ 12; Abaza Decl. ¶ 2. Orascom does not maintain any offices in New York State (Abaza Decl. ¶ 3); it is not registered to do business in New York State (*id.* ¶ 3); it does not have any officers, employees, or authorized business agents in New York State (*id.* ¶ 4); it does not maintain any bank or brokerage accounts in New York State (*see* Sawiris Dep. 74:16-75:3, Mar. 15, 2007 (excerpts attached hereto as Erb Decl. Attach. D); Mareuse Dep. 165:16-23, Mar. 14, 2007 (excerpts

attached hereto as Erb Decl. Attach. E); *see also* Abaza Decl. ¶ 6); it does not hold any real or intellectual property or any other assets in New York State (*see* Sawiris Dep. 75:4-10; Mareuse Dep. 165:5-166:4; Farid Dep. 76:3-11, Mar. 13, 2007 (excerpts attached hereto as Erb Decl. Attach. F); *see also* Abaza Decl. ¶¶ 6, 8). Further, Orascom securities are not listed or traded on any stock exchange in the United States. *See* Mareuse Dep. 25:2-12; *see also* Abaza Decl. ¶ 9.

Because none of the traditional jurisdictional indicia is present, the Complaint should be dismissed for lack of personal jurisdiction. *See, e.g.*, *Hoffritz for Cutlery, Inc.*, 763 F.2d at 58 (holding that "a showing of jurisdiction under section 301 has not been made" when "[n]one of the elements [of the pragmatic test] are present"); *Nordic Bank PLC v. Trend Group, Ltd.*, 619 F. Supp. 542, 566 (S.D.N.Y. 1985) (in dismissing for lack of personal jurisdiction, holding that "[a]s in *Helicopteros*, [the corporate defendants] lack the traditional indicia of doing business in New York").

**B.    Plaintiffs Have Failed To Raise Any Other Jurisdictionally Sufficient Contacts**

The discovery Plaintiffs obtained from Orascom representatives does not change the fact that Orascom's activities in New York are insufficient to confer personal jurisdiction over Orascom. *See Estate of Ungar*, 400 F. Supp. 2d at 549-52.

**1.    This Court Has Already Concluded That New York Financial Services Contacts Are Jurisdictionally Insufficient**

As this Court has already held, Orascom's entry into an agreement with the Bank of New York to permit the private placement of Orascom securities does not support general personal jurisdiction. *See Estate of Ungar*, 400 F. Supp. 2d at 550 (in analyzing Plaintiffs' allegation related to Orascom's participation in an American Depository Receipts ("ADR") program in New York, recognizing that "[i]t has previously been held that having securities listed on a New York exchange, or transacting in private placements of commercial paper when such placements

11

are made only to a limited group of buyers, is insufficient to confer general jurisdiction over the seller") (citing *Nordic Bank PLC*, 619 F. Supp. at 565-67). *See also Klonis v. National Bank of Greece, S.A.*, 05 Civ. 9289, 2007 WL 959257, at *6 (S.D.N.Y. Mar. 28, 2007) (holding American Depository Receipts traded on the NYSE, attorneys in New York, and a depository account in connection with its listing insufficient to establish jurisdiction); *Pieczenik v. Cambridge Antibody Technology Group*, No. 03 Civ. 6336, 2004 WL 527045, at *6 (S.D.N.Y. Mar. 16, 2004) (holding that defendant's "designation of the Bank of New York as a depository for its ADRs cannot support a finding of general jurisdiction under New York law"); *Robbins v. Ring*, 9 Misc. 2d 44, 45, 166 N.Y.S. 2d 483, 484-85 (N.Y. Sup. Ct. 1957) (holding that the fact that Canadian corporation was listed on the American Stock Exchange, had a stock transfer agent in New York, and successfully negotiated the private placement or sale of certain convertible notes was an insufficient basis for personal jurisdiction because otherwise "almost every corporation would be subject to the jurisdiction of New York").

Rather than being involved in an American Depository Receipt ("ADR") program, Orascom is actually involved in a ***Global*** Depository Receipt ("GDR") program. *See* Farid Dep. 54:9-18; Mareuse Dep. 26:12-15; Sawiris Dep. 43:25-44:22. A GDR program is an even more attenuated contact for purposes of jurisdiction; while ADRs are available only to U.S. investors, GDRs are generally available in one or more markets outside the foreign company's home country, and are not limited to U.S. investors. *See* Bank of New York, DR Basics and Benefits, *available at* http://www.bnyadr.com/dr_edu_basics_and_benefits.jsp.

Orascom's GDRs are traded on the London Stock Exchange — ***not*** in the United States. *See* Mareuse Dep. 25:8-12; Abaza Decl. ¶ 9. In addition, the analysts and researchers who follow Orascom's GDRs are all based in London. *See* Mareuse Dep. 136:5-11. Furthermore, the

attendance of Orascom personnel at trainings sponsored by the Bank of New York in connection with the GDR program also are jurisdictionally insufficient.  *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 418, 104 S.Ct. 1868, 1874 (1984) (presence of employees to attend training sessions insufficient for purposes of general jurisdiction); *Grendene, S.A. v. Brazam Int'l Trading Corp.*, No. 83 Civ. 0782, 1986 WL 10709, at *4 (S.D.N.Y. Sept. 24, 1986) (in holding that "occasional trips to New York" by Brazilian corporation's owner are jurisdictionally insufficient, recognizing that "[v]isits on business, even if occurring at regular intervals, would not warrant the inference that the corporation was present in the jurisdiction").

Likewise, quarterly and annual conference calls with investors and research analysts from all over the world, including New York to present and comment upon Orascom's financial results, to update shareholders on recent events at Orascom,  and to answer investors' questions (*see* Mareuse Dep. 136:20-137:16; Farid Dep. 69:19-71:10; Sawiris Dep. 60:10-22) are jurisdictionally insufficient.  *See Beatie and Osborn LLP v. Patriot Scientific Corp.*, 431 F. Supp. 2d 367, 388 (S.D.N.Y. 2006) ("telephone calls and correspondence sent into New York" held jurisdictionally insufficient).

On a related point, this Court also has already held that "solicit[ing] investment at various conferences held within New York State" does not constitute "doing business" for purposes of § 301.  *Estate of Ungar*, 400 F. Supp. 2d at 550.  Investor road shows are standard practice for non-U.S. companies having international investors.  For the most part, the road shows in which Orascom participates are "non-deal" road shows, which are solely designed to meet with existing investors and provide them with updates regarding Orascom's performance (including its financial and competitive position) and forecasts.  *See* Farid Dep. 34:22-35:9; Mareuse Dep. 56:6-15; 57:8-24; Sawiris Dep. 56:20-57:18.

Only one road show, which took place in late January-early February 2007, was characterized as a "deal" road show because it involved an international bond offering of $750 million. *See* Farid Dep. 35:10-36:10; Mareuse Dep. 59:6-23; 119:10-131:21; Sawiris Dep. 60:23-62:14; 67:13-70:2. The bond offering was only available to qualified institutional buyers ("QIBs"), organizations that are in the business of buying and selling securities. *See* Mareuse Dep. 119:13-25. The bond was not listed with any exchanges in the United States. *See* Mareuse Dep. 125:22-25. The road show related to the bond offering was international in scope, involving stops in Geneva, Zurich, London, New York, and Boston. *See* Mareuse Dep. 121:9-15. For the bond offering, Orascom relied exclusively on investment bankers and lawyers in London. *See* Mareuse Dep. 123:25-124:3; 125:8-10.

Orascom's involvement in the bond offering and related international road show with a stop in New York is not jurisdictionally sufficient. *See In re Ski Train Fire*, 2003 WL 1807148, at \*4 (holding that "sporadic financial transactions — and the activities in support thereof — do not constitute 'doing business' in New York"); *Clarke v. Fonix Corp.*, No. 98 Civ. 6116, 1999 WL 105031, at \*5 (S.D.N.Y. Mar. 1, 1999), *aff'd*, 199 F.3d 1321 (2d Cir. 1999) ("Raising financing is not a form of 'doing business' for the purpose of § 301; if it were, then almost every company in the country would be subject to New York's jurisdiction."); *Daniel v. American Bd. of Emergency Medicine*, 988 F. Supp. 127, 223-24 (W.D.N.Y. 1997) (holding that issuance of bonds through New York financial markets to raise capital is jurisdictionally insufficient under § 301); *id.* ("As with most businesses, borrowing money for capital or operating purposes is an activity incidental to the hospital Defendants' primary business, thus, the Defendants' issuance of bonds to obtain capital, and visits by each Defendant to help consummate the bond sales do not amount to the continuous business necessary to support jurisdiction under Section 301");

*Nordic Bank PLC*, 619 F. Supp. at 566 (holding that commercial paper sales are jurisdictionally insufficient even though "the sale of commercial paper is an essential aspect of the Nordic defendants' business"); *Robbins*, 9 Misc. 2d at 45-46, 166 N.Y.S. 2d at 485 (holding that Canadian corporation's sale or placement of $3,000,000 of its convertible notes in New York does not constitute "doing business").

The value of the bond offering also is irrelevant for purposes of the jurisdictional analysis. *See In re Ski Train Fire*, 2003 WL 1807148, at *4 n.11 (holding that "the value of, and profits derived from investment capital does not bring a foreign company within the purview of section 301") (citing *Nordic Bank*, 619 F. Supp. at 565-66). Even if New York banks and law firms (rather than their London offices) had played a significant role in the bond offering, that would not render such a contact sufficient for purposes of general jurisdiction. *See id.* at *5 (holding "the retention of advisors or counsel in New York to assist with [financing] transactions" insufficient for purposes of general jurisdiction) (citing cases). Furthermore, the international dimension of the bond offering also deprives this contact of any jurisdictional significance. *See Landoil Res. Corp.*, 918 F.2d at 1046 (recognizing that the "transactions must be considered not in isolation, but against the background of multinational entities doing a much larger business of which these transactions were but a small part").

Finally, even assuming that Orascom had acquired credit from New York commercial banks, this Court has already held such contacts to be insufficient to confer personal jurisdiction. *See Estate of Ungar*, 400 F. Supp. 2d at 550 (holding that a $200 million syndicated loan from Chase and Citigroup does not constitute "continuous, permanent, and substantial" activity sufficient to confer general jurisdiction); *see also Freeplay Music, Inc. v. Cox Radio, Inc.*, No. 04 Civ. 5238, 2005 WL 1500896, at *4 (S.D.N.Y. June 23, 2005) (holding that "Freeplay's

allegation regarding Beasley's credit facility is insufficient to support a finding of general jurisdiction"); *Mende v. Milestone Tech., Inc.*, 269 F. Supp. 2d 246, 254 (S.D.N.Y. 2003) ("Raising financing is not a form of 'doing business' for the purpose of § 301; if it were, then almost every company in the country would be subject to New York's jurisdiction."); *In re Ski Train Fire*, 2003 WL 1807148, at *4 (holding that "a long line of cases establishes that a foreign defendant is not 'present' in New York for the purposes of jurisdiction simply because it has engaged in financing transactions here") (citing cases); *Crucible Ventures, Inc. v. Futuresat Ind.*, No. 88 Civ. 4251, 1990 WL 16140, at *2 (S.D.N.Y. Feb. 15, 1990) (holding that "approximately twenty-five [meetings] between 1984 and 1986 to negotiate and consummate various loans" insufficient under § 301; "[a]s with most businesses . . . we presume that the borrowing of money is an activity incidental to Futuresat's primary business").

### 2. This Court Has Already Held That Attendance At Meetings Is Jurisdictionally Insufficient

Mr. Sawiris attends an annual International Advisory Committee meeting at the New York Stock Exchange ("NYSE"). *See* Sawiris Dep. 30:12-22, 31:17-32:2. The Committee's purpose is to advise the NYSE Board of Directors, *inter alia*, on the internationalization of capital markets, facilitating trading by non-U.S. residents in U.S. securities, and enhancing communications between the NYSE and the international corporate community. *See* NYSE, Charter, Advisory Committees to the Board of Directors at 2 (Dec. 7, 2006), *available at* http://www.nyse.com/pdfs/ACCHARTER2007.pdf. International Advisory Committee participants are chosen based on their professional knowledge of international capital markets (*id.*), and their expertise in the relevant region. *See* Sawiris Dep. 33:11-22. As such, Mr. Sawiris attends the annual Committee meeting in his personal capacity to provide advice on the status of the economy and financial markets in the Middle East. *Id.* 32:16-24.

Mr. Sawiris's annual attendance at the NYSE International Advisory Committee meeting is akin to his participation at the Worldwide Wireless Conference, a contact that this Court has already found to be jurisdictionally insufficient. *See Estate of Ungar*, 400 F. Supp. 2d at 550 (holding that isolated meetings and attendance at business conferences do not constitute "doing business" for purposes of general personal jurisdiction); *see also Grendene, S.A.*, 1986 WL 10709, at *4 (holding that "occasional trips to New York" by Brazilian corporation's owner jurisdictionally insufficient).

*    *    *

In sum, Orascom's sporadic and collateral financing activities in New York do not constitute "doing business" for purposes of general jurisdiction under § 301. *See Landoil Res. Corp.*, 77 N.Y.2d at 34 (holding that the court lacked personal jurisdiction because insurance underwriter located in London "did not directly or purposefully solicit, sell or promote its underwriting activity in New York"). If such contacts were jurisdictionally sufficient, most foreign corporations would be subject to jurisdictional discovery or jurisdiction in New York. *See Clarke*, 1999 WL 105031, at *5 (if raising financing were sufficient for purposes of general jurisdiction, "then almost every company in the country would be subject to New York's jurisdiction"); *Robbins*, 9 Misc. 2d at 45, 166 N.Y.S.2d at 485 (holding that "defendant clearly does not operate here by its own employees nor in its own offices, and financial arrangements, isolated and alone are not sufficient to subject [defendant Canadian corporation] to our jurisdiction")

Furthermore, as this Court has already recognized (*see Estate of Ungar*, 400 F. Supp. 2d at 552, 554), because Plaintiffs have failed to make their prima facie showing of personal jurisdiction over Orascom, they are not entitled to jurisdictional discovery. *See Jazini*, 148 F.3d

17

at 185-86 ("Since the Jazinis did not establish a prima facie case that the district court had jurisdiction over Nissan Japan, the district court did not err in denying discovery on that issue."); *see also id.* ("The rules governing establishment of jurisdiction over . . . a foreign corporation are clear and settled, and it would be inappropriate for us to deviate from them or to create an exception to them because of the problems plaintiffs may have in meeting their somewhat strict standards."); *accord In re Ski Train Fire*, 2003 WL 1807148, at *6.

## II.    THE COURT LACKS SUBJECT-MATTER JURISDICTION

This Court has already rejected the *Ungar* Plaintiffs' purported basis for subject-matter jurisdiction in the virtually identical *Knox* federal turnover action.  *See Knox*, 477 F. Supp. 2d 642.  Relying on the U.S. Supreme Court's decision in *Peacock v. Thomas*, 516 U.S. 349, 116 S. Ct. 862 (1996), Judge Marrero held that this Court lacks ancillary jurisdiction because that action raised alter-ego or veil-piercing claims that were not before the judgment court and thus required an independent basis for federal question jurisdiction.  *See Knox*, 477 F. Supp. 2d at 647 ("As Orascom correctly points out, once the Court is required to engage in a veil-piercing or alter ego analysis as to this question, an independent basis for jurisdiction is required") (citing *Epperson v. Entm't Express, Inc.*, 242 F.3d 100, 106 (2d Cir. 2001) (analyzing *Peacock*)).

In *Peacock*, the plaintiff prevailed in an ERISA claim against his employer, a corporation, in district court, and then sought to rely on the ERISA statute as the basis for ancillary jurisdiction in a second suit seeking to pierce the corporate veil between the corporation and its officer and shareholder.  The Supreme Court concluded, however, that the plaintiff's "veil-piercing claim does not state a cause of action under ERISA and cannot independently support federal jurisdiction."  *Peacock*, 516 U.S. at 353-54, 116 S. Ct. at 866.  The plaintiff's attempt to extend liability for payment of the ERISA judgment from the corporation to its officer and shareholder under a veil-piercing theory did not fall within the district court's ancillary

enforcement jurisdiction because "[o]ther than the existence of the ERISA judgment itself, the suit had little connection to the ERISA case." *Id.* 516 U.S. at 359, 116 S. Ct. at 869.

Likewise here, Plaintiffs pursue this action against Orascom on theories that did not exist at the time of the entry of the ATA judgment against the PA. Specifically, Plaintiffs seek an order compelling Orascom to turn over to Plaintiffs the assets Orascom owes to the PIF in order to satisfy Plaintiffs' judgment against the PA under a theory that the assets at issue are only "nominally titled" to the PIF (Compl. ¶¶ 28, 30).

Such alter-ego allegations do not state a claim under the ATA and, therefore, cannot independently support federal question jurisdiction. *See Peacock*, 516 U.S. at 353-54, 116 S. Ct. at 866. Thus, the instant turnover action against Orascom is not "ancillary to the judgment in the former suit," but rather is "entirely new and original," and seeks "relief . . . of a different kind or on a different principle than that of the prior decree." *Id.* at 516 U.S. at 358, 116 S. Ct. at 868 (internal quotations and citations omitted); *see also id.* at 516 U.S. at 357, 116 S. Ct. at 868 ("We have never authorized the exercise of ancillary jurisdiction in a subsequent lawsuit to impose an obligation to pay an existing federal judgment on a person not already liable for that judgment."); *Epperson*, 242 F.3d at 104 (recognizing that "an action to establish liability on the part of a third party . . . must have its own source of federal jurisdiction"); *Manway Constr. Co. v. Housing Auth.*, 711 F.2d 501, 505 (2d Cir. 1983) ("Even at the farthest reaches of ancillary jurisdiction, we have not allowed district courts to consider claims so distinct as here from the underlying basis for federal jurisdiction."); *accord Williams v. Pfeffer*, 117 F. Supp. 2d 331, 335 (S.D.N.Y. 2000); *Nat'l Westminster Bank U.S.A. v. Cheng*, 751 F. Supp. 1158, 1160 (S.D.N.Y. 1990).

In a transparent attempt to avoid the veil-piercing and alter-ego allegations inherent in their Complaint, the *Ungar* Plaintiffs state in conclusory fashion that they "do not and will not

seek in this action to establish that the PIF is an alter ego of the PA" (Compl. ¶ 36), and that they "do not and will not seek in this action to pierce the PIF's corporate veil" (*id.* ¶ 37). Such conclusory statements are unavailing because the Complaint necessarily calls upon this Court to disregard the PIF's corporate form and order Orascom to turn over the PIF's assets in its possession to the *Ungar* Plaintiffs to satisfy their judgment against the PA. *See id.* ¶¶ 28 ("Orascom's Debt is nominally titled to the Palestine Investment Fund ("PIF")"); ¶ 30 (same). Plaintiffs' allegations that the PA's assets are only "nominally titled" to the PIF is equivalent to alleging that the PIF is an alter-ego of the PA because such an allegation asks the Court to disregard the PIF's corporate form. *See, e.g.*, *In re R.H.N. Realty Corp.*, 84 B.R. 356, 357-59 (Bankr. S.D.N.Y. 1988) (treating allegation that debtor corporation was to "hold nominal legal title in the property" as allegation of an alter-ego relationship with partnership).

In denying the *Knox* Plaintiffs' motion for reconsideration of this issue, Judge Marrero recognized that Plaintiffs' contention that Orascom's debt is "nominally titled" to the PIF requires "a finding by the Court that the PIF is an alter ego of the PA," and expressly rejected Plaintiffs' semantic ploy to write the PIF out of the equation:

> While Plaintiffs artfully attempt to diminish the significance of PIF's role in this action by describing its entitlement to the amounts due from Orascom as **"nominal[ ],"** it is nevertheless an undisputed material allegation in Plaintiffs' complaint that the assets held and debts owed by Orascom at issue in the proceeding are in fact due to the PIF, not the PA. Indeed, in its memorandum in support of the instant motion, Plaintiffs again state that while the assets at issue are owned by the PA, they are **"nominally held or titled under the name of the PIF."** (Pls.' Memo at 10.) The Court cannot ignore the fact that the assets now sought by Plaintiffs are **"nominally"** due to the PIF and that Orascom owes the amounts at issue to the PIF — this is a material factual allegation.

*Knox v. Orascom Telecom Holding S.A.E.*, Civ. No. 06-6824, 2007 WL 1225545, at *2-*3 (S.D.N.Y. Apr. 19, 2007) (emphasis added); *see also Saudi Arabia v. Nelson*, 507 U.S. 349, 363, 113 S.Ct. 1471, 1480 (1993) (in dismissing action for lack of subject-matter jurisdiction under

the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1391, 1602-11, rejecting as a "semantic ploy" plaintiffs' attempt to recast a claim; it was inappropriate "to give jurisdictional significance to this feint of language . . . ."). Moreover, as this Court has recognized "a judgment may not be enforced against third parties' subsidiaries such as the PPF or PIF, absent strong evidence of corporate impropriety." *Estate of Ungar*, 400 F. Supp. at 548 (citing *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 61-62 (2d Cir. 2004)).

Accordingly, as Judge Marrero correctly concluded in the *Knox* federal action, Plaintiffs' Complaint should be dismissed for lack of subject-matter jurisdiction.

## III. THE COURT LACKS JURISDICTION OVER THE ASSETS AT ISSUE

This action should be dismissed on the independent ground that the assets at issue are located overseas and thus are beyond the territorial jurisdiction of this Court.

It is well-settled that "a New York Court cannot attach property not within its jurisdiction." *Koehler v. Bank of Bermuda*, No. M18-302, 2005 WL 551115, at *11 (S.D.N.Y. Mar. 9, 2005); *id.* at *8-9 (holding that a New York court lacks authority to garnish stock certificates in Bermuda); *Fidelity Partners, Inc. v. Philippine Export & Foreign Loan Guarantee Corp.*, 921 F. Supp. 1113, 1120 (S.D.N.Y. 1996) (holding that property sought to be levied against under a restraining notice and order of execution must "exist within the jurisdiction").

This territorial limitation on the Court's jurisdiction over a garnishee's property applies even if the Court has personal jurisdiction over the potential garnishee in question. *See, e.g.*, *Mones v. Commercial Bank of Kuwait, S.A.K.*, No. 18 Misc. 0302, 2005 WL 1653930, at *4 (S.D.N.Y. July 12, 2005) ("Even if the Court had jurisdiction over [financial intermediary] CBK, the Court lacked authority to order CBK to transfer assets from Kuwait into the Southern District of New York."), *vacated on other grounds*, 204 Fed. Appx. 988 (2d Cir. 2006); *Koehler*, 2005 WL 551115, at *12-13 (holding that even if the court had personal jurisdiction over garnishee,

neither N.Y. C.P.L.R. § 5225 nor § 5227 authorize the court to order garnishee to transfer property presently located in Bermuda to judgment creditor); *cf. Palestine Monetary Authority v. Strachman*, Index No. 107777/05, 2007 WL 1063867, at *6 (N.Y. Sup. Ct. Apr. 2, 2007) ("Nor may the court attach [PA] funds allegedly held by the [Palestine Monetary Authority ("PMA")] in the Palestinian territories, since those funds are not within this court's jurisdiction[,] . . . [and] [t]he fact that the court has obtained personal jurisdiction over PMA through PMA's commencement of the instant lawsuit does not change this result.").

Orascom does not hold any assets, let alone the assets at issue, in New York or elsewhere in the United States. *See* Sawiris Dep. 74:16-75:10; Mareuse Dep. 165:5-166:4; Farid Dep. 76:3-11; Order, *Estate of Ungar v. Orascom Telecom Holding S.A.E.*, Index. No. 108090/05 (N.Y. Sup. Ct. Aug. 15, 2006) (vacating sheriff's levy and execution issued to Orascom because "[t]he attachment here targets no property located in New York"); *see also* Abaza Decl. ¶ 8. Plaintiffs' Complaint does not allege otherwise. Indeed, even the press releases upon which Plaintiffs have relied to pursue Orascom as a potential garnishee provide that the alleged property at issue is located outside the United States. *See* Pls.' Turnover Pet. (appending 2005 Orascom Press Releases) (describing overseas transactions between Orascom and the PIF and PPF), *available at* http://www.otelecom.com/media/PressRelease.aspx .[1]

Furthermore, Plaintiffs cannot escape this result simply by characterizing the assets in question as a "debt." *See Fidelity Partners, Inc.*, 921 F. Supp. at 1118 (in denying plaintiff's motion for attachment and execution of assets located in the Philippines, recognizing that

---

[1] This Court may take judicial notice of Orascom's press releases. *See Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006) ("For purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and 'it is capable of accurate and ready determination.'") (quoting Fed.R.Evid. 201(b)).

plaintiff "cannot gain 'additional' rights merely be characterizing the same bank accounts as a 'debt' rather than as an 'asset'").

Thus, regardless of whether the Court has personal jurisdiction over Orascom, the Complaint should be dismissed for lack of jurisdiction over the alleged assets.

## IV.    THE COMPLAINT FAILS TO STATE A CLAIM FOR TURNOVER

In addition to the grounds for dismissal set forth above, Plaintiffs' turnover action should be dismissed because (i) the Complaint lacks any specific facts supporting the allegations that Orascom owes assets to the PA, and (ii) there is no evidence in the record that Plaintiffs have complied with § 5227's strict requirement for service of the turnover action upon the judgment debtors in this case.

### A.    The Complaint Only Contains Conclusory Allegations Regarding The Ownership Of The Assets At Issue

Under N.Y. C.P.L.R. § 5227, "a judgment creditor seeking to collect a *debt* that is owed to the judgment debtor must proceed against the person who owes the debt: the judgment debtor's debtor." *Alliance Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A.*, 190 F.3d 16, 21 (2d Cir. 1999) (emphasis in the original).  In the instant action, the Complaint alleges in conclusory fashion that Orascom owes assets to Plaintiffs' judgment debtor, the PA, because such assets are only "nominally titled" to the PIF.  Compl. ¶¶ 28, 30.  The Complaint, however, fails to allege any specific facts in support of this allegation.  Such conclusory allegations are insufficient to state a claim.  *See De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996) (holding that plaintiffs' allegations were insufficient to pierce the corporate veil because "the pleadings are devoid of *any* specific facts or circumstances supporting this assertion") (emphasis in the original).  Because Plaintiffs' Complaint relies on conclusory allegations, it "fails even the liberal standard of Rule 12(b)(6)." *Id.*

**B.    Plaintiffs Have Not Shown That The Complaint Was Served On The Judgment Debtors**

Plaintiffs' claim for turnover should be dismissed because Plaintiffs have not shown that the Complaint in this federal action was served on the judgment debtors, the PA and the PLO. Section 5227 of the N.Y. Civil Practice Law and Rules requires that "[n]otice of the proceeding *shall* also be served upon the judgment debtor."  N.Y. C.P.L.R. § 5227 (emphasis added); *Phoenician Trading Partners LP v. Iseson,* No. CV-04-2178, 2004 WL 3152394, at *4 (E.D.N.Y. Dec. 11, 2004) ("Because the proceeding divests the judgment debtor of any rights to the property in possession of the third party, due process requires proper notice of the turnover proceeding.").  Such notice must be served either "in the same manner as a summons or by registered or certified mail, return receipt requested."  N.Y. C.P.L.R. § 5227.

Here, there is no indication in the docket that Plaintiffs have complied with the requirement for service on the judgment debtors.  Failure to serve the judgment debtors is grounds for dismissal of the turnover claim.  *See Phoenician Trading Partners LP*, 2004 WL 3152394, at *4 (holding that "[t]o be entitled to judgment pursuant to § 5225 or § 5227, [the judgment creditor] must also have served . . . the judgment debtor . . . [with] notice [of] the proceeding[,] [and] [f]ailure to serve the judgment debtor renders the proceeding jurisdictionally defective") (citing *Oil City Petroleum Co. v. Fabac Realty Corp*., 70 A.D.2d 859, 859, 418 N.Y.S.2d 51 (N.Y. App. Div. 1979)); *Bergdorf Goodman, Inc. v. Marine Midland Bank*, 97 Misc. 2d 311, 313, 411 N.Y.S.2d 490, 491 (N.Y. Civ. Ct. 1978) (holding that "there must be strict compliance with the provisions for service upon the judgment debtor" and that "improper notice to the judgment debtor alone would be sufficient ground to dismiss the petition").

## <u>CONCLUSION</u>

For the foregoing reasons, the Complaint should be dismissed in its entirety with prejudice.

Dated: May 30, 2007                                   Respectfully submitted,

**WHITE & CASE** LLP

By: <u>/s/Christopher M. Curran</u>
Christopher M. Curran (CC-4779)
Nicole Erb (NE-7104)
701 Thirteenth Street, N.W.
Washington, D.C.  20005
Tel:  202-626-3600
Fax:  202-639-9355

*Counsel for*
*Orascom Telecom Holding S.A.E.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

The Estate of Yaron Ungar, et al.,

               *Plaintiffs-Judgment*
               *Creditors*,

        v.

Orascom Telecom Holding S.A.E.,

               *Defendant-Garnishee.*

Civ. Action No. 07 CV 2572

(CM) (LMS)

## DECLARATION OF NICOLE ERB

       I, Nicole Erb, an attorney at the law firm of White & Case LLP and a member of the bar

of this Court, declare that I attach true and correct copies of the following documents:

A.     Plaintiffs' Turnover Pet. Pursuant to N.Y. C.P.L.R. §§ 5225, 5227, *Estate of Ungar v. Orascom Telecom Holding S.A.E.*, Index No. 108090/05 (N.Y. Sup. Ct. June 9, 2005) (excerpt);

B.     Order, *Estate of Ungar v. Orascom Telecom Holding S.A.E.*, Index. No. 108090/05 (N.Y. Sup. Ct. Aug. 15, 2006);

C.     Order, *Estate of Ungar v. Orascom Telecom Holding S.A.E.*, Index. No. 108090/05 (N.Y. Sup. Ct. May 17, 2007);

D.     Deposition of Naguib Sawiris dated March 15, 2007 (excerpts);

E.     Deposition of Rodolphe Aldo Mario Mareuse dated March 14, 2007 (excerpts); and

F.     Deposition of Emad Farid dated March 13, 2007 (excerpts).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: May 30, 2007             /s/ Nicole Erb_____

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------X

In the matter of the Application of:

THE ESTATE OF YARON UNGAR by and through its
Administrator, DAVID STRACHMAN; DVIR UNGAR, a
minor, by his guardians and next friends, YISHAI
UNGAR, minor, by his guardians and next friends,
PROFESSOR MEIR UNGAR, JUDITH UNGAR,
individually and in their capacity as legal guardians of
Petitioners DVIR UNGAR and YISHAI UNGAR; RABBI
URI DASBERG, and JUDITH DASBERG, in their capacity
as legal guardians of Petitioners DVIR UNGAR and
YISHAI UNGAR; AMICHAI UNGAR; DAFNA UNGAR;
and MICHAL COHEN,

Petitioners,

For an order pursuant to CPLR §§5225 and 5227,

-against-

ORASCOM TELECOM HOLDING S.A.E (a/k/a
"Orascom Telecom" a/k/a "OTH")

Respondent.

------------------------------------------------------------------X

Index No: _105090_ / 05

**VERIFIED PETITION
PURSUANT TO CPLR 5225
AND 5227**

      PETITIONERS, complaining of the defendant, by their attorneys,
JAROSLAWICZ & JAROS, allege for their petition as follows:

**NATURE OF PROCEEDING AND RELIEF REQUESTED**

      1.      Petitioners hold a final judgment in excess of $116,000,000 against the
Palestinian Authority ("PA") and the Palestine Liberation Organization ("PLO") that was
entered by the United States District Court for the District of Rhode Island on July 13, 2004,

**b.    Respondent is Indebted to and Holds Assets of Judgment-Debtor PA**

25.    Upon information and belief, as of January 1, 2003, the PA made, held and owned the following direct investments in the Respondent (collectively hereinafter: "Direct Investments"):

a.    On December 10, 2002, the PA purchased 10 million shares of Respondent; and

b.    As of January 1, 2003, the PA held 2 million Global Depository Receipts ("GDR") shares of Respondent traded on the London stock exchange; and

c.    On an unknown date or dates prior to January 1, 2003, the PA transferred approximately $107,500,000.00 to Respondent as investment, in expectation of an increase in shareholder capital which did not take place.

26.    Upon information and belief, the Direct Investments have not been repaid or returned to the PA, and the Respondent continues to hold the Direct Investments and/or remains indebted to the PA for the amount of the Direct Investments.

27.    Upon information and belief, Orascom Telecom Algeria (a/k/a "Djezzy") (hereinafter: "OTA") and Orascom Telecom Tunisia (a/k/a "Tunisiana") (hereinafter: "OTT") are telecommunication companies.

28.    Upon information and belief Respondent owns a majority ownership interest in OTT and OTA.

29.    Some details about the transactions between Orascom and the PA / PLO are contained in Orascom's own press releases, annexed hereto as Exhibit A.

Respondent, including without limitation the Direct Investments as defined herein; and

(b)    All sums owed by Respondent to the PA, however titled, including without limitation all sums owed, due or payable as a consequence and result of, and/or as consideration for, the Respondent's Acquisition of the PA's OTA and OTT Stakes as defined herein; and

(ii)    Awarding Petitioners their costs, expenses, disbursements and attorney's fees in connection with this proceeding, together with such other and further relief that this Court deems just, proper and equitable.

Dated: New York, New York
      June 9, 2005

Yours,

JAROSLAWICZ & JAROS, ESQS.
*Attorneys for the plaintiff*

by:

Robert J. Tolchin,
Of counsel

150 William Street, 19th Floor
New York, New York 10038
(212) 227-2780

David Strachman, Esq.
MCINTYRE, TATE, LYNCH & HOLT, LLP
*Attorneys for the petitioners*
321 South Main Street, Suite 400
Providence, Rhode Island 02903
(401) 351-7700

# EXHIBIT A



# Orascom Telecom Announces
## Additional Acquisitions of Minority Stakes
## in Algerian and Tunisian Operations

**_Cairo, May 3, 2005:_** Orascom Telecom Holding S.A.E. ("OTH") announced today that it has finalized an additional acquisition of 2.45% and 5.5% indirect equity stakes in its Algerian and Tunisian subsidiaries, respectively.

The agreement was finalized between OTH and the Palestine Pension Fund for the State Administrative Employees ("PPF"), the selling minority shareholder in two of OTH's core GSM subsidiaries, Orascom Telecom Algeria ("Djezzy") and Orascom Telecom Tunisia ("Tunisiana").

As a result of the latest transaction, OTH increases its total direct and indirect ownership stake in Djezzy to 87.66% from 85.21% and has increased its ownership stake in Tunisiana to 50% from 44.5%. Pro forma for the new ownership after the three acquisitions of minority stakes in Djezzy and Tunisiana this year, OTH has increased its proportionate subscribers by 15.3%, and proportionate EBITDA by 22.5% based on financials for calendar year 2004.

This transaction concludes the exit of both PPF and the Palestine Investment Fund from Djezzy and Tunisiana.

**_-END-_**



## Orascom Telecom Finalizes Recently Announced Acquisitions of Significant Minority Stakes in Algerian and Tunisian Operations

***Cairo, April 24th, 2005:*** Orascom Telecom Holding S.A.E. ("OTH") announced today that it has resolved the discrepancies associated with implementing the recently announced agreement to acquire additional 23.07% and 22.3% indirect equity stakes in its Algerian and Tunisian subsidiaries, respectively.

The agreement between OTH and the Palestine Investment Fund ("PIF"), the selling minority shareholder in two of OTH's core GSM subsidiaries, Orascom Telecom Algeria ("Djezzy") and Orascom Telecom Tunisia ("Tunisiana"), was announced in March of this year.

After amicably resolving all pending issues with PIF, including agreeing to compensation for calendar year 2004 dividends of Djezzy, and receiving all documents corresponding to the acquisitions, OTH confirmed that it will not proceed with the pending arbitration claims brought by it before the International Chamber of Commerce.

As a result of the finalization of the transaction, OTH increases its total direct and indirect ownership stake in Djezzy to 85.21% from 62.14% and has increased its ownership stake in Tunisiana to 44.5% from 22.47%. Pro forma for the new ownership, OTH has increased its proportionate subscribers by 13.6%, and proportionate EBITDA by 20.5% based on financials for calendar year 2004.

Mr. Naguib Sawiris, Chairman and CEO of OTH stated "The finalization of this transaction with PIF reiterates our strategy in consolidating OTH's ownership in our strongest markets, thereby enhancing OTH's ongoing efforts to increase growth and profitability".

***-END-***



**About Orascom Telecom Holding**

Orascom Telecom Holding S.A.E. ("Orascom Telecom") is a leading mobile telecommunications company operating in nine emerging markets in the Middle East, Africa and South Asia, having a total population under license of approximately 520 million with an average mobile telephony penetration of approximately 6%. Orascom Telecom operates GSM networks in Algeria ("Djezzy"), Egypt ("MobiNil"), Pakistan ("Mobilink"), Iraq ("IraQna"), Bangladesh ("Banglalink"), Tunisia ("Tunisiana"), Congo Brazzaville ("Libertis"), Democratic Republic of Congo ("Oasis") and Zimbabwe ("Telecel Zimbabwe"). Orascom Telecom had 14.5 million subscribers as of December 2004. Orascom Telecom is traded on the Cairo & Alexandria Stock Exchange under the symbol (ORTE.CA, ORAT EY), and on the London Stock Exchange its GDR is traded under the symbol (ORTEq.L, OTLD LI)

**For further information:**
**Orascom Telecom Holding S.A.E.**

**Investor Relations**
Hatim E. El Gammal
Telephone: +202 461 5121
Fax:        +202 461 5125
Email: **hgammal@otelecom.com**

**Public Relations & Communications**
Dina Abou Zenada
Telephone: +2012 222 9000
Fax:        +202 461 5054 / 55
Email: **dzenada@otelecom.com**

**Visit our website: www.orascomtelecom.com**
Telephone: +202 461 5050 / 51
Fax:        +202 461 5055



For further information:
**Orascom Telecom Holding S.A.E.**

**Investor Relations**
Hatim E. El Gammal
Telephone: +202 461 5121
Fax:        +202 461 5125
Email: **hgammal@otelecom.com**


**Public Relations & Communications**
Dina Abou Zenada
Telephone: +2012 222 9000
Fax:        +202 461 5054 / 55
Email: **dzenada@otelecom.com**


**Visit our website: www.orascomtelecom.com**
Telephone: +202 461 5050 / 51
Fax:        +202 461 5054 / 55



## <u>Press Release</u>

## Acquisition of Minority Stakes

***March 17, 2005, Cairo, Egypt***:  Orascom Telecom Holding S.A.E. ("OTH") announced today that it has experienced certain difficulties in implementing the recently announced agreement to acquire additional 23.07% and 22.3% indirect equity stakes in its Algerian and Tunisian subsidiaries, respectively, from significant minorities.

The binding agreement was signed after extensive negotiations with the Palestine Investment Fund ("PIF"), the selling minority shareholder in two of OTH's core GSM subsidiaries, Orascom Telecom Algeria ("Djezzy") and Orascom Telecom Tunisia ("Tunisiana").

Concurrent with OTH's payment of the first installment to PIF in accordance with the agreement, the shares corresponding to the indirect equity stakes in OTH's Algerian subsidiary were transferred to, and registered in the name of, OTH. However, OTH reported that difficulties remain in the implementation of the transfer of the shares corresponding to OTH's Tunisian subsidiary due to the former minority shareholder's failure to fully comply with its obligations under the corresponding agreement.

Mr. Naguib Sawiris, Chairman and CEO of OTH stated, "After diligently seeking the compliance of the seller with their obligations under the acquisition agreement, we are left with no alternative but to fully enforce our rights through arbitration to ensure the finalization of the remaining formalities of this transaction".

OTH confirmed that it will file a request for arbitration with the International Chamber of Commerce's International Court of Arbitration today.

**-END-**



**About Orascom Telecom**

Orascom Telecom Holding S.A.E. ("Orascom Telecom") is a leading mobile telecommunications company operating in nine emerging markets in the Middle East, Africa and South Asia having a total population under license of approximately 520 million with an average penetration of mobile telephony of 5%. Orascom Telecom operates, GSM networks in Algeria ("Djezzy"), Egypt ("MobiNil"), Pakistan ("Mobilink"), Iraq ("IraQna"), Bangladesh ("Banglalink"), Tunisia ("Tunisiana"), Congo Brazzaville ("Libertis"), Democratic Republic of Congo ("Oasis") and Zimbabwe ("Telecel Zimbabwe"). Orascom Telecom had over 11 million subscribers as of September 2004.

**For further information:**
**Orascom Telecom Holding S.A.E.**

**Investor Relations**
Hatim E. El Gammal
Telephone: +202 461 5121
Fax:        +202 461 5125
Email: **hgammal@otelecom.com**

**Public Relations & Communications**
Dina Abou Zenada
Telephone: +2012 222 9000
Fax:        +202 461 5054 / 55
Email: **dzenada@otelecom.com**

**Visit our website: www.orascomtelecom.com**
Telephone: +202 461 5050 / 51
Fax:        +202 461 5055



**About Orascom Telecom**

Orascom Telecom Holding S.A.E. ("Orascom Telecom") is a leading mobile telecommunications company operating in nine emerging markets in the Middle East, Africa and South Asia, having a total population under license of approximately 520 million with an average mobile telephony penetration of approximately 5%. Orascom Telecom operates GSM networks in Algeria ("Djezzy"), Egypt ("MobiNil"), Pakistan ("Mobilink"), Iraq ("IraQna"), Bangladesh ("Banglalink"), Tunisia ("Tunisiana"), Congo Brazzaville ("Libertis"), Democratic Republic of Congo ("Oasis") and Zimbabwe ("Telecel Zimbabwe"). Orascom Telecom had over 11 million subscribers as of September 2004.

**For further information:**
**Orascom Telecom Holding S.A.E.**

**Investor Relations**
Hatim E. El Gammal
Telephone: +202 461 5121
Fax:       +202 461 5125
Email: **hgammal@otelecom.com**

**Public Relations & Communications**
Dina Abou Zenada
Telephone: +2012 222 9000
Fax:       +202 461 5054 / 55
Email: **dzenada@otelecom.com**

**Visit our website: www.orascomtelecom.com**
Telephone: +202 461 5050 / 51
Fax:       +202 461 5055



# Orascom Telecom Acquires Minority Stakes
# in its GSM Operations in
# Algeria and Tunisia

*Cairo, January 25th, 2005:* Orascom Telecom Holding S.A.E. ("OTH" or the "Company") announced today that as part of the implementation of its strategy to maximize its equity stake in its key GSM operations, it has signed an agreement to acquire additional 2.83% and 2.00% equity stakes in its Algerian ("OTA") and Tunisian ("OTT") GSM operations respectively, for a total consideration of US$ 39.3 million.

OTH will increase its proportionate stake in OTA to 62.14% from 59.31% and will increase its ownership in OTT to 22.47% from 20.47%.

The transaction will be funded through a combination of debt and cash flow.

OTH will extend the same offer to minority shareholders in Orascom Telecom Algeria, and Orascom Telecom Tunisia.

-END-

**About Orascom Telecom**

Orascom Telecom Holding S.A.E. ("Orascom Telecom") is a leading mobile telecommunications company operating in nine emerging markets in the Middle East, Africa and South Asia having a total population under license of approximately 520 million with an average penetration of mobile telephony of 5%. Orascom Telecom operates, GSM networks in Algeria ("Djezzy"), Egypt ("MobiNil"), Pakistan ("Mobilink"), Iraq ("IraQna"), Bangladesh ("Banglalink"), Tunisia ("Tunisiana"), Congo Brazzaville ("Libertis"), Democratic Republic of Congo ("Oasis") and Zimbabwe ("Telecel Zimbabwe"). Orascom Telecom had over 11 million subscribers as of September 2004.



**About Orascom Telecom Holding**

Orascom Telecom Holding S.A.E. ("Orascom Telecom") is a leading mobile telecommunications company operating in nine emerging markets in the Middle East, Africa and South Asia, having a total population under license of approximately 520 million with an average mobile telephony penetration of approximately 6%. Orascom Telecom operates GSM networks in Algeria ("Djezzy"), Egypt ("MobiNil"), Pakistan ("Mobilink"), Iraq ("IraQna"), Bangladesh ("Banglalink"), Tunisia ("Tunisiana"), Congo Brazzaville ("Libertis"), Democratic Republic of Congo ("Oasis") and Zimbabwe ("Telecel Zimbabwe"). Orascom Telecom had 14.5 million subscribers as of December 2004. Orascom Telecom is traded on the Cairo & Alexandria Stock Exchange under the symbol (ORTE.CA, ORAT EY), and on the London Stock Exchange its GDR is traded under the symbol (ORTEq.L, OTLD LI)

**For further information:**
**Orascom Telecom Holding S.A.E.**

**Investor Relations**
Hatim E. El Gammal
Telephone: +202 461 5121
Fax:        +202 461 5125
Email: **hgammal@otelecom.com**

**Public Relations & Communications**
Dina Abou Zenada
Telephone: +2012 222 9000
Fax:        +202 461 5054 / 55
Email: **dzenada@otelecom.com**

**Visit our website: www.orascomtelecom.com**
Telephone: +202 461 5050 / 51
Fax:        +202 461 5055

SCANNED ON 8/25/2006

SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

**SHIRLEY WERNER KORNREICH**
J.S.C.

PRESENT:                                                                    PART 64
Index Number : 108090/2005

UNGAR, YARON

vs

ORASCOM TELECOM HOLDINGS

Sequence Number : 005

VACATE

| | |
|---|---|
| INDEX NO. | _____ |
| MOTION DATE | _____ |
| MOTION SEQ. NO. | _____ |
| MOTION CAL. NO. | _____ |

The following papers, numbered 1 to _____ were read on this motion to/for _vacate the_ _restraining notice + charge's levy_

|  | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | _____ |
| Answering Affidavits — Exhibits | _____ |
| Replying Affidavits | _____ |

Cross-Motion:    ☐ Yes    ☐ No

Upon the foregoing papers, it is ordered that this motion

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE
FOR THE FOLLOWING REASON(S):

to vacate the August 2005
Restraining Notices and dismissing the Turnover Petition, is denied in accordance with this
Court's May 25, 2006 decision. However, the *ex parte* Order of Attachment issued by
petitioners, is vacated. As stated by David D. Siegel in *New York Practice (4th ed.)*, §313, p.4:
"An order of attachment is a device whereby a plaintiff effects a seizure of a defendant's
property....It operated on only property of the defendant, not on his person." The attachment here
targets no property located in New York, but rather was issued in anticipation of finding some
property belonging to respondent. Petitioner argues that personal jurisdiction of respondent is
sufficient to establish the ground for the attachment. But, the Court does not believe this to be the
case. Moreover, personal jurisdiction of respondent is in doubt. Indeed, the Federal Court has
ruled jurisdiction over respondent, thus far, has not been established and has granted petitioner
discovery to demonstrate jurisdiction. This Court has stayed proceedings pending discovery.
Accordingly, it is
ORDERED that the Sheriff's Levy and Execution issued as against Orascom Telecom
Holding S.A.E., is vacated.

Dated: 8/15/06

FILED
AUG 25 2006
COUNTY CLERK'S OFFICE
NEW YORK

SHIRLEY WERNER KORNREICH
J.S.C.

J.S.C.

Check one:    ☐ FINAL DISPOSITION    ☑ NON-FINAL DISPOSITION

Check if appropriate:    ☐ DO NOT POST    ☐ REFERENCE

# Attachment C

At an IAS Part 5 of the Supreme Court of
the State of New York, held in and for the
County of New York, at the Courthouse
located at 111 Centre Street, New York, on
the 17 day of May, 2007.

PRESENT:

HON. SHIRLEY W. KORNREICH

J.S.C.

---------------------------------------------------x

THE ESTATE OF YARON UNGAR, et al.,

Petitioners,

-against-

ORASCO TELECOM HOLDING, S.A.E.,

Respondent.

------------------------------------------------X

Index No: 108090 / 05

ORDER

The Petitioners, though their counsel, having advised the Court that they wish to
discontinue this case without prejudice; and

The Respondent, through its counsel, having advised the Court that it consents to
this case being discontinued without prejudice, *so long as there is also a vacatur of the remaining notice docketed under index no. 105521/05 as against Respondents*

NOW, THEREFORE, IT IS ORDERED:

Pursuant to CPLR § 3217(b), this action shall be and hereby is discontinued,
without prejudice and without costs.

ENTER:

_____

J.S.C.

SHIRLEY WERNER KORNREICH
J.S.C.

# Attachment D

1

1   SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF NEW YORK
2   ------------------------------------x

3   YARON UNGAR,

4            Plaintiff,

5       -against-                    Index No.
                                     05521/05
6
    PALESTINIAN AUTHORITY,
7
             Defendant.
8
    ------------------------------------x
9

10

11          DEPOSITION of NAGUIB SAWIRIS, a

12   Non-Party Witness, taken pursuant to Subpoena,

13   held at the law offices of WHITE & CASE, LLP,

14   1155 Avenue of the Americas, New York, New

15   York, on March 15, 2007, commencing at 8:12

16   a.m., before Jessica R. Berman, a Shorthand

17   Reporter and Notary Public within and for

18   the State of New York.

19

20

21

22

23          REINIG REPORTING, INC.
             192 Lexington Avenue
24              Suite 1004
          New York, New York   10016
25             (212) 684-7298

30

```
1                    N. Sawiris

2         Q    Sir, in April of 2003, your

3    passport reflects that you came to the

4    United States.  Do you remember anything

5    about what you did during that visit?

6         A    No.  I would say that most

7    probably it was also a road show.  I have no

8    other business in the United States except

9    these road shows, you know.

10             Since I started my Telecom

11   activity, I only do this Telecom and I have

12   no other business except the road shows.  I

13   am also a -- recently, since I think around

14   three years, I have been appointed as an

15   advisor on the New York Stock Exchange.  And

16   besides that, I have no other business in

17   the United States.

18             So, the only reason I would come

19   to the United States is either for a road

20   show or also when I have the advisory, both

21   of the New York Stock Exchange, and this is

22   usually in October and not in April.

23        Q    About that April 2003 visit, this

24   might help you remember something.

25   According to Mr. Mareuse's passport, he
```

31

```
 1                    N. Sawiris

 2      entered the United States on April 9th of

 3      2003, which would have been a couple of

 4      weeks before you arrived.

 5                    When you came to the United

 6      States, did you and Mr. Mareuse do something

 7      here?

 8            A     I don't remember, you know, but,

 9      as I had said, I repeat, I have no reason to

10      come to the United States except for either

11      pleasure or the -- my New York Stock

12      Exchange advisory or a road show.

13            Q     Did you come to the United States

14      in April of 2003 for something that had to

15      do with Orascom's GDR program?

16            A     No, sir.

17            Q     In October 2005, specifically

18      October 14, 2005, you came to the United

19      States.  We are not aware of a road show at

20      that time.  Do you know what the purpose of

21      your visit was?

22            A     I would guess it is the New York

23      Stock Exchange advisory board.

24            Q     Would that be the same answer for

25      October 25, 2006?
```

32

```
 1                   N. Sawiris

 2          A    Yes, sir.

 3          Q    When you came to the United

 4     States on those two dates in October '05 and

 5     '06 in connection with the stock exchange

 6     advisory board, what did you do while you

 7     were here?

 8               MR. CURRAN:  I object on

 9               foundation.  I think technically it is

10               an advisory committee to the New York

11               Stock Exchange.

12               MR. TOLCHIN:  I just used the

13               witness's words.

14               MR. CURRAN:  The witness may

15               answer the question.

16          A    I attended the advisory board.

17     You know, usually they get some people from

18     the State Department and like that.  We talk

19     about the world, what is happening in the

20     world, and specifically I am always asked to

21     report on my area of the world.  So I tell

22     them what is happening in the Middle East

23     and how the Middle East is developing and so

24     on.  That's all I report on.

25               I might have gone to dinner the
```

33

```
 1                    N. Sawiris

 2      in the evening.  We have a big dinner

 3      associated with the event, and that is it.

 4      And I stay in my hotel, I walk in Manhattan,

 5      I enjoy the shopping, and that is it.

 6           Q    How did you get to be on that

 7      stock exchange advisory committee or board?

 8                MR. CURRAN:  Objection, lacks

 9           foundation.

10                The witness may answer.

11           A    When the -- the stock exchange is

12      very interested to have people come and

13      listen at the New York Stock Exchange, and

14      they are also very interested to have people

15      of the region advise them on what is

16      happening in the different regions

17      economically speaking.  And as we are

18      running one of the successful entities in

19      the Middle East, I think this would have

20      been what the selection criteria is based

21      on, the success of the company I lead and my

22      knowledge of the Middle East.

23           Q    By the way, I should have asked

24      you a moment ago, do you have more than one

25      United States passport?
```

43

```
 1                    N. Sawiris
 2              MR. CURRAN:  Mr. Tolchin, I
 3         have a question.  I trust you are not
 4         going to run through an extensive list
 5         of OTH employees, asking the same
 6         question as covered by a prior
 7         umbrella question?
 8              THE WITNESS:  I can actually
 9         make it simple.  I don't know if you
10         want to or not, but I basically, you
11         know, I don't control where everybody
12         goes, you know.  If they go on a
13         private vacation or visit, I do not
14         know their destination.
15              I can tell you that we have no
16         business in the United States except
17         our road shows.  And I would say also
18         that another point is that the Bank of
19         New York is really the -- it manages
20         the whole GDR program of Egypt.  So,
21         this is -- beyond that, I don't think,
22         you know, I would know of anybody
23         going for any other reason.
24    BY MR. TOLCHIN:
25         Q    When you say the Bank of New York
```

44

1                    N. Sawiris

2      manages the whole GDR program of Egypt, do

3      you mean to say the GDR program of Orascom

4      Telecom Holding of Egypt or of the country

5      of Egypt?

6           A    No, I think as far as I

7      understand, they are running -- I mean, I am

8      not sure whether they do the whole program

9      of Egypt, but they do a substantial part of

10      the GDR program of Egypt, you know.  I am

11      not an expert on that, but I think they do a

12      large part of that.

13           We are not the only company who

14      has a GDR program.  It depends who you

15      entrust with managing the shares, you know.

16      I think there is other banks, like Deutsche

17      Bank and so on, that do the same thing.

18           So, the GDR program is a program

19      between the London Stock Exchange and Egypt.

20      So, the Bank of New York is only -- let's

21      say it manages the traffic or the selling

22      and buying of the GDRs.

23           Q    Who actually holds the shares,

24      the Orascom Telecom Holding company shares

25      for which the GDR certificates are issued?

```
 1                      N. Sawiris

 2           proceed.  Thank you.

 3      BY MR. TOLCHIN:

 4           Q    Mr. Sawiris, do you know whether

 5      Orascom Telecom Holding will be

 6      participating in any road shows in the

 7      United States in 2007?

 8           A    I would -- we usually do one a

 9      year as a minimum and even sometimes two.

10      So the answer will be that it's quite -- the

11      answer is yes, I think they will do one this

12      year for sure.

13           Q    Do you know which road show

14      that's expected to be?

15           A    No, I think -- I don't know which

16      one they take, there is Citibank, there is

17      Merrill Lynch, there is Lehman, there is

18      HSBC.  I think they will select one and they

19      will go to one.  I don't know which one.

20           Q    Do you have an understanding,

21      sir, as to why Orascom chooses to

22      participate in these road shows?

23           A    We have a wide world

24      shareholder -- I mean, we have shareholders

25      from all over the world, you know, and we
```

57

```
 1                    N. Sawiris
 2    need to go -- we do road shows in London; we
 3    do road shows in Europe; we do road shows
 4    here in Egypt.
 5              It is an obligation to be
 6    transparent and to explain your company to
 7    all different kinds of shareholders.  So, it
 8    is an act of transparency and it also acts
 9    to simply maintain the interest of the
10    shareholders in the company.
11         Q    What benefit does Orascom Telecom
12    Holding achieve by participating in these
13    road shows?
14         A    It is mainly about transparency
15    and to get the interest that -- to get
16    shareholders interested in the company so
17    they would buy the stock or sell it if they
18    are not satisfied.
19         Q    Does Orascom Telecom Holding
20    maintain a Web site?
21         A    Yes.
22         Q    On Orascom Telecom Holding's Web
23    site, is it possible for people to sign up
24    to receive updates and e-mails about Orascom
25    Telecom?
```

60

```
 1                    N. Sawiris

 2           A    No, but on average, we have

 3      something between 50 to 150, depending on

 4      the importance, you know, whether it's just

 5      a quarterly or end-of-year results, but the

 6      average would be from 50 to 150.

 7           Q    Do you personally participate in

 8      those conference calls?

 9           A    I try as much, sir, yes.

10           Q    What do you hope to achieve from

11      those conference calls when you participate

12      in them?

13           A    Just to answer all of the

14      questions and the worries of my

15      shareholders, to explain to them the

16      direction of the company, the strategy going

17      forward, to explain some of the recent

18      events.  The more transparent and the more

19      clear about your intentions and the business

20      of the company, the more the shareholders

21      feel comfortable and remain loyal

22      shareholders for the long term.

23           Q    Are you familiar with a bond

24      issue that Orascom Telecom Holding recently

25      sold?
```

61

```
 1                    N. Sawiris
 2          A    Yes, sir.
 3          Q    Do you refer to that bond issue
 4     by any particular name?
 5          A    No.  I think it was -- no, I
 6     don't remember a name.
 7          Q    Would you be comfortable calling
 8     those bonds the 2007 bonds?
 9          A    Yes, I don't mind calling it like
10     that, yes.
11          Q    Is it correct, sir, that Orascom
12     Telecom Holding sold $750,000,000 of those
13     2007 bonds?
14          A    Yes, sir.
15          Q    Were some of those bonds sold to
16     investors in New York?
17          A    I don't know, but I would guess
18     that definitely.  You know, New York is a
19     financial hub, so most investors are there
20     and I can hardly imagine that nobody in New
21     York bought a bond.  So you are most
22     probably right.
23          Q    Would you be able to estimate the
24     percentage of that, of those 2007 bonds that
25     were sold to investors in New York?
```

62

```
 1                    N. Sawiris
 2              MR. CURRAN:  I object.  It
 3        calls for speculation.
 4                The witness may answer.
 5        A    I don't know exactly, sir.
 6        Q    Do you know approximately?
 7        A    No, sir.  I am only interested in
 8    one fact, and one fact only is that our bond
 9    gets covered, and I am not very much
10    interested on the level of who bought it,
11    you know.  In the end, what we care for is
12    getting the money.  So if it's invested from
13    U.K., the Gulf or New York, our main
14    objective is to cover the bond.
15        Q    When you say to cover the bond,
16    what do you mean by the term to cover?
17        A    It's like when you ask for
18    $750,000,000, you get in the end
19    $750,000,000.  Bonds are usually
20    oversubscribed or undersubscribed.  So,
21    oversubscription means you got more money
22    than you needed, which was the case in our
23    bond; and undersubscription is that you
24    didn't get the amount you want, which is an
25    indication that -- which is not a positive
```

67

```
 1                    N. Sawiris

 2    want to harass someone, you are my best

 3    choice.

 4         Q    I will take that as a compliment.

 5         A    It is, I swear.

 6              MR. TOLCHIN:  Be careful, Chris.

 7              THE WITNESS:  It is meant as a

 8         compliment.  Okay?

 9              MR. CURRAN:  I won't play that

10         role.

11              MR. TOLCHIN:  I appreciate

12         that.

13         Q    Sir, when Orascom Telecom Holding

14    was selling these bonds, is it correct that

15    you did a road show that took you to Geneva

16    and Zurich, then London, and then New York,

17    then Boston; is that correct?

18         A    Yes, I think so, yes.

19         Q    At what point in that odyssey did

20    you make the determination to increase the

21    bond issue from 500,000,000 to 750,000,000?

22         A    This is after the end of the road

23    show and before we decide to close the book

24    and everything, which means when the road

25    show is finished and we were surprised by
```

68

```
 1                    N. Sawiris
 2      the demand, the high demand on the bond,
 3      then it's -- it is, let's say, it is good
 4      for us to go out and increase the amount
 5      because that saves us, as I said, many --
 6      besides the harassment, saves us also
 7      another road show and effort and time.  And
 8      as we are in need of the extra amount for
 9      our future investment, it is just the right
10      thing to do.
11           Q    So, you made the determination
12      after the road show finished in Boston?
13           A    Yes, sir.
14           Q    So, do you have a sense of where
15      the heavy demand for this bond was coming
16      from?  In other words, was it from the
17      European cities you visited or the United
18      States cities you visited or both?
19           A    As I told you before, sir, we
20      are -- this is very irrelevant for us.  The
21      $1 note looks the same whether it came from
22      London, the United States or the Middle
23      East.  It is the same green note, you know.
24      So, we really we don't care.
25           Q    You must have had a sense of what
```

69

```
 1                    N. Sawiris

 2      the demand was for your bond after each of

 3      your road show stops, didn't you?

 4                    MR. CURRAN:  Objection, lacks

 5           foundation.

 6                    The witness can answer.

 7           A    No.  As I said, you know, at my

 8      level I am only interested at the end

 9      result.  I don't follow them point by point.

10      You know, if they called me during the road

11      show, which they didn't, but if they would,

12      they would just tell me, Well, it is going

13      well; it is not going well; we are getting

14      good reaction.  But we don't discuss

15      amounts, allocation and nationalities.

16           Q    Did Mr. Mareuse tell you that the

17      road show went very well in the United

18      States?

19           A    No, he said it went well

20      everywhere, not just in the United States.

21      He said it was very well received on the

22      whole trip.  He was not specific where it

23      went well.  He said it went very well

24      everywhere, and he just said it did very

25      well.  He did not mention where it went
```

70

1                      N. Sawiris

2      better or less.

3            Q    Do you know what portion of

4      Orascom Telecom Holding's stock, whether

5      directly as stock or through GDRs, is owned

6      by investors in the United States?

7            A    As I said, I never made that

8      exact -- I know that there is a good deal of

9      investors from the United States.  Most of

10     the big funds are U.S. funds, like Capital,

11     Fidelity, Templeton.  These are the big guys

12     and they are mostly in the States.

13               So, I mean, if you were trying to

14     derive the fact that a large shareholder

15     base of our shareholders are U.S. based, I

16     would say that more or less that you are

17     most probably right.

18            Q    Sir, you said Templeton, Fidelity

19     -- what were the other names you mentioned?

20            A    I was just giving you examples of

21     the large funds of the United States.  So, I

22     said Capital, Fidelity and Templeton.  But I

23     am not sure that are my shareholders or not.

24     But what I am saying is these are big names.

25     Usually they have shares everywhere in the

74

```
 1                    N. Sawiris
 2    do not remember a lawsuit called GTE versus
 3    Orascom?
 4              MR. CURRAN:  Can you give us
 5         the full caption, Mr. Tolchin?
 6              MR. TOLCHIN:  Not as I sit here
 7         this moment.
 8         A    No, the answer is easy.  The
 9    answer is easy.  I don't remember a lawsuit
10    by GTE against Orascom.
11              MR. CURRAN:  Mr. Tolchin, are
12         you referring to Orascom Telecom
13         Holding?
14              MR. TOLCHIN:  Yes.
15         A    I maintain the same answer.
16         Q    Does Orascom maintain any bank
17    accounts in the United States?
18              MR. CURRAN:  Again, I assume --
19         Q    Orascom Telecom Holding?
20              MR. CURRAN:  Thank you.  The
21         distinction is important to us.
22         A    The answer is no, sir.
23         Q    Does Orascom Telecom Holding
24    maintain any investment accounts of any
25    kind, stocks, bonds, equities, what have
```

75

```
1                    N. Sawiris

2       you?

3              A    No, sir.

4              Q    Does Orascom Telecom Holding own

5       any real property in the United States?

6              A    No, sir.

7              Q    Does Orascom Telecom Holding hold

8       any intellectual property in the United

9       States?

10             A    No, sir.

11             Q    When you come to visit the United

12      States yourself, specifically New York,

13      where do you stay?

14                    MR. CURRAN:  Objection, lacks

15             foundation.

16                    The witness may answer.

17             A    I stay in the Four Seasons in New

18      York.  When I go to Laguna, I stay in the

19      Laguna Beach Hotel, the Ritz Carlton,

20      Laguna?

21             Q    Do you, sir, own a residence

22      anywhere in the United States?

23             A    Not anymore.
```

(Redacted)

166

1              **C E R T I F I C A T E**

2

3       STATE OF NEW YORK    )
                                : SS
4       COUNTY OF NEW YORK   )

5

6              I, JESSICA R. BERMAN, a Shorthand

7       Reporter and Notary Public within and for

8       the State of New York do hereby certify:

9              That NAGUIB SAWIRIS, the witness

10      whose examination is hereinbefore set forth,

11      was duly sworn by me and that this

12      transcript of such examination is a true

13      record of the testimony given by such

14      witness.

15             I further certify that I am not

16      related to any of the parties to this action

17      by blood or marriage and that I am in no way

18      interested in the outcome of this matter.

19

20      IN WITNESS WHEREOF, I have hereunto set my

21      hand this 21st day of March, 2007.

22

23

24      JESSICA R. BERMAN

25

REINIG REPORTING, INC., (212) 684-7298

# Attachment E

1

1

2      SUPREME COURT OF THE STATE OF NEW YORK
       COUNTY OF NEW YORK
3      - - - - - - - - - - - - - - - - - - - - - - - - - - -x

4      YARON UNGAR,

5                              Plaintiff,
                                                    Index No.
6                  -against-                        105521/05

7      PALESTINIAN AUTHORITY,

8                              Defendant.

9      - - - - - - - - - - - - - - - - - - - - - - - - - - -x

10

11            DEPOSITION VIA VIDEOCONFERENCE of

12     a Non-Party Witness, RODOLPHE ALDO MARIO

13     MAREUSE, taken pursuant to Subpoena, held at

14     the offices of WHITE & CASE, 1155 Avenue of

15     the Americas, New York, New York, on March 14,

16     2007, commencing at 9:05 a.m., before Shamona

17     Adderley, a reporter and Notary Public within

18     and for the State of New York.

19

20

21

22

23            REINIG REPORTING, INC.
              192 Lexington Avenue
24                 Suite 1004
            New York, New York 10016
25              (212) 684-7298

25

1                              R. Mareuse

2          Q.    Where is Orascom Telecom Holding's

3    stock traded today?

4          A.    In Cairo.

5          Q.    Is it also traded in London?

6                MR. CURRAN:  Objection as to form.

7                You may answer.

8          Q.    Is Orascom Telecom Holding stock

9    traded in London?

10                MR. CURRAN:  Same objection.

11                The witness may answer.

12          A.    GDR's are traded in London.

13          Q.    What are GDR's?

14          A.    Global depository receipts.

15          Q.    Again, for the layman who doesn't

16    necessarily understand these things, could you

17    explain what that means, global depository

18    receipts?

19          A.    These are receipts that are issued

20    on the basis of one share per one GDR, the

21    share listed in Cairo are basically traded in

22    Egyptian pounds and.

23                MR. TOLCHIN:  Sir, just repeat the

24                last line, the share --

25          A.    The shares being traded in Egypt

26

1                              R. Mareuse

2      are traded in Egyptian pounds, the GDRs are

3      traded in U.S. dollars.

4           Q.    Who issues the GDRs?

5           A.    I believe it's the bank.

6           Q.    Do you know which bank?

7                 MR. SULLIVAN:  Objection.  Where?

8      Hold on --

9                 MR. TOLCHIN:  GDRs.

10                 MR. SULLIVAN:  Are we talking

11      about London?

12           Q.    Sir, is there an institution, or

13      entity, or company that issues the GDRs?

14           A.    Yes, I think it's the Bank of New

15      York.

16           Q.    In order to issue the GDRs does

17      the Bank of New York hold a corresponding

18      amount of Orascom's stock?

19           A.    Yes.

20           Q.    Does the Bank of New York hold, if

21      you know, does the Bank of New York hold the

22      Orascom stock in the form of a actual

23      certificate?

24           A.    I don't know that.

25           Q.    Have you ever personally had any

56

1                          R. Mareuse

2          Q.    Sir during your, when you came to

3    the United States in March of 2004, did you

4    have a particular objective that you hoped to

5    achieve during that visit?

6          A.    Well, the objective of road show

7    is to communicate the story to investors,

8    that's just, you know, every road show is the

9    same objective, which is to communicate the

10   story of the Orascom Telecom.

11         Q.    Was this road show intended to

12   promote any particular issue of stock or debt

13   of Orascom?

14         A.    No, no.  We call it non-deal road

15   show which was just basically to --

16         Q.    A non -- I didn't hear the work, a

17   non-deal road show?

18         A.    Non-deal, yeah.

19         Q.    So --

20              MR. CURRAN:  Please continue with

21         your answer.

22              Please Mr. Tolchin try to refrain

23         from interrupting the witness mid

24         answer, he can always go back and

25         clarify a word.

57

1                          R. Mareuse

2               MR. TOLCHIN:  Just, Mr. Curran

3          it's just sometimes there is a little

4          lag between, because of the connection,

5          and sometimes it's hard to know when he

6          is done or when he is about to start,

7          so please continue.

8          A.    So a non-deal road show means

9     basically to communicate the story and to

10    update the story to investors, we see some

11    news on us, so there is no particular

12    objective just a regular objective.

13         Q.    I just want to ask you about two

14    terms, when you say communicate the story,

15    what story are you talking about?

16         A.    The story of the Orascom Telecom.

17         Q.    What is the story of Orascom

18    Telecom?

19         A.    Well, it's basic facts about how

20    the company is doing, what its forecasts are,

21    what is its, you know, competitive position,

22    the industry dynamic, the financial position,

23    that is what we call the story in the

24    financial -- in the equity world.

25         Q.    And is it your expectation when

59

1                    R. Mareuse

2    there could be a benefit if they like the

3    story they will buy the shares, there could be

4    not a benefit, if they don't like the story

5    then they sell the shares.

6              Q.    You used the term non-deal road

7    show, could you explain please what is the

8    difference between a deal road show and a

9    non-deal road show?

10              MR. SULLIVAN:   Objection,

11         foundation.

12              He can answer.

13         A.    Non-deal road show means when that

14    you don't want to raise any money, and deal

15    road show means when you want to raise money.

16         Q.    In a -- what is the objective of a

17    deal road show?

18         A.    To raise money.

19         Q.    Would it be fair to say that when

20    you have a deal road show your objective is

21    to, is to persuade the people you're meeting

22    with to buy the stock or buy the bonds?

23         A.    That's correct.

24         Q.    Do you recall during your March

25    2004 trip, do you recall any of the meetings

119

1                           R. Mareuse

2           Q.    And what is Mr. Michaelmayr's

3    role?

4           A.    He -- well, on this particular

5    trip he was the one who worked on the bond

6    offering and -- before he came with us on the

7    road trip.

8           Q.    When you say the bond offering,

9    what are you referring to?

10          A.    We did a 144 Reg S bond offering

11   in late January 2007, we raised 750 million

12   dollars.

13          Q.    As you understand it, sir, what is

14   a 144 Reg S bond offering?

15          A.    It means that the U.S. retail

16   investors cannot buy this bond, it's only what

17   we call QIB which are qualified institution

18   buyer that can buy this bonds.

19          Q.    Do you have an understanding as to

20   what one has to be, what qualifications one

21   has to have to be a QIB?

22          A.    I have a vague understanding.

23          Q.    What is your vague understanding?

24          A.    That you have to be in the

25   business of buying and selling securities.

120

1                               R. Mareuse

2            Q.    Do you know whether there is a

3     minimum of net worth element to that status of

4     QIB?

5            A.    I don't know for sure.

6            Q.    In order to participate in this

7     bond issue, in other words in order to buy the

8     bond, was there a minimum investment that one

9     needed to make?

10           A.    Well, I think the bond of a

11    minimum par value, probably $500,000 I would

12    say.

13           Q.    Just to define the term, when you

14    say a minimum par value, what does that mean?

15           A.    If you want to buy one bond you

16    have to pay $500,000.

17           Q.    So one cannot buy less than

18    $500,000 worth of this bond, is that correct?

19           A.    That's right.

20                 MR. TOLCHIN:  I'm sorry.

21           A.    That's right.

22                 MR. CURRAN:  Objection, vague.

23           Did you say stock, Mr. Tolchin?

24                 MR. TOLCHIN:  Bond, no I said

25           bond.

121

1                          R. Mareuse

2              MR. CURRAN:  Okay.

3              MR. TOLCHIN:  If I misspoke, I'm

4        sorry, but I believe I said bond.

5         Q.    Where did this --

6              MR. TOLCHIN:  Withdrawn.

7         Q.    What was the purpose of your

8        January 30, 2007 visit?

9         A.    To sell the bond to this QIB, so

10       we started the road show work in Geneva then

11       we went to London, then we went one day New

12       York and one in day Boston.

13        Q.    Say that again, Geneva?

14        A.    Geneva, Zurich, London, New York,

15       Boston.

16        Q.    How long did you spend in each of

17       those cities?

18        A.    Geneva, half a day; Zurich, half a

19       day; London, one day; New York, one day;

20       Boston, one day.

21        Q.    When did the process of putting

22       together this bond issue begin?

23        A.    Three years ago we started to

24       think about this and then we really started a

25       month before, I would say a month before the

122

1                          R. Mareuse

2    offering itself.

3              MR. TOLCHIN:  You're fading out

4         and getting very quiet again.

5         A.    I said three years ago we started

6    to have this idea and then we did not do it

7    for several reason, and then we were -- we

8    prepared very actively in the month preceding

9    the offering.

10        Q.    Before you could issue these

11   bonds, am I correct that there is a

12   considerable amount of legal and regulatory

13   paperwork that you have to go through, is that

14   correct?

15        A.    That's correct, yeah.

16        Q.    And was anything filed with a

17   government agency in the United States about

18   this bond issue?

19        A.    I think a 144 offering has to be

20   filed, but I'm not sure, I'm not a hundred

21   percent sure because it's not a public

22   offering, so I don't, I don't know for sure,

23   actually this, I don't know what exactly the

24   process is with the offer 144.

25        Q.    Was there -- do you know whether

123

1                        R. Mareuse

2        Orascom utilized the services of any

3        investment professionals in New York relating

4        to this 144 S filing or bond issue?

5                    MR. SULLIVAN:  Objection, vague as

6                to what investment professionals might

7                be.

8                    If you could understand that

9                question, Mr. Mareuse, you can --

10                   MR. TOLCHIN:  I mean legal

11               advisors, financial advisors,

12               accountants, underwriters, bookrunners,

13               merchant bankers, investment bankers,

14               I'm sorry?

15                   MR. CURRAN:  Tell us when the

16               question is over so the witness can

17               answer.

18                   MR. TOLCHIN:  The hint is, I get

19               done talking.

20                   MR. CURRAN:  Well, the problem is

21               it seems like you're getting done and

22               then there is additional.

23                   If that question is done, I think

24               the witness can answer.

25               A.   I said the investment bankers and

124

1                        R. Mareuse

2    the lawyers for the offering were all based in

3    London.

4            Q.    Who were they?

5            A.    They were Credit Suisse, Citi

6    Group, ABN Amro and Deutsche Bank and on the

7    legal side was White and Case and Allen and

8    Obery.

9            Q.    Allen and?

10           A.    Obery.

11           Q.    Do you know how to spell that?

12           A.    O-B-E-R-Y.

13           Q.    Do you know who at White and Case

14   Orascom Telecom Holdings dealt with?

15           A.    I don't remember his name now off

16   the top of my head.  I don't remember his

17   name, sorry.

18           Q.    Was it just one person?

19           A.    No, but I don't remember the team

20   leader on the White and Case side.

21           Q.    So there is a team leader in

22   London and a team leader in New York, is that

23   accurate?

24           A.    No.

25           Q.    I don't want to put words in your

125

1                        R. Mareuse

2    mouth.

3          A.    No, no.

4                MR. CURRAN:  See there again you

5          Mr. Tolchin, you keep adding in stuff

6          after a question is over.

7                The witness can answer.

8          A.    No, no, no the team was basically

9    in London, from the bankers side and the legal

10   advisor side.

11         Q.    But as you sit here today, you

12   don't know, do you, whether any filings were

13   made with the Securities and Exchange

14   Commission in the United States relating to

15   this bond, is that correct?

16         A.    I don't think so, I don't think

17   so, but I'm not sure, it's not a public, it's

18   not a public offering in the United States, so

19   I don't think it has to be filed with the SEC,

20   and I'm pretty sure it is not, but I'm not a

21   hundred percent sure.

22         Q.    Were any steps necessary in order

23   for that bond to be listed with any exchanges

24   in the United states?

25         A.    No.

126

1                           R. Mareuse

2           Q.    What was the involvement of Allen

3     and Obery?

4           A.    They were the underwriters'

5     counsel.

6           Q.    And who was the underwriter or the

7     underwriters?

8           A.    As I said before, Credit Suisse,

9     Citi Group, ABN Amro and Deutsche Bank.

10          Q.    Now this -- was this road show

11    relating to the bond in January to February of

12    2007, was it -- was the format different from

13    the road shows we've discussed before?

14          A.    A little bit different because you

15    talking to bond investors, but not that much

16    different in the sense that you go and see

17    investors in their offices, you tell them the

18    story of the company, and then either they

19    like it or they don't like it.

20                MR. TOLCHIN:  I didn't hear the

21          last phrase of the answer.

22                (Whereupon, the record was read

23          back.)

24          Q.    How many investors did you meet

25    with in their offices?

```
 1                        R. Mareuse

 2          A.    I would say probably, probably

 3     eight in New York and we had, we had lunch

 4     meeting in New York, I'd I said then eight and

 5     then probably had a lunch of about ten people

 6     so like 18, then we had a breakfast in Boston

 7     of about six investors.

 8          Q.    When you started out with this

 9     bond issue was there a target of how many

10     dollars worth of this bond you hoped to sell?

11          A.    We started with target of 500

12     million dollars.

13          Q.    You testified earlier that you

14     sold 750 million dollars?

15          A.    That's correct.

16          Q.    What happened?

17          A.    The issue was very successful so

18     we increase the size from 500 to 750.

19          Q.    Now, of the 750 million dollars

20     worth of these bonds, what percentage were

21     sold directly due to your road show to Geneva,

22     Zurich, London, New York and Boston?

23               MR. CURRAN:  Objection as to form,

24          lacks foundation.

25               The witness may answer.
```

128

1                              R. Mareuse

2              A.    I can't remember precisely the

3      break down between the different investors.

4              Q.    During your meetings with the

5      various investors whom you met with on this

6      road show, did the investors tell you whether

7      they intended to purchase the bonds?

8              A.    Some of them did.

9              Q.    How many in New York told you that

10     they intended to purchase the bonds?

11             A.    I can't remember precisely, maybe

12     five.

13             Q.    And do you know whether those

14     investors did, in fact, purchase the bonds,

15     those five?

16             A.    I did not check.

17             Q.    I'm sorry?

18             A.    I did not check.

19             Q.    Does Orascom have records, to your

20     knowledge, as to who purchased each one of the

21     bond?

22             A.    Yes.

23             Q.    Do you, sir, know who purchased

24     all the bonds?

25             A.    I don't recall exactly who

129

1                           R. Mareuse

2     purchased the bond, I mean, I look at this

3     list, it was, you know a month or two ago, but

4     I don't remember precisely who bought these

5     bonds.

6              Q.     During your meetings, your eight

7     meetings in New York and the lunch with ten

8     investors, do you know how many of those

9     investors, those 18 investors purchased the

10    bonds?

11             A.     No.

12             Q.     Do you know how many dollars worth

13    of bonds were purchased by those 18 investors?

14             MR. SULLIVAN:   Objection,

15             foundation.   There is no evidence that

16             he knows that they actually did invest,

17             but if you know, you can answer.

18             A.     No, I don't know, I don't

19    remember.

20             Q.     Do you know in order of magnitude

21    as to how many dollars worth of bonds were

22    sold to New York investors?

23             A.     No.  I mean, I tell you why it's

24    very difficult because a lot of this

25    institutions have offices in New York, in

130

1                    R. Mareuse

2      London, or in Geneva, so what you see is, you

3      know who is the ultimate buyer is which

4      institution, you don't know if it's New York,

5      or London, or Geneva, bought these bonds, so

6      you don't really, you know there is some

7      investors and you don't know where they are

8      based.

9            Q.   Can you identify any of the

10     institutions who you -- that were investors

11     that you met with while you were in New York

12     in January to February of 2007?

13           A.   I'm sure if I had the names in

14     front of me I would remember them.

15           Q.   But as you sit here today do you

16     have any memory of who you met with a month

17     and a half ago?

18           A.   Frankly, no.

19           Q.   Other than meeting with those 18

20     investors in New York and six in Boston

21     relating specifically to the bond road show,

22     did you meet any other investors during your

23     visit to the United states in January to

24     February of 2007?

25           A.   No.

131

1                           R. Mareuse

2          Q.    Where did you stay when you came

3     to New York in January to February of 2007?

4          A.    At the New York Palace.

5          Q.    And how long did you remain in the

6     United states during that visit?

7          A.    Two days.

8          Q.    Where did you go after that visit?

9          A.    London.

10         Q.    Did you bring any written

11    materials with you in connection with the bond

12    road show in January to February 2007?

13         A.    Yeah we brought investors

14    presentation and we brought prospectuses.

15         Q.    You brought the prospectus for the

16    bond issue?

17         A.    Yes.

18         Q.    Is that prospectus publicly

19    available anywhere, to your knowledge?

20         A.    No.  No, it's not publicly

21    available.

22              MR. TOLCHIN:  Maybe this would be

23         a break point if you wish.

24              MR. SULLIVAN:  I know it's late in

25         Cairo it's noon here, how much, just

136

```
 1                    R. Mareuse

 2            MR. CURRAN:  No, we haven't

 3       changed anything with respect to the

 4       microphones on this end.

 5       Q.   By the way, are there researchers

 6   and analysts who follow Orascom Telecom

 7   Holdings' stock or GDRs in New York?

 8       A.   I don't think so.  I think we--

 9   always based in London.

10            MR. TOLCHIN:  All what?

11       A.   All based in London.

12            MR. TOLCHIN:  That Sounds

13       horrible, we'll keep working but we're

14       having some technical glitch on this

15       end.

16            MR. CURRAN:  Can the reporter

17       please read back the last answer.

18            (Whereupon, the record was read

19       back.)

20       Q.   Are you aware that Orascom Telecom

21   Holdings conducts quarterly and annual

22   conference calls?

23       A.   Yes.

24       Q.   Do you participate in those

25   conference calls from time to time?
```

137

1                              R. Mareuse

2              A.    Yes.

3              Q.    And what is the purpose of those

4    conference calls?

5              A.    To comment the quarterly or yearly

6    financial results.

7              Q.    Who are participants in those

8    conference calls other than Orascom Telecom

9    Holdings personnel?

10                  MR. CURRAN:  Objection, vague as

11             to whether participants mean those who

12             speak or those who merely listen, but

13             the witness can answer.

14                  MR. TOLCHIN:  I'm referring to

15             those who listen.

16             A.    Research analysts and investors.

17             Q.    And are some of those research

18   analysts and investors located in the United

19   States?

20             A.    Some investors are located in the

21   United States.

22             Q.    And are some of those research

23   analysts and/or investors located in New York?

24             A.    Yes.

25                  MR. CURRAN:  Objection as to form,

1                              R. Mareuse

2          A.    I don't know the exact

3    relationship between these two, between these

4    three entities.

5          Q.    Okay, do you know if Orascom owns

6    any property in the United States, and by

7    property I mean any kind of property, not just

8    real estate?

9               MR. CURRAN:  And the question is

10              by Orascom, you're referring to Orascom

11              Telecom Holding?

12              MR. TOLCHIN:  Correct, correct.

13              MR. CURRAN:  The witness may

14              answer.

15          A.    I believe it does not.

16          Q.    Do you know whether Orascom

17    Telecom Holding has any bank accounts in the

18    United States?

19          A.    I believe it does not.

20          Q.    Do you know whether Orascom

21    Telecom Holding has any deposits of any sort

22    in the United States?

23          A.    I believe it does not.

24          Q.    Does Orascom Telecom Holding own

25    any intellectual property in the United

1                    R. Mareuse

2       States, patents, trademarks, copyrights,

3       anything like that?

4            A.    I believe it does not.

5            Q.    During any visit that you made to

6       the United states in connection with Orascom,

7       have you stayed in any type of accommodation

8       other than a hotel, in other words, did you

9       ever stay in a private house, apartment?

10           A.    Yes, I have stayed in private

11      house.

12           Q.    When was that?

13           A.    When I went skiing and went to a

14      hotel and when I went to stay at my friend in

15      Wyoming, that was a private house.

16           Q.    But those where --

17                 MR. TOLCHIN:  Withdrawn.

18           Q.    You're referring to the personal

19      time aspect of those trips?

20           A.    Yes.

21           Q.    Do you know whether Orascom

22      Telecommunications Holding has had any

23      communication with the PIF, the PPF, or the

24      Palestinian Authority about this lawsuit,

25      meaning the Ungars' lawsuit?

200

1

2                  C E R T I F I C A T E

3

4      STATE OF NEW YORK    )
                            ) ss.:
5      COUNTY OF NEW YORK   )

6

7           I, SHAMONA ADDERLEY, a reporter and

8      Notary Public within and for the State of New

9      York, do hereby certify:

10          That RODOLPHE ALDO MARIO MAREUSE, the

11     witness whose deposition is hereinbefore set

12     forth, was duly sworn by me and that such

13     deposition is a true record of the testimony

14     given by such witness.

15          I further certify that I am not related

16     to any of the parties to this action by blood

17     or marriage, and that I am in no way

18     interested in the outcome of this matter.

19          IN WITNESS WHEREOF, I have hereunto set my

20     hand this 22nd day of March, 2007.

21

22          _____

23               SHAMONA ADDERLEY

24

25

1

2  SUPREME COURT OF THE STATE OF NEW YORK
   COUNTY OF NEW YORK
3  ------------------------------------X

4  YARON UNGAR,

5                              Plaintiff,

6            -against-                      Index No:
                                            105521/05
7
   PALESTINIAN AUTHORITY,
8
                             Defendant.
9
   ------------------------------------X

10

11        DEPOSITION VIA VIDEOCONFERENCE of EMAD

12  FARID, a Non-Party Witness, taken pursuant to

13  Subpoena, held at the law offices of WHITE &

14  CASE, 1155 Avenue of the Americas, New York,

15  New York, on March 13, 2007, commencing at 9:00

16  a.m., before ARTHUR HECHT, a Court Reporter and

17  Notary Public within and for the State of New

18  York.

19

20

21

22

23            REINIG REPORTING, INC.
                192 Lexington Avenue
24                   Suite 1004
              New York, New York 10016
25                (212) 684-7298

34

```
1                        Farid
2           asking for personal documents or
3           corporate documents?
4                  MR. TOLCHIN:  Personal document.
5           A     I don't know.
6                  MR. TOLCHIN:  I mean, certainly an
7           airplane ticket that he flew with would
8           be a personal document.
9           A     No, it was an electronic ticket, I
10    don't have.
11                 MR. CURRAN:  The witness answered
12          your question, but that doesn't mean I
13          agree with your position.
14                 MR. TOLCHIN:  That's why we have
15          our respective jobs.
16          Q     What was the purpose of your visit
17    in January of 2007, January to February of
18    2007?
19          A     It's a road show, again,
20    supporting the finance department in a road
21    show where we meet investors.
22          Q     And when you use the term road
23    show, can you tell us what you mean by that?
24          A     Road show is like -- it's a visit
25    where we meet investors, bankers, it's not
```

```
 1                        Farid

 2     arranged by -- it's not a conference arranged

 3     by any party, but we will -- and we have

 4     appointments with investors, we go to them in

 5     their offices or they come to us in a place,

 6     hotel or restaurant, according to the schedule,

 7     and we just meet with them and answer their

 8     questions and present what we want to present

 9     to them.

10          Q     And when you have meetings with

11     investors at such a road show, is it your hope

12     that these investors will in fact invest in

13     Orascom Telecom Holding?

14          A     In this case, it was the bonds, it

15     was the bonds that we were issuing high-yield

16     bond, and that was the purpose of the road

17     show.

18          Q     So it was your hope that investors

19     would invest in these bonds, correct?

20               MR. CURRAN:  Objection.  Vague.

21               When you use the term you, are you

22               talking about Mr. Farid personally or

23               the company or both?

24               MR. TOLCHIN:  I'm asking about Mr.

25               Farid personally.
```

36

```
 1                        Farid

 2           A      My objective was to help and

 3    support the finance department in their

 4    objective, which I -- again, I'm not -- it's

 5    not my role to be -- but it was to sell the

 6    bond, as you said.

 7           Q      That bond issue that you're

 8    referring to, how many dollars worth of bonds

 9    were being sold, if you know?

10           A      750 million.

11           Q      Where did that $750 million go?

12           A      I don't know.

13           MR. SULLIVAN:  Objection.

14           Q      Meaning --

15           MR. SULLIVAN:  Hold on, objection.

16    He testified that 750 million were

17    offered --

18           MR. TOLCHIN:  I'm sorry, I'll

19    accept that.

20           Q      How many dollars worth of those

21    high-yield bonds were sold --

22           MR. SULLIVAN:  If you know.

23           Q      -- if you know?

24           A      That's the only figure, I know

25    750, so I don't know if that's the difference
```

54

```
1                          Farid
2     know.
3          Q     Are you aware of anybody else from
4     the operations department of Orascom Telecom
5     Holding who accompanied other Orascom personnel
6     on a visit to New York?
7                MR. SULLIVAN:  Same objection.
8          A     No.
9          Q     Do you have any knowledge
10    regarding Orascom's depository receipt program?
11               MR. SULLIVAN:  Foundation.
12          Objection.
13               MR. CURRAN:  Objection.  Vague.
14               MR. SULLIVAN:  Foundation, no
15          foundation either.
16          Q     Okay, you can answer.
17          A     I have no specific knowledge, I
18    know there are GDRs, but with no details.
19          Q     But no details?  As you understand
20    it, sir, what are GDRs?
21          A     Is what?
22          Q     As you understand the term, sir,
23    what are GDRs?
24          A     Global depository -- I don't
25    know -- actually, I don't know, I used to know,
```

69

```
 1                        Farid

 2    said, even the suppliers, like Motorola who are

 3    dealing with the offices in Egypt or Dubai or

 4    the middle east in general, but not the United

 5    States.

 6         Q    Does David Ross have an office in

 7    Dubai or the middle east, or do you deal with

 8    David Ross in the United States?

 9         A    I cannot confirm, I don't know, we

10    are dealing with some persons, and most

11    probably they -- the very few times we did with

12    them was in our office in Egypt, they came to

13    Cairo or to the subsidiary, and we had the

14    meeting or the communication this way.

15         Q    Do you recall who came to meet

16    with you on behalf of David Ross?

17         A    No, and I didn't -- I didn't

18    personally meet anybody from David Ross.

19         Q    Just give me a moment.  Have you

20    ever participated in a quarterly or year-end

21    conference call on behalf of Orascom?

22              MR. SULLIVAN:  Objection.

23              MR. CURRAN:  Objection.  Vague.

24              MR. SULLIVAN:  Vague.

25         A    No.
```

REINIG REPORTING, INC. (212) 684-7298

1                          Farid

2          Q     Just to make sure you understand

3    the terminology, when I refer -- when I refer

4    to a quarterly or year-end conference call, do

5    you understand what I'm talking about?

6          A     Yes, you mean if I understand

7    right, you mean the conference call with the

8    investors and outside external community?

9          Q     Correct.

10         A     To present the results and answer

11   the questions related to the results?

12         Q     Right, that's what I'm referring

13   to.

14         A     The answer is no, I have never

15   represented Orascom Telecom in such conference

16   calls or calls, except I attended as a

17   listener, just as a listener, not as a

18   participant.

19         Q     Do you have an understanding of

20   what the purpose of those conference calls is?

21         A     Yes.

22         Q     What is that?

23         A     To present the results of a

24   quarter of a year, and to answer the questions

25   of the interested parties.

1                               Farid

2          Q      And the interested parties --

3     withdrawn.

4                 The people on those conference

5     calls are people who have invested or are

6     considering investigating in Orascom?

7          A      Part of them, yes, and in addition

8     to analysts, financial analysts, and sometimes

9     any individual interested to join, it's a

10    public calls.

11         Q      And why do you participate in

12    these calls, as a listener, I understand that,

13    what's your purpose in listening?

14         A      To get update on the information

15    and concerns of the participants.

16         Q      Do you know what portion of the --

17    let me start differently, withdrawn.

18                How many people participate in

19    those calls, on average?

20                MR. CURRAN:  Objection.  Vague as

21                to the term participate.  You may

22                answer.

23         A      I don't have any idea.  Orascom

24    Telecom, you mean from Orascom Telecom Holding

25    or you mean in total?

REINIG REPORTING, INC. (212) 684-7298

76

```
 1                        Farid
 2     this.
 3          Q      To your knowledge, does Orascom
 4     Telecom Holding have any assets in the United
 5     States of any kind?
 6          A      Of any what?
 7          Q      Of any kind.  Any kind of asset at
 8     all?
 9          A      No, I'm not aware of any asset
10     owned by Orascom Telecom Holding in the United
11     States.
12          Q      Does Orascom Telecom Holding have
13     any investments in the United States, stocks,
14     bonds, securities, real estate, patents,
15     trademarks, anything like that?
16               MR. SULLIVAN:  Objection.  Asked
17               and answered.  That would fall under the
18               heading of assets, but go ahead, Mr. --
19          A      I cannot talk about stocks or
20     bonds, because this is not in my -- under my
21     scope, and I'm not aware of anything not within
22     my scope.
23          Q      Are you familiar with a debt owed
24     by the Orascom Telecom Holding to the
25     Palestinian Authority?
```

REIÑIG REPORTING, INC. (212) 684-7298

107

1

2                    C E R T I F I C A T E

3

4    STATE OF NEW YORK      )

5                           ) SS.

6    COUNTY OF QUEENS       )

7

8              I, ARTHUR E. HECHT, a Stenotype

9    Shorthand Reporter and Notary Public within and

10   for the State of New York, do hereby certify:

11             THAT EMAD FARID, the witness whose

12   examination is herein before set forth, was

13   duly sworn by me and that this transcript of

14   such examination is a true record of the

15   testimony given by such witness.

16             I further certify that I am not

17   related to any of the parties to this action by

18   blood or marriage and that I am in no way

19   interested in the outcome of this matter.

20

21   IN WITNESS WHEREOF, I have hereunto set my hand

22   this 19th day of March, 2007.

23

24   _____

25              Arthur E. Hecht


REINIG REPORTING, INC. (212) 684-7298



## DECLARATION OF AMR ESMAT ABAZA

1.      I am the Treasury Director of Orascom Telecom Holding S.A.E. ("OTH") and have personal knowledge of the facts set forth in this declaration.

2.      OTH is a corporation organized under the laws of Egypt and having its principal place of business in Egypt.  It is a mobile telecommunications company operating in nine emerging markets in the Middle East, Africa and South Asia.

3.      OTH is not registered to do business in New York State or in any other place in the United States of America.  OTH does not maintain an office within New York State or elsewhere in the United States of America.

4.      OTH does not have any officers, employees, sales personnel or authorized business agents in New York State or elsewhere in the United States of America.  OTH does not conduct public relations work within New York State or elsewhere in the United States of America with regards to its products.  Nor are there any persons promoting OTH's interests permanently located in New York State or elsewhere in the United States of America. OTH does have a contract to air commercials on CNN, but that applies to CNN's international network rather than to its US network.

5.      To the best of my knowledge, OTH is not listed in any telephone directory in New York State or elsewhere in the United States of America.

6.      OTH does not own any banking or brokerage accounts, real estate or other assets in New York State or elsewhere in the United States of America.

Orascom Telecom Holding S.A.E, (Société Anonyme Egyptienne), with a Paid Capital 1,100,000,000 LE.
(Subject to law No. 95 / 1992), CR. 134935 - Giza
Nile City Towers, Cornish El Nile, Ramlet Beaulac, Cairo, Egypt
South Tower, 26th & 27th Floor
Tel :(202) 461 50 50/1
Fax:(202) 461 50 54/5
 e-mail: info@otelecom.com



7.      OTH does not do business in New York State or elsewhere in the United States of America.  OTH does not ship products to New York State or elsewhere in the United States of America.  OTH does not solicit business, make any sales, or maintain a warehouse for the storage of goods in New York State or elsewhere in the United States of America.

8.      OTH does not hold any property in New York State or elsewhere in the United States of America.  In particular, OTH does not hold any property of the Palestinian Authority or the Palestinian Liberation Organization or property in which the Palestinian Authority or the Palestinian Liberation Organization has any interest in New York State or elsewhere in the United States of America.

9.      Shares of OTH are traded on the Cairo and Alexandria Stock Exchange, and Global Depositary Receipts are traded on the London Stock Exchange.  OTH securities are not listed or traded on any stock exchange in the United States of America.  The Bank of New York serves as a depositary bank for OTH shares and issues 144A Global Depositary Receipts representing those shares.  Apart from the arrangement with the Bank of New York, any offering or sale of OTH securities in the United States of America consists of private off-exchange activities done without the consent, authorization or participation of OTH.

10.     OTH has various subsidiaries and affiliates.  None is incorporated or headquartered in the United States of America.  These subsidiaries and affiliates are legal entities separate and distinct from OTH, and corporate formalities are preserved and observed.  Any activities conducted by these subsidiaries and affiliates in the United States of America are not conducted for or on behalf of OTH.

Orascom Telecom Holding S.A.E, (Société Anonyme Egyptienne; with alleged Capital: 1,100,000,000 LE.
(Subject to law No. 95 / 1992), CR. 134934- Giza Cairo Egypt South Tower, 26 th & 27 th
Nile City Towers, Cornish El Nile, Ramlet Beaulac Cairo, Egypt (202) 4615050/ ;
South Tower, 26th & 27th Floor                         Fax : (202) 4615054 / 5
Tel :(202) 461 50 50/1
Fax:(202) 461 50 54/5
 e-mail: info@otelecom.com



11.    OTH does not participate in any programs of the United States Agency for International Development. One of OTH's subsidiaries, LINKdotNet, has participated in USAID programs, but OTH had no part in LINKdotNet's participation.

12.    Mr. Khaled Bichara is the Chief Executive Officer of LINKdotNet. He is also a member of the board of directors of OTH. Mr. Bichara is not an OTH officer and does not hold any position in OTH's top management, as reflected on OTH's website, an excerpt of which is attached hereto as Attachment A. Nor is Mr. Bichara an Orascom Telecom managing or general agent, or agent authorized to receive service of process. Mr. Bichara resides, is employed, and regularly transacts business in Egypt. Mr. Bichara does not conduct business on behalf of OTH in New York State or elsewhere in the United States of America.

13.    Mr. Bichara was arrested for, pleaded guilty to, and ultimately was fined US $250 for violating U.S. law in connection with LINKdotNet's participation in a USAID program. Mr. Bichara was not acting in any capacity for OTH when he participated in the USAID program, when he was arrested at John F. Kennedy International Airport, or when he appeared at his sentencing in the federal courthouse in New York (at which time he was presented with the Subpoenas, Restraining Notice, and Turnover Petition).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Cairo, Egypt, the _3_ day of August, 2005.



Amr Esmat Abaza

Orascom Telecom Holding S.A.E. (Société Anonyme Egyptienne), with a Paid Capital: 1,100,000,000 LE.
(Subject to law No. 95 / 1992), CR. 134934 - Giza
Nile City Towers, Cornish El Nile, Ramlet Beaulac, Cairo, Egypt
South Tower, 26th & 27th Floor
Tel :(202) 461 50 50/1
Fax :(202) 461 50 54/5
e-mail: info@otelecom.com

3