**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

The Estate of Yaron Ungar, et al.,

      *Plaintiffs-Judgment*
      *Creditors*,

      v.

Orascom Telecom Holding S.A.E.,

      *Defendant-Garnishee*.

Civ. Action No. 07 CV 2572
(CM) (LMS)

---

**ORASCOM'S COMBINED (1) REPLY MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION TO DISMISS THE FIRST
AMENDED COMPLAINT AND (2) OPPOSITION TO
PLAINTIFFS' CROSS-MOTION FOR JURISDICTIONAL DISCOVERY**

**WHITE & CASE** LLP
701 Thirteenth Street, NW
Washington, DC  20005

September 5, 2007

*Counsel for*
*Orascom Telecom Holding S.A.E.*

# TABLE OF CONTENTS

Page

I.    THE COURT LACKS PERSONAL JURISDICTION OVER ORASCOM ......................1

    A.    The "Solicitation-Plus" Rule Does Not Apply ......................................................2

        1.    Orascom's Financing Activities Do Not Constitute the Solicitation of
            Business in New York ............................................................................... 2

        2.    Orascom Does Not Engage in Any "Substantial And Continuous" Activity
            In New York ............................................................................................. 6

    B.    Orascom's Contacts With New York, Individually and Collectively, Are
        Jurisdictionally Insufficient ...................................................................................8

        1.    New York Financing Activities are Jurisdictionally Insufficient under §
            301 .......................................................................................................... 10

        2.    Mr. Sawiris's Membership on NYSE's International Advisory Committee
            is Jurisdictionally Insufficient................................................................. 13

        3.    Plaintiffs' Other Alleged Contacts Are Jurisdictionally Insufficient........ 14

    C.    Plaintiffs Are Not Entitled To *Additional* Jurisdictional Discovery ....................16

        1.    Plaintiffs Are Not Entitled to Additional Jurisdictional Discovery Under
            Any Standard .......................................................................................... 16

        2.    Orascom Officials Were Forthcoming and Cooperative During the
            Discovery Process ................................................................................... 19

II.    THIS COURT LACKS SUBJECT-MATTER JURISDICTION ......................................20

III.    THE COURT LACKS JURISDICTION OVER THE ASSETS AT ISSUE ....................23

IV.    THE FIRST AMENDED COMPLAINT DOES NOT STATE A CLAIM FOR
    TURNOVER .................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**FEDERAL CASES**                                                    **PAGE(S)**

*Aaron v. Mattikow*, 225 F.R.D. 407 (E.D.N.Y. 2004) ...................................................22

*Alliance Bond Fund, Inc. v. Grupo Mexicano*,
    190 F.3d 16 (2d Cir. 1999)...........................................................................................24

*Aqua Products, Inc. v. Smartpool, Inc.*, No. 04 CV 5492,
    2005 WL 1994013 (S.D.N.Y. Aug., 18, 2005) ............................................................ 6

*Arkwright Mut. Ins. Co. v. Scottsdale Ins. Co.*,
    874 F. Supp. 601 (S.D.N.Y. 1995).............................................................................16

*Atlantic Mutual Ins. Co. v. CSX Expedition*, No. 00 Civ. 7668,
    2003 WL 21756414 (S.D.N.Y. July 30, 2003) ............................................................6

*Beatie and Osburn LLP v. Patriot Scientific Corp.*,
    431 F. Supp. 2d 367 (S.D.N.Y. 2006)........................................................................10

*Big Apple Pyrotechnic v. Sparktacular*, No. 05 Civ. 9994,
    2007 WL 747807 (S.D.N.Y. Mar. 9, 2007) .................................................................6

*Chandamuri v. Georgetown*, 274 F. Supp. 2d 71 (D.D.C. 2003) .................................25

*Clarke v. Fonix Corp.*, No. 98 Civ. 6116,
    1999 WL 105031 (S.D.N.Y. Mar. 1, 1999),
    *aff'd*, 199 F.3d 1321 (2d Cir. 1999) ...............................................................3, 9, 10

*Clarinda Color LLC v. BW Acquisition Corp.*, No. 00 CV 722,
    2004 WL 2862298 (D. Minn. 2004) ..........................................................................23

*Consolidated Dev. Corp. v. Sherritt, Inc.*,
    216 F.3d 1286 (2d Cir. 2000).......................................................................................3

*Crucible Ventures, Inc. v. Futuresat Ind.*,
    No. 88 Civ. 4251, 1990 WL 16140 (S.D.N.Y. Feb. 15, 1990) ...................................3

*Dale v. Banque SCS Alliance S.A.*, No. 02 Civ. 3592,
    2004 WL 2389894 (S.D.N.Y. Oct. 22, 2004) ...........................................................16

*De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65 (2d Cir. 1996) ...............................23, 25

*Daniel v. American Bd. Emergency Medicine*, 988 F. Supp. 127

(W.D.N.Y. 1996), *aff'd*, 428 F.3d 408 (2d Cir. 2005) .......................................................4, 11

*DiBella v. Hopkins*, 403 F.3d 102 (2d Cir. 2005) ...................................................................12, 13

*Ehrenfeld v. Mahfouz*, 489 F.3d 542 (2d Cir. 2007) ............................................................. 17-18

*Epperson v. Entm't Express, Inc.*, 242 F.3d 100 (2d Cir. 2001)....................................................22

*Estate of Ungar v. Palestinian Auth.*, 400 F. Supp. 2d 541
   (S.D.N.Y. 2005) ........................................................................................................ *passim*

*Freeplay Music, Inc. v. Cox Radio, Inc.*,
   No. 04 Civ. 5238, 2005 WL 1500896 (S.D.N.Y. June 23, 2005)..............................................3

*Galgay v. Bulletin Co., Inc.*,
   504 F.2d 1062 (2d Cir. 1974)....................................................................................................16

*Grendene, S.A. v. Brazam Int'l Trading Corp.*,
   No. 83 Civ. 0782, 1986 WL 10709, (S.D.N.Y. Sept. 24, 1986)..............................................14

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
   466 U.S. 408, 104 S. Ct. 1868 (1984)..................................................................................9, 15

*Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*,
   763 F.2d 55 (2d Cir. 1985)...............................................................................................2, 9, 10

*Hollins v. U.S. Tennis Ass'n*, 469 F. Supp. 2d (E.D.N.Y. 2006) ...................................................18

*Hygh v. Jacobs*, 961 F.2d 359 (2d Cir. 1992) ...............................................................................13

*In re Magnetic Audiotape Antitrust Litig.*,
   334 F.2d 204 (2d Cir. 2003)......................................................................................................18

*In re Ski Train Fire*, No. 1428, 01 Civ. 7342,
   2003 WL 1807148 (S.D.N.Y. Apr. 4, 2003)...............................................................3, 9, 19

*Indemnity Ins. Co. of North America v. K-Line America, Inc.*,
   Nos. 06 Civ. 0615, 2557, 2956, 2962, 3038, 3040, 3042,
   2007 WL 1732435 (S.D.N.Y. June 13 2007) ...........................................................8, 9, 14, 17

*Jacobs v. Felix Bloch*, 160 F. Supp. 2d 722 (S.D.N.Y. 2001) ...............................................1, 7, 10

*Jazini v. Nissan Motor Co.*, 148 F.3d 181 (2d Cir. 1996)..................................................... *passim*

*Karaha Bodas Co. v. Perusahaan Pertambangan*, No. M-18-302,
   2004 WL 2712556 (S.D.N.Y. Nov. 24, 2004)........................................................................24

*Kingsepp v. Wesleyan University*,
   763 F. Supp. 22 (S.D.N.Y. 1991)................................................................................8

*Klonis v. Nat'l Bank of Greece, S.A.*,
   05 Civ. 6289, 2007 WL 959257 (S.D.N.Y. Mar 28, 2007) .......................................3

*Knox v. Orascom Telecom Holding S.A.E.*,
   242 F.R.D. 251 (S.D.N.Y. 2007) ...................................................................20-21, 23

*Knox v. Orascom Telecom Holding S.A.E.*,
   477 F. Supp. 2d 642 (S.D.N.Y. 2007)........................................................................20

*Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.*,
   918 F.2d 1039 (2d Cir. 1990).......................................................................... *passim*

*M'Baye v. World Boxing Ass'n*,
   429 F. Supp. 2d 652 (S.D.N.Y. 2006)........................................................................13

*McShan v. Omega Louis Brandt et Frere, S.A.*,
   536 F.2d 516 (2d Cir. 1976).......................................................................................15

*Medpay Sys., Inc. v. Medpay USA, LLC*,
   No. 06-CV-1054, 2007 WL 1100796 (E.D.N.Y. Mar. 29, 2007).........................14-15

*Mende v. Milestone Tech., Inc.*,
   269 F. Supp. 2d 246 (S.D.N.Y. 2003).........................................................................3

*Merrell v. Miller*, No. Civ.A. 91-493-A,
   1998 WL 329264 (E.D. Va. 1998).............................................................................22

Murray v. Pataki, No. 03-CV-1263, 2007 WL 956941
   (N.D.N.Y. Mar. 29, 2007)..........................................................................................23

*Nordic Bank PLC v. Trend Group, LTD*,
   619 F. Supp. 542 (S.D.N.Y. 1985).......................................................................5, 11

*Overseas Media, Inc. v. Skvortsov*,
   407 F. Supp. 2d 563 (S.D.N.Y. 2006)........................................................................6

*Peacock v. Thomas*, 516 U.S. 349, 116 S. Ct. 862 (1996)...........................................22

*Pieczenik v. Cambridge Antibody Tech. Group*,
   No. 03 Civ. 6336, 2004 WL 527045 (S.D.N.Y. Mar. 16, 2004) ...........................3, 9

*Rizzo v. Edison, Inc.*,
    No. 05-3707, 2006 WL 759797 (2d Cir. Mar. 24, 2006)............................................12

*Ruhrgas AG v. Marathon Oil Co.*,
    526 U.S. 574, 119 S.Ct. 1563 (1999)......................................................................20

*SEC v. Antar*, 120 F. Supp. 2d 431 (D.N.J. 2000) .................................................22

*Stewart v. Vista Point Verlag & Ringier Publishing*,
    2000 WL 1459839 (S.D.N.Y. 2000)
    *aff'd*, 20 Fed. Appx. 91 (2d Cir. 2001) ................................................................14

*Tese-Milner v. AD EFX Promotions, Inc.*,
    No. 06 Civ. 1630, 2007 WL 196866 (S.D.N.Y. Jan. 26, 2007)................................14

*Texas Int'l Magnetic, Inc. v. BASF Aktiensell-Schafz*,
    31 Fed. Appx. 738 (2d Cir. 2002) ..........................................................................18

*UFCW Local 174 Commercial Health Care Fund v. Homestead
    Meadows Food Corp.*, 425 F. Supp. 2d 392 (S.D.N.Y. 2005)................................22

*United States v. Articles of Banned Hazardous Substances*,
    34 F.3d 91 (2d Cir. 1994)......................................................................................13

*United States v. Bok*, 156 F.3d 157 (2d Cir. 1998) .................................................24

*Wiwa v. Royal Dutch Petroleum Co.*,
    226 F.3d 88 (2d Cir. 2000)............................................................................1, 5, 6
                                                      1, 5, 6
*Yellow Page Solutions, Inc. v. Bell Atlantic Yellow Pages Co.*,
    No. 00 CIV 5663, 2001 WL 1468168 (S.D.N.Y. Nov. 19, 2001) ..........................16

**STATE CASES**

*Adelaide Prod. v. BKN Int'l AG*, 39 A.D.3d 254,
    833 N.Y.S.2d 450 (N.Y. App Div. 2007) ..............................................................24

*Chestnut Ridge Air, LTD v. 1260269 Ontario Inc.*,
    13 Misc. 3d 807, 827 N.Y.S. 2d 461 (N.Y. Sup. Ct. 2006) ....................................14

*Klein v. Klein*, 296 A.D.2d 533, 745 N.Y.S.2d 569
    (N.Y. App. Div. 2002) ..........................................................................................24

*Laufer v. Ostrow*,
    55 N.Y.2d 305, 434 N.E.2d 692, 449 N.Y.S. 456 (N.Y. 1982) ............................2, 6

*NYC Med. & Neurodiagnostic, P.C. v. Republic Western Ins. Co.*,
    8 Misc. 3d 33, 798 N.Y.S. 309 (N.Y. App. Term 2004)..........................................................17

*Robbins v. Ring*,
    9 Misc. 2d 44, 166 N.Y.S.2d 483 (N.Y. Sup. Ct. 1957) ........................................................ 3-4

## **FEDERAL STATUTES**

Rule 702 of the Federal Rules of Evidence ..................................................................................12

## **STATE STATUTES**

N.Y. C.P.L.R. § 301 (McKinney 1997).................................................................... *passim*

N.Y. C.P.L.R. § 5201 (McKinney 1997)......................................................................24

N.Y. C.P.L.R. § 5225 (McKinney 1997)......................................................................24

N.Y. C.P.L.R. § 5227 (McKinney 1997)...............................................................23, 24

While Plaintiffs go to great lengths in their Opposition to circumvent controlling authority and prior decisions by this Court, these efforts are futile and the First Amended Complaint must be dismissed at this time on a number of independent grounds.

## I.    THE COURT LACKS PERSONAL JURISDICTION OVER ORASCOM

Plaintiffs relegate their personal jurisdiction arguments to the back of their opposition brief, as though such sequencing of arguments can obscure that Orascom's occasional and collateral activities in New York do not constitute the "continuous, permanent, and substantial" activity required under § 301.  *See Wiwa*, 226 F.3d at 95 (holding § 301 "doing business" standard requires "continuous, permanent, and substantial activity in New York") (quoting *Landoil*, 918 F.2d at 1043); *see also Jacobs v. Felix Bloch*, 160 F. Supp. 2d 722, 731 (S.D.N.Y. 2001) (recognizing that "[m]ore recent Second Circuit decisions have clarified that the [§ 301] standard requires a showing of ***continuous, permanent, and substantial*** activity in New York.") (internal quotations omitted) (emphasis added).  This Court earlier held that Orascom was not subject to personal jurisdiction under § 301 and the Due Process Clause.  *See Estate of Ungar*, 400 F. Supp. 2d at 549-52.  Now after two years of extensive court-ordered discovery that has yielded no facts supporting jurisdiction, this Court should dismiss Plaintiffs' First Amended Complaint on this same basis.

Plaintiffs attempt to circumvent the extensive § 301 case law Orascom cites in its opening papers (Orascom Mem. at 8-18) — and this Court's prior decision — by asserting (at 15-21) that jurisdiction over Orascom is proper under § 301's "solicitation-plus" rule.  In support of this theory, Plaintiffs rely on Orascom's alleged financing activities in New York, but the "solicitation-plus" rule does not apply here.  Indeed, under Plaintiffs' theory, foreign corporations would suddenly find themselves subject to general personal jurisdiction in New

York based on their isolated financing activities in New York — effectively rewriting the law of general personal jurisdiction.

### A.     The "Solicitation-Plus" Rule Does Not Apply

Under § 301's "doing business" standard, courts examine various factors or "indicia of jurisdiction," including: "[1] the existence of an office in New York; [2] the solicitation of business in New York; [3] the presence of bank accounts or other property in New York; and [4] the presence of employees or agents in New York." *Landoil Res. Corp.*, 918 F.2d at 1043; *accord Hoffritz*, 763 F.2d at 57-58. The Second Circuit has explained that when a plaintiff relies on the "solicitation of business" factor as a basis for jurisdiction, the "[s]olicitation of business alone will not justify a finding of corporate presence in New York with respect to a foreign manufacturer or purveyor of services." *Landoil Res. Corp.*, 918 F.2d at 1043 (citing *Laufer v. Ostrow*, 55 N.Y.2d 305, 309-310, 434 N.E.2d 692, 694, 449 N.Y.S.2d 456, 458 (1982)). Rather, the "solicitation of business" factor requires that (i) the solicitation be "substantial and continuous," and (ii) the defendant "engage[ ] in other activities of substance in the state." *Id.* at 1043-44. The Second Circuit has referred to this requirement as the "solicitation-plus" rule. *Id.*

The solicitation-plus rule does not apply here because Plaintiffs have failed to satisfy the "solicitation" prong of the rule: Orascom does not solicit "business" in New York, and Orascom's financing activities in New York (upon which Plaintiffs rely) are not "substantial and continuous." Moreover, Orascom does not engage in any "other activities of substance" in New York that would satisfy the "plus" prong.

### 1.     Orascom's Financing Activities Do Not Constitute the Solicitation of Business in New York

Orascom does not solicit business in New York as defined by the case law. As this Court has already held, "solicit[ing] investment at various conferences held within New York State"

does not constitute "doing business" for purposes of § 301. *Estate of Ungar*, 400 F. Supp. 2d at 550[1]; *see also Consolidated Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1292 (2d Cir. 2000) (holding that under the due process clause, the court lacked jurisdiction over Canadian corporation that "twice issued bonds and debentures to investors in the United States"); *Clarke*, 1999 WL 105031, at *5 ("[r]aising financing is not a form of 'doing business' for the purpose of § 301"); *Freeplay Music, Inc.*, 2005 WL 1500896, at *4 (substantially same); *Mende*, 269 F. Supp. 2d at 254 (substantially same); *In re Ski Train Fire*, 2003 WL 1807148, at *4 ("A long line of cases establishes that a foreign defendant is not 'present' in New York for the purposes of jurisdiction simply because it has engaged in financing transactions here.") (citing cases); *Crucible Ventures, Inc.*, 1990 WL 16140, at *2 (holding "approximately twenty-five [meetings] between 1984 and 1986 to negotiate and consummate various loans" insufficient under § 301); *Klonis*, 2007 WL 959257, at *6 (S.D.N.Y. Mar. 28, 2007) (holding ADRs traded on the NYSE, attorneys in New York, and a depository account in connection with its listing insufficient to establish jurisdiction); *Pieczenik*, 2004 WL 527045, at *6 (substantially same); *Robbins*, 9 Misc. 2d at 45, 166 N.Y.S. 2d at 484-85 (substantially same); *Daniel*, 988 F. Supp. at 223-24 (holding issuance of bonds through New York financial markets jurisdictionally insufficient under § 301).

---

[1] Plaintiffs distort the record on appeal to argue (at 3) that Orascom should not be permitted to rely upon this Court's November 7 Decision. Contrary to Plaintiffs' assertion, it was Plaintiffs — not Orascom — who sought and received a stay of the appeal by moving for a 90-day enlargement of time on the ground that "further proceedings in the district court may significantly narrow this appeal." *See* Pls.' Mot. for Enlargement of Time ¶¶ 1(a), 10, 11, *Estate of Ungar v. Palestinian Auth.*, No. 05-6900 (2d Cir. May 8, 2006) (attached hereto as Erb Decl. (Ex. 1) Attach. G). In any event, the November 7 Decision remains good law, and there is nothing "contradictory" about Orascom's reliance on this Court's sound Decision and Orascom's position regarding the appealability of that Decision.

Indeed, it would be anomalous for this Court to conclude that Orascom's alleged financing activities do not constitute "continuous, permanent, and substantial" activity under § 301's traditional indicia test, only to conclude that they are somehow significant under the solicitation-plus rule, which is merely another approach to analyzing general personal jurisdiction under § 301. *See Landoil Res. Corp.*, 918 F.2d at 1044 (recognizing that "the solicitation-plus rule is not a talismanic test for jurisdiction, but merely a means by which courts have attempted to resolve that issue").

In an attempt to bring Orascom's limited New York activities within the solicitation-plus rule, Plaintiffs assert (at 16-17) that Orascom's financing activities constitute its "core business" or "its very corporate raison d'être." This is not the case. *See* Declaration of Emad Farid ("Farid Decl.") ¶ 7 (attached hereto as Ex. 2); Declaration of Rodolphe Aldo Mario Mareuse ("Mareuse Decl.") ¶ 13 (attached hereto as Ex. 3). In fact, Orascom's principal corporate activity is to provide operational support to its telecommunications subsidiaries that operate Global System for Mobile Communications ("GSM") mobile networks, provide internet services, and sell handsets to their customers in the Middle East, Africa and South Asia. Farid Decl. ¶ 4. Orascom provides such support in the various different operational areas, such as technical, commercial, procurement, human resources, budgeting, strategic planning, regulatory, and revenue assurance. *Id.* ¶¶ 5- 6. The management services Orascom provides to its subsidiaries (in exchange for management fees and dividends) are intended to add value to its operations by capitalizing on the experience gained in one market for the benefit of other markets, transferring know-how from one operation to another, and leveraging the group volume to get better prices and better services from vendors. *Id.* From time to time, when the operating subsidiaries are in need of financing, Orascom evaluates the best means to obtain that financing, whether through debt or equity.

Mareuse Decl. ¶ 13.   As the need arises, Orascom raises financing from sources located throughout the world, including London, Geneva, Zurich, Paris, Frankfurt, Amsterdam, Edinburgh, Hong Kong, Singapore, Kuwait City, Dubai, Boston, San Francisco, Laguna Beach and New York.  *Id.*  Raising financing does not constitute Orascom's principal corporate activity. *Id.* ¶¶ 7, 13; Farid Decl. ¶ 7.

Even if raising financing was Orascom's "core business" (which it is not), this Court has concluded that financing activities are jurisdictionally insufficient even when it is "***an essential aspect*** of the [] defendants' business."  *See Nordic Bank PLC*, 619 F. Supp. at 566 (holding commercial paper sales jurisdictionally insufficient) (emphasis added).

To support their solicitation-plus argument, Plaintiffs misstate (at 15-16) dicta in *Wiwa*, 226 F.3d at 98.  There, the Second Circuit applied § 301's ***traditional indicia standard*** to hold that maintaining a physical Investor Relations Office in New York City was sufficient for the exercise of general personal jurisdiction over defendants, and addressed the District Court's solicitation-plus analysis only in passing.  *Id.* at 98 ("[***E***]***ven without relying on the 'solicitation plus' formulation***, the activities of the Investor Relations Office meet the 'doing business' standard.  In assessing whether jurisdiction lies against a foreign corporation, both ***this Court and the New York courts have focused on a traditional set of indicia*** . . . .") (emphasis added).

Plaintiffs (at 16) further misstate the dicta from *Wiwa* by insisting that "any activity" benefiting Orascom constitutes "solicitation."   The Second Circuit held no such thing in remarking that "a finding of 'solicitation' in the jurisdictional context does not necessarily require 'solicitation' in the sense of an offer of contract."  *See id.*  The *Wiwa* dicta — which Plaintiffs cite liberally throughout their papers (at 15-16, 19, 20) — did not herald the Second Circuit's articulation of a new standard that deviates from the "substantial, permanent, and

continuous" activity standard in favor of some lesser standard. After all, the solicitation-plus theory is anchored in § 301's requirement that a foreign corporation be "engaged in such a continuous and systematic course of 'doing business' here as to warrant a finding of its 'presence' in this jurisdiction." *Landoil Res. Corp.*, 918 F.2d at 1043; *accord Wiwa*, 226 F.3d at 95; *Jazini*, 148 F.3d at 184.

> ### 2. Orascom Does Not Engage in Any "Substantial And Continuous" Activity In New York

In any event, Orascom does not engage in financing activities in New York "on a systematic and continuous basis" as would be required to trigger the solicitation-plus standard, assuming such activities were jurisdictionally significant (which they are not). When determining whether solicitation is "substantial and continuous," "[c]ourts will frequently look to the percentage of a company's revenue attributable to New York business." *Overseas Media, Inc.*, 407 F. Supp. 2d at 569 (citing cases); *see also Big Apple Pyrotechnic,* 2007 WL 747807, at *3 (under solicitation-plus, discussing solicitation of New York business, as measured by employee visits, sales and customer contacts); *Laufer v. Ostrow*, 55 N.Y. 2d 305, 311, 434 N.E. 2d 692, 449 N.Y.S. 2d 456 (1982) (defining solicitation as encompassing volume of business generated, employing New York sales representatives assigned to New York accounts, soliciting sales in New York, running clinics for customers, following up on complaints or difficulties, delivering swatches and sales materials, and working with sales representatives to call on New York accounts); *Atlantic Mutual Ins. Co. v. CSX Expedition*, 2003 WL 21756414 at *2 (S.D.N.Y. July 30, 2003) (solicitation as measured by New York earnings arising from contracts); *Aqua Products, Inc. v. Smartpool, Inc.*, 2005 WL 1994013 at *4 (S.D.N.Y. Aug. 18, 2005) (discussing solicitation in terms of annual gross revenue from sales to New York entities); *cf. Jacobs*, 160 F.

Supp. 2d at 733 (holding that "efforts to acquire the rights to plays or musicals in New York are not properly characterized as solicitation" even when defendants are theatrical producers).

Orascom does not make any sales, generate any sales revenue, or provide any services to customers in New York.  *See* Farid Decl. ¶ 8.  Moreover, even if Orascom's financing activities constituted business solicitation (which they do not), the vast majority of road shows in which Orascom participates are "non-deal" road shows, which (like the quarterly and annual conference calls) do not involve solicitation of investment, but rather are designed to provide investors with updates regarding Orascom's performance (including its financial and competitive position) and forecasts.  *See* Mareuse Decl. ¶ 14; Farid Dep. 34:22-35:9; 69:19-71:10 (attached hereto as Erb Decl. Attach. H); Mareuse Dep. 56:6-15; 57:8-24; 136:20-137:16 (attached hereto as Erb Decl. Attach I); Sawiris Dep. 56:20-57:18; 60:10-22 (attached hereto as Erb Decl. Attach. J).  Only one road show, which took place in late January and early February 2007 in Geneva, Zurich, London, New York, and Boston, was a "deal" road show because it involved the promotion of an international bond offering.  *See* Farid Dep. 34:22-36:10; Mareuse Dep. 56:6-15; 57:8-24; 59:6-23; 119:10-131:21; Sawiris Dep. 56:20-57:18; 60:23-62:14; 67:13-70:2.  Thus, Orascom does not engage in "substantial and continuous" activity in New York as would be required under the solicitation-plus rule.

Furthermore, in a recent solicitation-plus case involving vastly more extensive contacts than those Plaintiffs have alleged here — including indirect sales in New York through 22 retail stores; sales employees that visited retailers in New York who purchased defendants products; over 2000 shipments to New York; total sales in New York of more than $9 million; a website that directs visitors to retail stores in New York; a sales representative and an international exporter based in New York; promoters attending events in New York to promote defendant's

products; advertisements in 15-20 magazines, some of which circulate in New York; advertisements on five or six weekly television shows which were seen by people who live in New York; representatives who attended a fair in New York; and previously filing a lawsuit in the Southern District of New York — this Court concluded that such contacts were jurisdictionally insufficient under § 301's "doing business" standard.  *See Indemnity Ins. Co. v. K-Line America*, Inc., Nos. 06 Civ. 0615, 2557, 2956, 2962, 3038, 3040, 3042, 2007 WL 1732435, at *7 (S.D.N.Y. June 14, 2007) ("Considering all of Plano's contacts with New York in combination with each other and in the light most favorable to [plaintiff], the Court concludes that Plano is not engaged in substantial solicitation in New York, and that it is not engaged in such a continuous and systematic course of doing business in New York as to subject it to personal jurisdiction under Section 301 of the CPLR.").

Finally, Plaintiffs' reliance (at 15 & 22) on *Kingsepp*, 763 F. Supp. at 27, is unavailing because there the court analyzed Dartmouth College's "issu[ance] of bonds in New York through Goldman Sachs on at least four separate occasions" as a "plus" factor, ***not*** as "solicitation." Dartmouth's core activity for "solicitation" purposes was the solicitation of students in New York, not the bond offering.  *Id.*

## B.  Orascom's Contacts With New York, Individually and Collectively, Are Jurisdictionally Insufficient

Plaintiffs appear to suggest (at 16) that the contacts they have alleged, which are individually insufficient, will somehow rise to jurisdictional significance when considered collectively, but this Court and many others have concluded that such aggregated contacts still do not constitute "presence" under § 301 or the due process clause.  *See, e.g.*, *Estate of Ungar*, 400 F. Supp. 2d at 549-52; *see also Helicopteros*, 466 U.S. at 418, 104 S.Ct. at 1874 (holding general personal jurisdiction lacking over Colombian corporation that sent its chief executive

officer to Houston for contract negotiation; accepted into its New York bank account checks drawn on Houston bank; purchased helicopters, equipment, and training services from Texas business for substantial sums; and sent personnel to Texas for training); *Hoffritz*, 763 F.2d at 57-58 (holding general personal jurisdiction lacking over defendant who visited New York 54 times to discuss a franchise agreement, and agreed to a clause authorizing arbitration in New York); *Indemnity Ins. Co.*, 2007 WL 1732435, at *3-7 (holding general personal jurisdiction lacking over Illinois defendant despite ten jurisdictional allegations, including $9 million in New York sales); *Pieczenik*, 2004 WL 527045, at *6 (holding general personal jurisdiction lacking over defendant who was a party to an agreement that gave rise to a lawsuit in New York, entered into contracts with New York businesses, designated the Bank of New York as a depository for its ADRs, and owned a minority stake in a New York business); *In re Ski Train Fire*, 2003 WL 1807148, at *4-6 (holding general personal jurisdiction lacking over a defendant that had a series of nine cross-border leasing transactions that closed in New York, maintained bank accounts in New York for the purpose of receiving the proceeds of the leasing transactions, retained financial advisors and counsel in New York to assist with these transactions, and maintained a website designed to attract New York investors and/or customers); *Clarke*, 1999 WL 105031, at *5 (holding general personal jurisdiction lacking over defendant that held board meetings, had a stock transfer agent, and attended trade shows in New York).

Indeed, in *Indemnity*, which as discussed above involved far greater contacts than those alleged here, this Court concluded that even such a "[c]ombination of [c]ontacts" is jurisdictionally insufficient under § 301's "doing business" standard.  2007 WL 1732435, at *7.

1.    **New York Financing Activities are Jurisdictionally Insufficient under § 301**

Plaintiffs assert (at 18-19) that Orascom continuously and systematically solicits business in New York by attending road shows and investor conferences and by engaging in quarterly and annual conference calls with investors and financial analysts from around the world, but that contention fails because, as discussed above, it is well-established that such activity is not "continuous, permanent, and substantial" under § 301. *See, e.g.*, *Estate of Ungar*, 400 F. Supp. 2d at 550 (holding that "***solicit[ing] investment*** at various conferences held within New York State" does not constitute "doing business" for purposes of § 301) (emphasis added); *see also Beatie and Osborn LLP*, 431 F. Supp. 2d at 388 ("telephone calls and correspondence sent into New York" held jurisdictionally insufficient); *Clarke*, 1999 WL 105031, at *5 ("Raising financing is not a form of 'doing business' for the purpose of § 301; if it were, then almost every company in the country would be subject to New York's jurisdiction."); Orascom's Mot. to Dismiss at 11-16 (citing cases).

In addition, this Court should reject Plaintiffs' attempt (at 19) to add jurisdictional weight to Orascom's attendance at the road shows and investor conferences by counting each and every individual rapid-fire meeting that Orascom representatives had with investors over what were essentially one- or two-day visits to New York, among other cities around the world. *See* Mareuse Dep. 51:14-52:24; 78:23-79:8; 104:22-105:4; 121:7-20. Relevant case law discusses such contacts in terms of the number or duration of visits to New York, not the number of meetings held in New York. *See Landoil*, 918 F.2d at 1045 (holding that "thirteen business trips" made over eighteen months did not constitute "substantial and continuous" solicitation); *Hoffritz*, 763 F.2d at 57-58 (holding that fifty-four visits per year jurisdictionally insufficient); *Jacobs v. Felix Bloch*, 160 F. Supp. 2d 722, 733 (S.D.N.Y. 2001) (holding "an average of four to

five visits per year are an insufficient basis for jurisdiction"). Such meetings are likewise insufficient under the solicitation-plus standard. *See Landoil*, 918 F.2d at 1045 (holding that the solicitation-plus standard not satisfied by "business trips [that] were of short duration, were by different employees, involved a number of accounts, including large multi-national corporations headquartered in New York, and in some instances concerned contacts that were not relevant to New York in any way").

Furthermore, Plaintiffs inaccurately characterize (at 18-19) Orascom representatives' attendance at road shows and investor conferences and their participation in quarterly and annual conference calls as "raising financing." That an investor ***might*** potentially purchase — or sell — Orascom GDRs in a secondary market following a road show or conference call at which Orascom discusses its financial performance does not mean that such contacts constitute "raising financing." Indeed, even the one road show that involved a "deal" — i.e., the 2007 bond offering — is jurisdictionally insufficient. *See, e.g.*, *Daniel*, 988 F. Supp. at 223-24 (holding that issuance of bonds through New York financial markets to raise capital is jurisdictionally insufficient under § 301); *Nordic Bank PLC*, 619 F. Supp. at 566 (holding commercial paper sales jurisdictionally insufficient).

In support of their argument that Orascom's GDR program at the Bank of New York is jurisdictionally significant, notwithstanding the extensive case law to the contrary, Plaintiffs rely on the Declaration of George H. Gregor, who is presented to the Court as a purported "expert."[2] *See* Pls.' Opp'n at 22; *see also* Declaration of Plaintiffs' Expert George H. Gregor ("Gregor

---

[2] Although Mr. Gregor's declaration is styled as one of an "expert" regarding the issue of GDR programs, Mr. Gregor merely indicates that he has "acquired a very detailed understanding of both international depository receipts and global bonds from the perspective of corporate trust services of such forms." *Id.*

Decl."). Mr. Gregor's purported "expert" declaration should be excluded for several reasons. First, the Gregor Declaration fails to assist the Court because it merely provides the underlying details related to jurisdictionally insufficient contacts, i.e., Orascom's GDR program and bond offering. *See DiBella v. Hopkins*, 403 F.3d 102, 121 (2d Cir. 2005) ("Federal Rule of Evidence 702 allows expert testimony if 'scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."). Neither Plaintiffs nor their purported "expert" even contend that Orascom's GDR program and related bond offering is distinguishable from all the other private placement programs discussed in the case law. Indeed, the GDR program at issue here may be even more attenuated because an Egyptian bank maintains custody over the Orascom shares for which the GDR certificates are issued, which is reflected in Plaintiffs' own exhibits. *See* Pls.' Ex. 1 at § 1.06; Pls.' Ex. 2 at § 1.05; Pls.' Ex. 3 at § 1.05; Pls.' Ex. 5 at § 1.06; Pls.' Ex. 6, at § 1.05; *see also* Sawiris Dep. 44:23-45:5.

Moreover, Mr. Gregor declares that he "submit[s] this declaration to provide the Court with [his] opinion . . . as to the material and substantial contacts with New York which have been had by Orascom" (*id.* ¶ 2), and that "Orascom engaged in continuous and substantial activities . . . in New York" (*id.* ¶ 6). By his own admission, Mr. Gregor's declaration opines on a legal standard (materiality and substantiality of contacts) in order to reach a legal conclusion (that Orascom engages in "continuous and substantial activities"). Such a declaration does not assist the Court because it is impermissible for an expert to opine on a legal standard or reach legal conclusions. *See, e.g.*, *Rizzo v. Edison, Inc.*, No. 05-3707, 2006 WL 759797, at *3 (2d Cir. Mar. 24, 2006) (holding that "the existence of probable cause is a question of law that is not properly the subject of expert testimony"); *DiBella*, 403 F.3d at 121 (affirming a district court's decision to exclude the testimony of an expert who "inappropriately drew a legal conclusion by opining

that DiBella's actions amounted to extortion"); *accord United States v. Articles of Banned Hazardous Substances*, 34 F.3d 91, 96 (2d Cir. 1994); *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992). Mr. Gregor may arguably be "qualified by experience to assist the trier of fact, [but] he is not qualified to compete with the judge." *Id.*; *see also* Gregor Decl. ¶¶ 2, 6.

### 2.    Mr. Sawiris's Membership on NYSE's International Advisory Committee is Jurisdictionally Insufficient

Notwithstanding Mr. Sawiris's testimony to the contrary (*see* Sawiris Dep. 32:16-24), Plaintiffs insist (at 23-24) that Mr. Sawiris's appointment and attendance at one annual meeting of the NYSE International Advisory Committee is a jurisdictional contact attributable to Orascom.

Plaintiffs rely (at 24) on *M'Baye*, 429 F. Supp. 2d at 658, for this proposition, but that case is inapposite. In *M'Baye*, the Court concluded that the World Boxing Association's compliance with the New York State Athletic Commission's registration requirements supported personal jurisdiction because, without it, the WBA would not have been able to sanction bouts in New York since the 1920s, which enabled the WBA "to earn considerable fees." *Id.* In contrast, Orascom does not depend on Mr. Sawiris's membership on the International Advisory Committee to conduct its business or generate revenue. Accordingly, *M'Baye* does not support Plaintiffs' attribution argument.

In any event, Mr. Sawiris's attendance at a single annual International Advisory Committee meeting does not constitute the "continuous, permanent, and substantial" activity required under § 301. *See Estate of Ungar*, 400 F. Supp. 2d at 550 (holding that isolated meetings and attendance at business conferences do not constitute "doing business" for purposes of general personal jurisdiction); *see also Grendene, S.A.*, 1986 WL 10709, at *4 (holding that "occasional trips to New York" by Brazilian corporation's owner jurisdictionally insufficient).

### 3. Plaintiffs' Other Alleged Contacts Are Jurisdictionally Insufficient

#### (a) Orascom's Website

Plaintiffs argue (at 21) that Orascom solicits business in New York by maintaining an interactive website, but this argument is without merit. Orascom's website provides only general information about Orascom, its management, and operations. Mareuse Decl. ¶ 15. Orascom does not enter into contracts or conduct any sale of shares, products or services through its website. *Id.* The webpage Plaintiffs cite, www.otelecom.com/media/Register.aspx, merely provides users with the option of registering to receive updated Orascom news and financial reports by email (*id.*), and thus is jurisdictionally insufficient. *See, e.g.*, *Indemnity Ins. Co.*, 2007 WL 1732435, at *7 (holding that because defendant "does not sell goods directly via its website," "[t]his type of website does not constitute solicitation of business in New York because it is not targeted at New York"); *Tese-Milner v. AD EFX Promotions, Inc.*, No. 06 Civ. 1630, 2007 WL 196866, at *4 (S.D.N.Y. Jan. 26, 2007) (holding defendant Comfort Inn's "solicitation of New York residents through the Choice website and its receipt of income from New York residents who stay at Comfort Inn in Florida are insufficient to create general jurisdiction in New York over Comfort Inn"); *Stewart v. Vista Point Verlag & Ringier Publishing*, 2000 WL 1459839, at *6 (S.D.N.Y. 2000), *aff'd*, 20 Fed. Appx. 91 (2d Cir. 2001) (holding that German defendant's "maintenance of a web site and its alleged marketing campaign [are] also insufficient to establish minimum contacts" under the due process clause of the Fourteenth Amendment), *aff'd*, 20 Fed. Appx. 91, 92 (2d Cir. 2001) (affirming district court's due process holding) (summary order); *Medpay Sys., Inc. v. Medpay USA, LLC*, No. 06-CV-1054, 2007 WL 1100796, at *5 (E.D.N.Y. Mar. 29, 2007) (holding "courts have routinely held that the fact that a foreign corporation has an interactive website accessible to New York, without more, is insufficient to confer jurisdiction under CPLR § 301") (citing cases).

Further, *Chestnut Ridge Air, LTD.*, is inapposite because there — unlike here — the defendant's website "created a virtual community in New York that [met] all of [defendant's] clients' needs."  13 Misc. 3d 807, 827 N.Y.S. 2d 461.

### (b)    The Warner Music Agreement

Plaintiffs assert (at 22-23) that a purported contract between Orascom and Warner Music Group may serve as the basis of personal jurisdiction over Orascom.  Plaintiffs' own exhibit (Ex. 46), however, reveals that the purported contract does not involve Orascom, but one of its subsidiaries, ARPU+, and that it concerns the distribution of Warner Music's mobile music products to telecommunications operators in Algeria, Bangladesh, Italy, Pakistan, Tunisia, the United Arab Emirates, and Egypt — not New York.  *Id.*  Such purchases of goods and services for use in overseas business, and contracts with New York companies to provide services overseas, are insufficient to confer jurisdiction.  *Estate of Ungar*, 400 F. Supp. 2d at 550-52; *id.* at 552 n.8 ("New York law states that a foreign parent corporation is not present merely because of the activities of its subsidiaries.") (citing *Jazini*, 148 F.2d at 184); *see also Helicopteros*, 466 U.S. at 418, 104 S. Ct. at 1874 (holding "mere purchases," even if occurring regularly, insufficient).

### (c)    Choice of Law and Choice of Forum Clauses; Agents for Service of Process

Finally, notwithstanding Plaintiffs' assertions to the contrary (at 24-25), it is well-established that New York choice of law clauses, forum selection clauses and clauses appointing agents for the receipt of process in New York — which apply only to claims arising from the particular contract in question — do not confer jurisdiction under § 301.  *See McShan v. Omega Louis Brandt et Frere, S.A.*, 536 F.2d 516, 518 (2d Cir. 1976) (holding that "[t]he law is well settled…that a choice of law provision in a contract does not constitute a voluntary submission to

personal jurisdiction in New York"); *accord Galgay v. Bulletin Co., Inc.*, 504 F.2d 1062, 1066 (2d Cir. 1974); *see also Dale v. Banque SCS Alliance S.A.*, No. 02 Civ. 3592, 2004 WL 2389894, at *5 (S.D.N.Y. Oct. 22, 2004) (holding that "the forum selection clause in the correspondent bank account agreement cannot be construed reasonably as blanket consent by [defendant] to be subject to personal jurisdiction in New York in any action brought against it by a person who is not a party to the correspondent bank account agreement"); *Yellow Page Solutions, Inc. v. Bell Atlantic Yellow Pages Co.*, No. 00 CIV. 5663, 2001 WL 1468168, at *4 (S.D.N.Y. Nov. 19, 2001) (holding that although defendant was "licensed to do business in New York and ha[d] appointed an agent for service of process, that is not sufficient to subject [defendant] to personal jurisdiction absent a showing that it is actually doing business in the state"); *accord Arkwright Mut. Ins. Co. v. Scottsdale Ins. Co.*, 874 F. Supp. 601, 605 (S.D.N.Y. 1995).

### C.    Plaintiffs Are Not Entitled To *Additional* Jurisdictional Discovery

#### 1.    Plaintiffs Are Not Entitled to Additional Jurisdictional Discovery Under Any Standard

Plaintiffs' cross-motion for discovery (at docket # 23) should be denied.  Previously, this Court held that Plaintiffs are not entitled to jurisdictional discovery because their jurisdictional allegations were legally insufficient.  *See Estate of Ungar*, 400 F. Supp. 2d at 550 (citing *Jazini*, 148 F.3d at 186 ("Since the Jazinis did not establish a prima facie case that the district court had jurisdiction over Nissan Japan, the district court did not err in denying discovery on that issue.")).  Despite this ruling, Plaintiffs have had extensive discovery over the past two years concerning their jurisdictional allegations, including depositions, document productions, and information subpoena responses from Orascom's top executives, and apparently numerous third-party depositions and documents.

Despite this extensive discovery, Plaintiffs argue (at 25-26) that they are nevertheless entitled to additional discovery under the "sufficient start" standard. Plaintiffs are not entitled to such discovery under New York state or federal law because they have not alleged any "facts that would support a colorable claim of jurisdiction." *Indemnity Ins. Co. of North America*, 2007 WL 1732435, at *7 (denying plaintiff's request for additional discovery because none of plaintiff's factual allegations "show[ed] that additional discovery would potentially reveal a connection between [defendant] and New York sufficient to establish general personal jurisdiction"); *NYC Med. and Neurodiagnostic, P.C.*, 8 Misc. 3d at 36-37, 798 N.Y. S. 2d at 312 (in denying plaintiffs discovery under the "sufficient start" standard, holding that the standard requires plaintiff to make "a discernible showing that some basis for jurisdiction exists").

In particular, because it is well-established that ADR and GDR programs through New York banks and bond offerings in New York are jurisdictionally insufficient, discovery regarding the percentage of Orascom stock held by New York investors or bond sales in New York adds nothing to the Court's jurisdictional analysis. Likewise, because quarterly and annual conference calls that include New York participants (among others) do not constitute "doing business" under § 301, it is immaterial how may invitees and participants are from New York. In any event, Plaintiffs received discovery regarding the number of worldwide participants. *See* Sawiris Dep. 59:23-60:6 (only 50 to 150 participants on average); Mareuse Dep. 138:7-11 (only 30 to 100 participants on average).

Moreover, Plaintiffs overstate (at 25) the Second Circuit's note in *Ehrenfeld*, 489 F.3d at 550 n.6. The Second Circuit continues to interpret *Jazini* as permitting a district court to exercise its discretion with respect to jurisdictional discovery — including to deny jurisdictional discovery for failure to satisfy the prima facie standard. *See id.* (noting that "we think the

District Court's comment on *Jazini* should be read as a justification of its exercise of discretion to deny jurisdictional discovery, not as a clear limit on its authority to exercise its discretion"). Indeed, in *Ehrenfeld*, the Second Circuit held that the district court there did not abuse its discretion in denying jurisdictional discovery after concluding that "there exist[ed] no need for additional jurisdictional discovery." *Id.* Thus, *Ehrenfeld* supports this Court's denial of Plaintiffs' request for additional discovery given Plaintiffs' failure to raise any jurisdictionally sufficient allegations worthy of such discovery.

Further, Plaintiffs' reliance (at 25-26) on *Hollins*, 469 F. Supp. 2d at 70-72, to support their request for further discovery under the "sufficient start" standard is unavailing. In *Hollins*, the court summarized the Second Circuit's jurisprudence regarding jurisdictional discovery as "distinguish[ing] between allegations that are 'insufficiently developed' warranting discovery and those that are 'sparse' and 'conclusory' requiring dismissal." *Id.* (analyzing *Texas Int'l Magnetic, Inc. v. BASF Aktiensell-Schafz*, 31 Fed. Appx. 738, 739 (2d Cir. 2002) and *In re Magnetic Audiotape Antitrust Litig.*, 334 F.2d 204, 208 (2d Cir. 2003)). Here, far from being "insufficiently developed," Plaintiffs' jurisdictional allegations have already had the benefit of a reported decision by this Court; extensive discovery from top Orascom officials and numerous third parties; and a series of complaints and amended complaints in federal court (as well as a turnover proceeding in New York Supreme Court). Plaintiffs also have benefited from their counsel's simultaneous representation of the *Knox* plaintiffs in virtually identical turnover actions in New York federal and state court. Notwithstanding Plaintiffs' extensive discovery and repeated attempts to cure their jurisdictionally defective allegations over the past two years, Plaintiffs have failed to raise ***any*** new jurisdictionally sufficient contacts, and instead have

amassed thousands of pages of exhibits concerning the same allegations that this Court and so many others have already held to be jurisdictionally insufficient.

In sum, further discovery is unwarranted. *See Indemnity Ins. Co*, 2007 WL 1732435, at *8 ("The Court will not permit [plaintiff] to engage in a fishing expedition when little more exists than [its] bare assertions that jurisdiction is proper.") (internal quotations and citations omitted); *In re Ski Train*, 2003 WL 1807148, at *6 (holding that plaintiffs are not entitled to jurisdictional discovery because they have failed to meet their "limited burden of establishing a prima facie case" even after "already tak[ing] some discovery regarding their main basis for jurisdiction — the cross border leasing transactions").

### 2. Orascom Officials Were Forthcoming and Cooperative During the Discovery Process

Contrary to Plaintiffs' assertions (at 26-27), Orascom officials have been forthcoming and cooperative throughout the discovery process. Three Orascom executives each devoted an entire day to sit for their depositions and testify in good faith to the best of their recollection in order to satisfy their legal obligations. Plaintiffs' suggestion otherwise is unfounded and disregards the extensive information these executives willingly provided. In any event, the purportedly withheld information is immaterial to this Court's jurisdictional analysis.

Plaintiffs' additional accusations (at 27) are also unfounded. Orascom has an agreement to pay over dividends with the PIF — *not* the PA. Mareuse Decl. ¶¶ 9-12; Pls.' Ex. 49, 61. Furthermore, far from indicating that Orascom is "coordinating" its defense with the PA and the PIF (*see* First Am. Compl. ¶ 36), the letters Plaintiffs append (at Exs. 62-64) — correspondence between Mr. Sawiris and Dr. Mohamed Abdullah Mostafa, the Chief Executive Officer of the PIF — show that Orascom wrote the letters in response to the PIF's multiple demands for payment and the PIF's threats of litigation in Egypt to avoid any further dispute with the PIF.

These letters further underscore that Orascom — which through no fault of its own finds itself facing conflicting legal demands — takes very seriously its legal obligations in this matter.

## II.    THIS COURT LACKS SUBJECT-MATTER JURISDICTION

This Court need not reach the issue of subject-matter jurisdiction. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584-85, 119 S.Ct. 1563, 1570 (1999) (holding that the issue of personal jurisdiction could be decided before subject-matter jurisdiction). In the event the Court reaches this issue, Plaintiffs erroneously argue (at 9) that this Court has subject-matter jurisdiction over this action because disposition of this case purportedly will not require an alter-ego or veil-piercing determination. In contradictory fashion, Plaintiffs contend that the PA never conveyed assets to the PIF while also alleging that the PA's assets are "titled to the PIF." *Id.*; *see also* Am. Compl. ¶¶ 28, 30 (alleging that "Orascom's Debt" is "nominally titled" to the PIF); ¶ 32 (alleging that "Orascom's Debt" is "titled to the PIF"). As Judge Marrero held in the substantially similar *Knox* action, Plaintiffs' allegations inescapably require this Court to engage in an analysis for which it lacks an independent basis of federal jurisdiction. *Knox v. Orascom Telecom Holding S.A.E.*, 242 F.R.D. 251, 253-54 (S.D.N.Y. 2007); *Knox*, 477 F. Supp. 2d at 646-49.

Both the *Knox* and *Ungar* turnover complaints allege that the assets at issue are the property of the PA but are "nominally titled" to the PIF. *Compare Knox* Compl. ¶ 31 ("Any and all assets and property of any type designated or ***titled*** to, or held in the name of the PCSC and the PIF, are legally, beneficially and equitably owned by the PA.") (emphasis added) (attached hereto as Erb Decl. Attach L) *with Ungar* First Am. Compl. ¶¶ 28, 30 (alleging that "Orascom's Debt" is "nominally titled" to the PIF); ¶ 32 (alleging that "Orascom's Debt" is "titled to the PIF"). Thus, contrary to Plaintiffs' assertion (at 11), the allegations before this Court are substantially similar to those before Judge Marrero in *Knox*.

Indeed, in denying the *Knox* plaintiffs' motion for reconsideration, Judge Marrero specifically recognized that the plaintiffs' contention that the PA's assets are "nominally titled" to the PIF requires "a finding by the Court that the PIF is an alter ego of the PA," and expressly rejected the *Knox* plaintiffs' attempt to write the PIF out of the equation. *See Knox*, 242 F.R.D. at 253-54 ("While Plaintiffs artfully attempt to diminish the significance of PIF's role in this action by describing its entitlement to the amounts due from Orascom as **'nominal[],'** it is nevertheless an undisputed material allegation in Plaintiffs' complaint that the assets held and debts owed by Orascom at issue in the proceeding are in fact due to the PIF, not the PA.") (emphasis added).

Like the *Knox* court, this Court should not "ignore the fact that the assets now sought by Plaintiffs are 'nominally' due to the PIF and that Orascom owes the amounts at issue to the PIF." *Id.* at 254. That Orascom owes dividends to the PIF — **not** the PA — is evidenced by Plaintiffs' own exhibits. *See, e.g.*, Pls.' Exs. 27, 36 (Orascom Press Releases discussing transaction between Orascom and the PIF); Pls.' Ex. 49 (April 17, 2005 Settlement Agreement between Orascom and the PIF); Pls.' Ex. 52 (Standard & Poor's Democracy Council Initial Report on Valuation and Transparency directed to the PIF Board of Directors); Pls.' Ex. 61 (Share Purchase Agreement Dated 27 February 2005 between the PIF and Orascom); Pls.' Exs. 62-64 (correspondence between Orascom and the PIF regarding the PIF's demand for payment); *see also* Mareuse Decl. ¶¶ 11-12.

Plaintiffs also assert (at 12) that *Knox* is inapposite because the plaintiffs there did not allege as Plaintiffs do here that the PA established the PIF to serve as a custodian of assets. Judge Marrero did not indicate that such allegations would have changed his analysis as Plaintiffs appear to suggest. Indeed, Judge Marrero's only reference to agency or trustee theories

arises when holding that Plaintiffs could not assert new arguments on reconsideration.  *See Knox*, 242 F.R.D. at 254.

Plaintiffs are also off-base in asserting (at 10) that *Epperson*, 242 F.3d at 103-07, supports their theory that this Court has ancillary enforcement jurisdiction.  *Epperson* involved a judgment debtor's ***fraudulent conveyance*** of assets in an attempt to avoid satisfying a judgment.  *See id.* at 107 (concluding that subject-matter jurisdiction exists over an action in which "[a]ppellants seek only to void the allegedly fraudulent conveyances . . . in order to ensure the collectibility of the default judgment").  *Epperson* is inapposite for the simple reason that this case does not involve — and Plaintiffs have not alleged — any fraudulent conveyance.  Accordingly, Plaintiffs' further reliance on fraudulent-conveyance cases (at 10-11 & n.6) is unavailing.  Plaintiffs cannot allege that there has been a fraudulent conveyance in connection with this case because the assets at issue have at all times been held by Orascom in favor of the PIF.  Mareuse Decl. ¶ 10.[3]

Contrary to Plaintiffs' allegations (at 11), a judgment debtor's affirmative act in attempting to avoid a judgment by fraudulently conveying assets to another party is not equivalent to a judgment debtor's ***failure*** to convey assets.  Nothing in *Peacock* or *Epperson* remotely suggests that this Court may exercise ancillary enforcement jurisdiction over an action

_____

[3] *See UFCW Local 174*, 425 F. Supp. 2d at 394 (holding subject-matter jurisdiction exists over action in which "plaintiffs seek through their assertions of fraudulent conveyance to collect the judgment entered against BMW Meats"); *Aaron*, 225 F.R.D. at 412 (holding that ancillary enforcement jurisdiction exists and discussing facts that "more closely approximate the circumstances of a fraudulent conveyance" because the transfer of judgment debtor's shares to his wife was "solely for purposes of avoiding the reach of creditors"); *Antar*, 120 F. Supp. 2d at 440 (holding ancillary enforcement jurisdiction exists because SEC seeks only to disgorge property the judgment debtor wrongly transferred to third parties); *Merrell*, 1998 WL 329264, at *2-3 (holding ancillary enforcement jurisdiction exists over action alleging fraudulent transfer of assets by defendant to garnishees).

requiring a legal determination that the PA *did not* convey assets to the PIF. Rather, as Judge Marrero concluded in *Knox*, Plaintiffs' allegation that the PA never conveyed assets to the PIF is more akin to an alter-ego determination, particularly since Plaintiffs allege that the PA's assets are "nominally titled" to the PIF. *See Knox*, 242 F.R.D. at 253-54; *see also* First Am. Compl. ¶¶ 28, 30.

Furthermore, Plaintiffs erroneously assert (at 8) that Orascom has acknowledged that the assets at issue are the PA's. Plaintiffs rely on a confidential letter that Orascom sent to the PIF (*see* Pls.' Ex. 62) in response to the PIF's demands for payment, but that letter expressly refers to Orascom's "obligation to pay *the PIF*." *Id.* This is underscored in the confidential agreements Plaintiffs imprudently submitted with their public filing. *See* Pls.' Exs. 49, 61. Nowhere in this correspondence does Orascom acknowledge that it owes any assets to the PA rather than the PIF. *See* Mareuse Decl. ¶¶ 9-12 (stating that Orascom negotiated only with the PIF and PPF in connection with the share purchase agreement and the settlement agreement, not the PA or the PLO).[4]

## III. THE COURT LACKS JURISDICTION OVER THE ASSETS AT ISSUE

Plaintiffs' contention (at 12) that this Court has jurisdiction to reach assets in Cairo rests entirely on Plaintiffs' legal conclusion (couched as a factual allegation) that the assets in question constitute a "debt," as opposed to property, and thus are subject to turnover under § 5227. *See, e.g.*, First Am. Compl. ¶¶ 27, 30-35, 37, 39. It is well-established that such conclusory

---

[4] Plaintiffs also hypothetically argue (at 11 n.8) that "[i]f the PA's ownership of the asset were ever contested in this case," they would assert theories of trust, resulting trust, constructive trust and fraudulent conveyance. This Court need not contend with Plaintiffs' hypothetical allegations. In any event, Plaintiffs reliance (at 11 n.8) on *Clarinda Color LLC* is misplaced because that case involved a fraudulent conveyance of assets. *See* 2004 WL 2862298, at *5 (upon holding that fraudulent transfer of assets was voidable, concluding that assets would be placed in a constructive trust for the benefit of the plaintiff).

allegations and characterizations unsupported by fact are insufficient to withstand a motion to dismiss. *See De Jesus*, 87 F.3d at 70; *Murray v. Pataki*, No. 03-CV-1263, 2007 WL 956941, at *3 (N.D.N.Y. Mar. 29, 2007) (holding that "the court need not credit conclusory statements unsupported by assertions of fact or legal conclusions and characterizations presented as factual allegations").

As Plaintiffs' own exhibits make clear, Orascom is obligated to pay over ***dividends*** to the PIF. *See* Pls.' Exs. 49, 61. Courts have routinely treated dividends as "property." *See United States v. Bok*, 156 F.3d 157, 162 (2d Cir. 1998) (discussing the Internal Revenue definition of the term "dividend" as "any distribution of property made by a corporation to its shareholders"); *Karaha Bodas Co. v. Perusahaan Pertambangan*, No. M-18-302, 2004 WL 2712556, at *2 (S.D.N.Y. Nov. 24, 2004) (referring to dividends as "property"); *Klein v. Klein*, 296 A.D.2d 533, 534, 745 N.Y.S.2d 569 (N.Y. App. 2002) (defining dividends as "marital property").

Plaintiffs seize on Orascom's 2006 Annual Report (Pls.' Ex. 53), but Plaintifffs' own authority establishes that the accounting treatment of an asset for a financial statement is not dispositive of the status of the assets. *See Adelaide Production*, 39 A.D.3d at 255 (reversing grant of money judgment and "refer[ring] for a fact-finding hearing the question of ***whether and to what extent*** respondent owed a debt," notwithstanding listing of debt in respondent's annual report) (emphasis added).

Finally, none of Plaintiffs' cases (at 13-14) address the question whether the assets in question in this case constitute debt or property. Similarly, Plaintiffs' reliance (at 13-14) on N.Y. C.P.L.R. § 5201 is misplaced because that provision does not govern whether the assets at issue are debt or property. *Cf. Alliance Bond Fund, Inc. v. Grupo Mexicano*, 190 F.3d 16, 25 (2d Cir.

1999) ("We decline the invitation to hold that an asset characterized as property for the purposes of § 5201 is necessarily characterizable as property for purposes of §§ 5225 and 5227 as well.").

## IV.     THE FIRST AMENDED COMPLAINT DOES NOT STATE A CLAIM FOR TURNOVER

Plaintiffs contend (at 27-28) that their claim for turnover is legally sufficient because they have alleged that "the asset is an asset of the PA."   But, again, that purported allegation is actually a legal conclusion couched as a factual allegation and is contradicted by Plaintiffs' allegation that the asset is "nominally titled to the PIF."   First Am. Compl. ¶¶ 28, 30; *see also* ¶ 32 (alleging that "Orascom's Debt" is "titled to the PIF").   Neither conclusory nor contradictory allegations support a claim for turnover.   *See De Jesus*, 87 F.3d at 70 (holding that plaintiffs' allegations were insufficient to pierce the corporate veil because "the pleadings are devoid of *any* specific facts or circumstances supporting this assertion") (emphasis in the original); *Chandamuri v. Georgetown*, 274 F. Supp. 2d 71, 79 (D.D.C. 2003) (holding that plaintiff's contradictory factual allegations constitute "facts that render success on the merits impossible").

Dated: September 5, 2007                              Respectfully submitted,

                                                     **WHITE & CASE** LLP

                                                     By: /s/Christopher M. Curran
                                                     Christopher M. Curran (CC-4779)
                                                     Nicole Erb (NE-7104)
                                                     701 Thirteenth Street, N.W.
                                                     Washington, D.C.  20005
                                                     Tel:  202-626-3600
                                                     Fax:  202-639-9355

                                                     *Counsel for*
                                                     *Orascom Telecom Holding S.A.E.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

The Estate of Yaron Ungar, et al.,

                    *Plaintiffs-Judgment*
                    *Creditors*,

              v.

Orascom Telecom Holding S.A.E.,

                    *Defendant-Garnishee*.

Civ. Action No. 07 CV 2572

(CM) (LMS)

## DECLARATION OF NICOLE ERB

I, Nicole Erb, an attorney at the law firm of White & Case LLP and a member of the bar

of this Court, declare that I attach true and correct copies of the following documents:

G.    Plaintiffs' Motion for Enlargement of Time ¶¶ 1(a), 10, 11, *Estate of Ungar v. Palestinian Auth.*, No. 05-6900 (2d Cir. May 8, 2006);

H.    Deposition of Emad Farid dated March 13, 2007 (excerpts);

I.    Deposition of Rodolphe Aldo Mario Mareuse dated March 14, 2007 (excerpts);

J.    Deposition of Naguib Sawiris dated March 15, 2007 (excerpts); and

K.    Complaint, *Knox v. Orascom Telecom Holding S.A.E.*, No. 06 Civ. 6824 (S.D.N.Y.).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  September 5, 2007          _____/s/ Nicole Erb_____

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

Thurgood Marshall U.S. Courthouse at Foley Square    40 Centre Street, New York, NY 10007    Telephone: 212-857-8500

**MOTION INFORMATION STATEMENT**

Docket Number(s): _05 6900_

Motion for: _ENLARGEMENT OF TIME_

Set forth below precise, complete statement of relief sought:

_ENLARGEMENT OF TIME TO_
_PERFECT APPEAL FOR 90 DAYS_

Caption [use short title]

_ESTATE OF UNGAR,_

_v._

_PALESTINIAN AUTHORITY,_

MOVING PARTY: _ESTATE OF UNGAR_

☒ Plaintiff    ☐ Defendant
☒ Appellant/Petitioner    ☐ Appellee/Respondent

OPPOSING PARTY: _PALESTINIAN AUTHORITY_

MOVING ATTORNEY: _ROBERT J. TOLCHIN_
[name of attorney, with firm, address, phone number and e-mail]
_ROBERT J. TOLCHIN_
_JAROSLAWICZ + JAROS_
_150 WILLIAM ST, 19th FL._
_NY, NY 10038_
_(212) 227-2780_

OPPOSING ATTORNEY [Name]: _CHRISTOPHER M. CURR_
[name of attorney, with firm, address, phone number and e-mail]
_CHRISTOPHER M. CURRAN_
_WHITE + CASE LLP_
_701 THIRTEENTH ST, NW_
_WASHINGTON, DC 20005_
_(202) 626-3600_

Court-Judge/Agency appealed from: _SDNY - JUDGE COLLEEN McMAHON_

Please check appropriate boxes:

Has consent of opposing counsel:
    A. been sought?    ☒ Yes    ☐ No
    B. been obtained?    ☐ Yes    ☒ No

Is oral argument requested?    ☐ Yes    ☒ No
(requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?    ☐ Yes    ☒ No
If yes, enter date _____

FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:
Has request for relief been made below?    ☐ Yes    ☐ No

Has this relief been previously sought
in this Court?    ☐ Yes    ☐ No

Requested return date and explanation of emergency:

Signature of Moving Attorney:

_[signature]_    Date: _5-8-06_

Has service been effected?    ☒ Yes    ☐ No
[Attach proof of service]

**ORDER**

IT IS HEREBY ORDERED THAT the motion is GRANTED    DENIED.

FOR THE COURT:
ROSEANN B. MacKECHNIE, Clerk of Court

Date: _____    By: _____

**Form T-1080** (Revised 10/31/02).

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

------------------------------------------ X

ESTATE OF YARON UNGAR, et al.,                    Docket no: 05-6900

                Plaintiffs-Appellants,

            v.                           **DECLARATION IN SUPPORT**

PALESTINIAN AUTHORITY, et al.,

                Defendants-Appellees,

ORASCOM TELECOM HOLDING, S.A.E.,

                Non-party Appellee.

------------------------------------------ X

**ROBERT J. TOLCHIN**, pursuant to 28 U.S.C. § 1746, declares and states as follows:

1.    I am making this declaration in support of the within motion by Appellants seeking an order either:

    a)    Enlarging the Appellants' time to file their brief for a period of 90 days, during which time further proceedings in the district court may significantly narrow this appeal; or

    b)    In the alternative, enlarging the Appellants' time to file their brief and appendix for a period of 45 days, or such shorter time as the Court may allow; and

    c)    Granting such other and further relief as is just and proper under the circumstances.

2.    A copy of the decision and order appealed from herein is annexed hereto as Exhibit A. The Notice of Appeal and Forms C and D are annexed hereto as Exhibit B.

3.    The Appellants' herein are the estate, heirs and survivors of an American citizen who was murdered in a terrorist attack carried out by Appellees Palestinian Authority

("PA") and Palestine Liberation Organization ("PLO"). Appellants hold a final judgment against the PA and PLO in the amount of approximately $116 million entered on July 13, 2004, by the United States District Court for the District of Rhode Island. *See Ungar v. Palestinian Authority*, 325 F.Supp.2d 15 (D.R.I. 2004) *aff'd* 402 F.3d 274 (1st Cir. 2005) *cert. denied* 126 S.Ct. 715 (2005).

4.    The PA and PLO have refused to satisfy the judgment and Appellants are therefore now conducting proceedings to enforce their judgment in various U.S. jurisdictions and abroad.

5.    After learning that Non-party Appellee Orascom Telecom Holding S.A.E. ("Orascom"), an Egyptian telecommunications company, owes a substantial debt to the PA, Appellants served a subpoena on Orascom via two of its officers who were present in New York for business purposes in September 2005. The subpoena on Orascom sought information regarding Orascom's jurisdictionally-relevant activities in the United States, and regarding Orascom's debt to the PA. At the same time, Appellants also served subpoenas seeking the same information on Orascom's officers.

6.    Orascom and its officers moved to quash these subpoenas, and on November 7, 2005, District Judge Colleen McMahon of the S.D.N.Y. entered a decision and order quashing the subpoenas on Orascom and on Orascom's officers in their official capacity.[1] That decision and order also quashed a subpoena served by Appellants on the law firm of White & Case, which represents Orascom in the United States and elsewhere. The subpoena on White & Case, like those on Orascom and its officers, sought information regarding Orascom's jurisdictionally-relevant activities in the United States.

7.    Judge McMahon's decision and order of November 7, 2005, quashing the aforementioned subpoenas, is the subject of the instant appeal.

8.      Subsequently, however, on January 5, 2006, Magistrate Judge Lisa Smith of the S.D.N.Y. entered a decision and order granting a motion by Appellants to issue a subpoena pursuant to 28 U.S.C. § 1783 to the Chairman and controlling shareholder of Orascom, Mr. Naguib Sawiris. Section § 1783 permits issuance of a subpoena to United States citizens resident abroad, and Mr. Sawiris, a resident of Egypt, is an American citizen. *See Ungar v. Palestinian Authority*, 412 F. Supp. 2d 328 (S.D.N.Y. 2006). That decision, which was subsequently affirmed by the district judge and has not been appealed, held that:

> [I]t is in the interest of justice to issue the subpoena compelling the testimony of the Respondent in an effort to establish that Orascom is subject to the personal jurisdiction of this Court. Given the apparent intent of the Defendants to evade the Rhode Island District Court's entry of default judgment, and the likelihood that Plaintiffs will never be able to satisfy the default judgment absent information of an elusive and amorphous judgment debtor, there exists a "compelling reason" to issue the subpoena for the testimony of the Respondent for the purposes of establishing the required minimum contacts for valid personal jurisdiction over Orascom. Such information, should it exist, possibly could enable the Plaintiffs to seize the debt Orascom owes to the Defendants and to satisfy the judgment they are owed as a matter of law.

*Ungar*, 412 F. Supp. 2d at 334.

9.      Appellants' counsel was informed late last week by Orascom's counsel that service of the subpoena on Mr. Sawiris in Egypt pursuant to the Hague Convention as ordered by the S.D.N.Y. (*see id.* at 335) has just been effected. Thus, in the near future, Appellants are to receive deposition testimony and extensive documents from the Chairman and controlling shareholder of Orascom.

---

[1] The subpoenas on Orascom's officers in their *individual* capacity were upheld, but a subsequent decision of Magistrate Judge Smith quashed the testimonial aspect of these

*(continued next page)*

10. If Mr. Sawiris is cooperative and forthcoming in his testimony and document production, it is possible that Appellants will no longer need to press some of the subpoenas that were quashed on the November 7 decision that this the subject of the instant appeal, which would permit Appellants to significantly narrow the scope of this appeal.

11. Appellants believe that it would be an unwarranted and unfortunate waste of this Court's (and counsel's) limited resources to brief, argue and dispose of an appeal that might soon be narrowed, and that enlarging the Appellants' time to file their brief for 90 days, by which time Mr. Sawiris' testimony and document production should be concluded, would be most economical for the Court, the Appellants and for Orascom as well.

12. Alternatively, if the Court denies the instant motion and decides that this appeal should proceed in any event, Appellants respectfully request a period of 45 days to file their brief and appendix, which time is necessary in light of the complexity and novelty of the issues involved.[2]

**WHEREFORE**, it is respectfully requested that the Court enter an order:

---

subpoenas thereby reducing their scope drastically.

[2]For example, the decision appealed from discusses (and dismisses) the jurisdictional significance of a "roaming agreement," a recent technological innovation under which a foreign cellular provider contracts with a United States cellular telephone firm to allow subscribers of the foreign provider to use their cell phones in the United States (and thereby generate revenue for the foreign company through calls placed and received in the United States). Likewise, the decision on appeal held, as a matter of first impression in this Circuit, that in a federal question case the relevant forum for measuring a nonparty witness' minimum contacts for personal jurisdiction purposes is the state in which the district court that issued the subpoena sits, rather than the United States as whole. The only other court to have considered the question arrived at precisely the opposite conclusion. *See In re Automotive Refinishing Paint*, 229 F.R.D. 482 (E.D.Pa. 2005) (holding that in a federal question case the relevant forum for testing a foreign nonparty witness' minimum contacts for personal jurisdiction purposes "is the United States as whole."). Appellants' counsel require significant preparation time in order to properly address these novel issues.

a)      Enlarging the Appellants' time to file their brief for a period of 90 days, during which time further proceedings in the district court may significantly narrow this appeal; or

b)      In the alternative, enlarging the Appellants' time to file their brief and appendix for a period of 45 days, or such shorter time as the Court may allow; and

c)      Granting such other and further relief as is just and proper under the circumstances.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: May 8, 2006

ROBERT J. TOLCHIN

1

1

2    SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK
3    ---------------------------------------X

4    YARON UNGAR,

5                              Plaintiff,

6              -against-                        Index No:
                                               105521/05
7

8    PALESTINIAN AUTHORITY,

9                              Defendant.

9    ---------------------------------------X

10

11           DEPOSITION VIA VIDEOCONFERENCE of EMAD

12    FARID, a Non-Party Witness, taken pursuant to

13    Subpoena, held at the law offices of WHITE &

14    CASE, 1155 Avenue of the Americas, New York,

15    New York, on March 13, 2007, commencing at 9:00

16    a.m., before ARTHUR HECHT, a Court Reporter and

17    Notary Public within and for the State of New

18    York.

19

20    ┌─────────────────────────────┐
      │   Portions Designated As    │
      │        Confidential         │
      └─────────────────────────────┘

21

22

23              REINIG REPORTING, INC.
                192 Lexington Avenue
24                   Suite 1004
               New York, New York 10016
25                (212) 684-7298

34

```
 1                          Farid
 2           asking for personal documents or
 3           corporate documents?
 4                 MR. TOLCHIN:  Personal document.
 5           A     I don't know.
 6                 MR. TOLCHIN:  I mean, certainly an
 7           airplane ticket that he flew with would
 8           be a personal document.
 9           A     No, it was an electronic ticket, I
10     don't have.
11                 MR. CURRAN:  The witness answered
12           your question, but that doesn't mean I
13           agree with your position.
14                 MR. TOLCHIN:  That's why we have
15           our respective jobs.
16           Q     What was the purpose of your visit
17     in January of 2007, January to February of
18     2007?
19           A     It's a road show, again,
20     supporting the finance department in a road
21     show where we meet investors.
22           Q     And when you use the term road
23     show, can you tell us what you mean by that?
24           A     Road show is like -- it's a visit
25     where we meet investors, bankers, it's not
```

35

```
 1                         Farid
 2      arranged by -- it's not a conference arranged
 3      by any party, but we will -- and we have
 4      appointments with investors, we go to them in
 5      their offices or they come to us in a place,
 6      hotel or restaurant, according to the schedule,
 7      and we just meet with them and answer their
 8      questions and present what we want to present
 9      to them.
10           Q     And when you have meetings with
11      investors at such a road show, is it your hope
12      that these investors will in fact invest in
13      Orascom Telecom Holding?
14           A     In this case, it was the bonds, it
15      was the bonds that we were issuing high-yield
16      bond, and that was the purpose of the road
17      show.
18           Q     So it was your hope that investors
19      would invest in these bonds, correct?
20               MR. CURRAN:  Objection.  Vague.
21               When you use the term you, are you
22               talking about Mr. Farid personally or
23               the company or both?
24               MR. TOLCHIN:  I'm asking about Mr.
25               Farid personally.
```

REINIG REPORTING, INC. (212) 684-7298

36

Farid

```
 1                         Farid
 2          A      My objective was to help and
 3     support the finance department in their
 4     objective, which I -- again, I'm not -- it's
 5     not my role to be -- but it was to sell the
 6     bond, as you said.
 7          Q      That bond issue that you're
 8     referring to, how many dollars worth of bonds
 9     were being sold, if you know?
10          A      750 million.
11          Q      Where did that $750 million go?
12          A      I don't know.
13          MR. SULLIVAN:  Objection.
14          Q      Meaning --
15          MR. SULLIVAN:  Hold on, objection.
16     He testified that 750 million were
17     offered --
18          MR. TOLCHIN:  I'm sorry, I'll
19     accept that.
20          Q      How many dollars worth of those
21     high-yield bonds were sold --
22          MR. SULLIVAN:  If you know.
23          Q      -- if you know?
24          A      That's the only figure, I know
25     750, so I don't know if that's the difference
```

REINIG REPORTING, INC. (212) 684-7298

69

```
 1                         Farid
 2      said, even the suppliers, like Motorola who are
 3      dealing with the offices in Egypt or Dubai or
 4      the middle east in general, but not the United
 5      States.
 6          Q      Does David Ross have an office in
 7      Dubai or the middle east, or do you deal with
 8      David Ross in the United States?
 9          A      I cannot confirm, I don't know, we
10      are dealing with some persons, and most
11      probably they -- the very few times we did with
12      them was in our office in Egypt, they came to
13      Cairo or to the subsidiary, and we had the
14      meeting or the communication this way.
15          Q      Do you recall who came to meet
16      with you on behalf of David Ross?
17          A      No, and I didn't -- I didn't
18      personally meet anybody from David Ross.
19          Q      Just give me a moment.  Have you
20      ever participated in a quarterly or year-end
21      conference call on behalf of Orascom?
22                 MR. SULLIVAN:  Objection.
23                 MR. CURRAN:  Objection.  Vague.
24                 MR. SULLIVAN:  Vague.
25          A      No.
```

REINIG REPORTING, INC. (212) 684-7298

70

```
 1                        Farid
 2         Q       Just to make sure you understand
 3    the terminology, when I refer -- when I refer
 4    to a quarterly or year-end conference call, do
 5    you understand what I'm talking about?
 6         A       Yes, you mean if I understand
 7    right, you mean the conference call with the
 8    investors and outside external community?
 9         Q       Correct.
10         A       To present the results and answer
11    the questions related to the results?
12         Q       Right, that's what I'm referring
13    to.
14         A       The answer is no, I have never
15    represented Orascom Telecom in such conference
16    calls or calls, except I attended as a
17    listener, just as a listener, not as a
18    participant.
19         Q       Do you have an understanding of
20    what the purpose of those conference calls is?
21         A       Yes.
22         Q       What is that?
23         A       To present the results of a
24    quarter of a year, and to answer the questions
25    of the interested parties.
```

71

```
 1                        Farid
 2          Q     And the interested parties --
 3     withdrawn.
 4                The people on those conference
 5     calls are people who have invested or are
 6     considering investigating in Orascom?
 7          A     Part of them, yes, and in addition
 8     to analysts, financial analysts, and sometimes
 9     any individual interested to join, it's a
10     public calls.
11          Q     And why do you participate in
12     these calls, as a listener, I understand that,
13     what's your purpose in listening?
14          A     To get update on the information
15     and concerns of the participants.
16          Q     Do you know what portion of the --
17     let me start differently, withdrawn.
18                How many people participate in
19     those calls, on average?
20                MR. CURRAN:  Objection.  Vague as
21                to the term participate.  You may
22                answer.
23          A     I don't have any idea.  Orascom
24     Telecom, you mean from Orascom Telecom Holding
25     or you mean in total?
```

107

```
 1
 2                    C E R T I F I C A T E
 3
 4     STATE OF NEW YORK      )
 5                            ) SS.
 6     COUNTY OF QUEENS       )
 7
 8             I, ARTHUR E. HECHT, a Stenotype
 9     Shorthand Reporter and Notary Public within and
10     for the State of New York, do hereby certify:
11             THAT EMAD FARID, the witness whose
12     examination is herein before set forth, was
13     duly sworn by me and that this transcript of
14     such examination is a true record of the
15     testimony given by such witness.
16             I further certify that I am not
17     related to any of the parties to this action by
18     blood or marriage and that I am in no way
19     interested in the outcome of this matter.
20
21     IN WITNESS WHEREOF, I have hereunto set my hand
22     this 19th day of March, 2007.
23
24     _____
25              Arthur E. Hecht
```

REINIG REPORTING, INC. (212) 684-7298

1

1

2   SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF NEW YORK
3   - - - - - - - - - - - - - - - - - - - - - - - - - - -x

4   YARON UNGAR,

5                           Plaintiff,
                                              Index No.
6              -against-                      105521/05

7   PALESTINIAN AUTHORITY,

8                           Defendant.

9   - - - - - - - - - - - - - - - - - - - - - - - - - - -x

10

11              DEPOSITION VIA VIDEOCONFERENCE of

12   a Non-Party Witness, RODOLPHE ALDO MARIO

13   MAREUSE, taken pursuant to Subpoena, held at

14   the offices of WHITE & CASE, 1155 Avenue of

15   the Americas, New York, New York, on March 14,

16   2007, commencing at 9:05 a.m., before Shamona

17   Adderley, a reporter and Notary Public within

18   and for the State of New York.

19

20   ┌─────────────────────────────┐
     │  Portions Designated As     │
21   │       Confidential          │
     └─────────────────────────────┘

22

23              REINIG REPORTING, INC.
                192 Lexington Avenue
24                   Suite 1004
                New York, New York 10016
25                  (212) 684-7298

51

R. Mareuse

1    I am the CFO of the company, my

2    role is to communicate about all financial

3    matters of Orascom Telecom to the investors.

5    Q.   What was Mr. El Gammal's function

6    on that trip?

7    A.   He is the investor relation so he

8    is the day to day contact for the investors.

9    Q.   What was Mr. Sawiris's role or

10   function on that trip?

11   A.   He is the CEO of the company, so

12   he's there to communicate the strategic issues

13   of the company to the investors.

14   Q.   How long were you here in the

15   United States?

16   A.   I believe it was a week.

17   Q.   Do you recall approximately how

18   many meetings you had during that week?

19   A.   I would say probably six a day.

20   Q.   And when you say a week, are you

21   talking about a calendar week or a business

22   week, in other words five days or seven days?

23   A.   I would actually say it's probably

24   more four days I think it's -- we went from

25   Monday through Thursday.

52

1                          R. Mareuse

2          Q.    So --

3          A.    Might be five.

4          Q.    Would it be fair to say, sir, that

5     during your visit to the United States in

6     March 2004 you conducted approximately 25

7     meetings with investors?

8          A.    Yes.

9          Q.    It could be a few more, it could

10    be a few less, but something in that vicinity

11    is that correct?

12         A.    Yes, yes.

13         Q.    Where did those meetings take

14    place?

15         A.    At the investors' offices,

16    different investors' offices.

17         Q.    And where were those investors

18    located in the United States?

19         A.    Some in New York, some in Boston.

20         Q.    What portion of those meetings do

21    you believe took place in New York and in

22    Boston?

23         A.    Probably 75 percent in New York,

24    25 percent in Boston.

25         Q.    Why didn't you just ask the

56

                              R. Mareuse

1

2          Q.     Sir during your, when you came to

3     the United States in March of 2004, did you

4     have a particular objective that you hoped to

5     achieve during that visit?

6          A.     Well, the objective of road show

7     is to communicate the story to investors,

8     that's just, you know, every road show is the

9     same objective, which is to communicate the

10    story of the Orascom Telecom.

11         Q.     Was this road show intended to

12    promote any particular issue of stock or debt

13    of Orascom?

14         A.     No, no.  We call it non-deal road

15    show which was just basically to --

16         Q.     A non -- I didn't hear the work, a

17    non-deal road show?

18         A.     Non-deal, yeah.

19         Q.     So --

20              MR. CURRAN:  Please continue with

21         your answer.

22              Please Mr. Tolchin try to refrain

23         from interrupting the witness mid

24         answer, he can always go back and

25         clarify a word.

57

1                    R. Mareuse

2            MR. TOLCHIN:  Just, Mr. Curran

3        it's just sometimes there is a little

4        lag between, because of the connection,

5        and sometimes it's hard to know when he

6        is done or when he is about to start,

7        so please continue.

8        A.    So a non-deal road show means

9   basically to communicate the story and to

10  update the story to investors, we see some

11  news on us, so there is no particular

12  objective just a regular objective.

13       Q.    I just want to ask you about two

14  terms, when you say communicate the story,

15  what story are you talking about?

16       A.    The story of the Orascom Telecom.

17       Q.    What is the story of Orascom

18  Telecom?

19       A.    Well, it's basic facts about how

20  the company is doing, what its forecasts are,

21  what is its, you know, competitive position,

22  the industry dynamic, the financial position,

23  that is what we call the story in the

24  financial -- in the equity world.

25       Q.    And is it your expectation when

59

1                           R. Mareuse

2    there could be a benefit if they like the

3    story they will buy the shares, there could be

4    not a benefit, if they don't like the story

5    then they sell the shares.

6           Q.    You used the term non-deal road

7    show, could you explain please what is the

8    difference between a deal road show and a

9    non-deal road show?

10                MR. SULLIVAN:   Objection,

11          foundation.

12                He can answer.

13          A.    Non-deal road show means when that

14   you don't want to raise any money, and deal

15   road show means when you want to raise money.

16          Q.    In a -- what is the objective of a

17   deal road show?

18          A.    To raise money.

19          Q.    Would it be fair to say that when

20   you have a deal road show your objective is

21   to, is to persuade the people you're meeting

22   with to buy the stock or buy the bonds?

23          A.    That's correct.

24          Q.    Do you recall during your March

25   2004 trip, do you recall any of the meetings

78

1                    R. Mareuse

2        Q.    Do you know whether Mr. Sawiris

3   traveled in the United States in April of

4   2005?

5        A.    I think he might have because we

6   did another, I know road show in early 2005,

7   if I remember it was in April of 2005.

8        Q.    What was that road show?

9        A.    It's the same as in 2004, it was

10   the, you know, the year end road show.

11        Q.    Was that a --

12        MR. CURRAN:  Hold on, the witness

13        wasn't completed with the answer.

14        A.    So it was a non-deal road show as

15   the one in 2004.

16        Q.    Do you know who organized that

17   non-deal road show in April of '05?

18        A.    I believe it was Citi Group.

19        Q.    Do you know whether anybody else

20   from Orascom attended that road show together

21   with Mr. Sawiris?

22        A.    Hatim El Gammal and myself.

23        Q.    And where did that road show take

24   place?

25        A.    In New York and Boston.

79

                              R. Mareuse

1

2       Q.    And how long was that road show?

3       A.    I would think four to five days.

4       Q.    Of the four to five days, how many

5    days were you in New York and how many in

6    Boston?

7       A.    One in Boston, the rest in New

8    York.

9       Q.    What was the format of that road

10   show?

11      A.    Well, we would go into investors'

12   offices, make our presentation and then meet

13   with our investors, we probably have like

14   about six meetings a day with different

15   investors.

16      Q.    Did you meet with the investors

17   one-on-one or in groups?

18      A.    One-on-one, we might have had a

19   lunch with a couple of investors, but I don't

20   recall precisely if we had one.

21      Q.    Is it fair to say that during that

22   April of 2005 Citibank road show or Citi Group

23   road show, you met with 25 to 30 investors?

24      A.    Yeah.

25      Q.    Yes?

104

R. Mareuse

2   have -- or any visa which is still valid, I

3   will basically hand out the old passport, they

4   will destroy it, and give me a new one.

5        Q.   The -- when the French government

6   renews your passport, is it their general

7   practice that you witnessed to destroy it or

8   do they mark it cancelled, or void, or expired

9   and return it to you?

10        A.   They ask usually if I want to keep

11   one, and I will only keep it when it has a

12   valid visa, if it doesn't have a valid visa I

13   just tell them to, you know, to destroy it

14   because I wouldn't need it anymore.

15        Q.   So it's your choice when you renew

16   your passport, it's your choice whether you

17   want to keep the expired one or let them

18   destroy it?

19        A.   I think they prefer to destroy it,

20   but when there is a valid visa, they allow me

21   to keep it.

22        Q.   So getting back to the line of

23   questioning about the June 2006 entry, what

24   was the purpose of that visit?

25        A.   It was to do, I believe two or

1                          R. Mareuse

2    three days road show in New York and Boston,

3    and then to go to the Merrill Lynch conference

4    in Laguna Beach, California.

5           Q.    You had a road show in New York

6    and Boston?

7           A.    Yes.

8           Q.    And you had in Laguna -- what was

9    it in Laguna Beach, a conference?

10          A.    A Merrill Lynch emerging market

11   equity conference.

12          Q.    Who organized the New York and

13   Boston road show that you referred to?

14          A.    I believe it was Credit Suisse.

15          Q.    Do you know who at Credit Suisse

16   was involved in that?

17          A.    I remember a first name, a first

18   name is a Olga, I can't remember her last

19   name, she's the equity research of Credit

20   Suisse.

21          Q.    Where is Olga based?

22          MR. TOLCHIN:   Withdrawn.

23          Q.    Is Olga somebody who you had

24   worked with when you used to work at Credit

25   Suisse?

REINIG REPORTING, INC.   (212) 684-7298

119

1                           R. Mareuse

2          Q.    And what is Mr. Michaelmayr's

3    role?

4          A.    He -- well, on this particular

5    trip he was the one who worked on the bond

6    offering and -- before he came with us on the

7    road trip.

8          Q.    When you say the bond offering,

9    what are you referring to?

10         A.    We did a 144 Reg S bond offering

11   in late January 2007, we raised 750 million

12   dollars.

13         Q.    As you understand it, sir, what is

14   a 144 Reg S bond offering?

15         A.    It means that the U.S. retail

16   investors cannot buy this bond, it's only what

17   we call QIB which are qualified institution

18   buyer that can buy this bonds.

19         Q.    Do you have an understanding as to

20   what one has to be, what qualifications one

21   has to have to be a QIB?

22         A.    I have a vague understanding.

23         Q.    What is your vague understanding?

24         A.    That you have to be in the

25   business of buying and selling securities.

120

R. Mareuse

Q.   Do you know whether there is a
minimum of net worth element to that status of
QIB?

A.   I don't know for sure.

Q.   In order to participate in this
bond issue, in other words in order to buy the
bond, was there a minimum investment that one
needed to make?

A.   Well, I think the bond of a
minimum par value, probably $500,000 I would
say.

Q.   Just to define the term, when you
say a minimum par value, what does that mean?

A.   If you want to buy one bond you
have to pay $500,000.

Q.   So one cannot buy less than
$500,000 worth of this bond, is that correct?

A.   That's right.

MR. TOLCHIN:  I'm sorry.

A.   That's right.

MR. CURRAN:  Objection, vague.

Did you say stock, Mr. Tolchin?

MR. TOLCHIN:  Bond, no I said
bond.

REINIG REPORTING, INC.  (212) 684-7298

121

R. Mareuse

 1

 2      MR. CURRAN:  Okay.

 3      MR. TOLCHIN:  If I misspoke, I'm

 4  sorry, but I believe I said bond.

 5      Q.   Where did this --

 6      MR. TOLCHIN:  Withdrawn.

 7      Q.   What was the purpose of your

 8  January 30, 2007 visit?

 9      A.   To sell the bond to this QIB, so

10  we started the road show work in Geneva then

11  we went to London, then we went one day New

12  York and one in day Boston.

13      Q.   Say that again, Geneva?

14      A.   Geneva, Zurich, London, New York,

15  Boston.

16      Q.   How long did you spend in each of

17  those cities?

18      A.   Geneva, half a day; Zurich, half a

19  day; London, one day; New York, one day;

20  Boston, one day.

21      Q.   When did the process of putting

22  together this bond issue begin?

23      A.   Three years ago we started to

24  think about this and then we really started a

25  month before, I would say a month before the

122

1                          R. Mareuse

2    offering itself.

3                 MR. TOLCHIN:  You're fading out

4           and getting very quiet again.

5           A.    I said three years ago we started

6    to have this idea and then we did not do it

7    for several reason, and then we were -- we

8    prepared very actively in the month preceding

9    the offering.

10          Q.    Before you could issue these

11   bonds, am I correct that there is a

12   considerable amount of legal and regulatory

13   paperwork that you have to go through, is that

14   correct?

15          A.    That's correct, yeah.

16          Q.    And was anything filed with a

17   government agency in the United States about

18   this bond issue?

19          A.    I think a 144 offering has to be

20   filed, but I'm not sure, I'm not a hundred

21   percent sure because it's not a public

22   offering, so I don't, I don't know for sure,

23   actually this, I don't know what exactly the

24   process is with the offer 144.

25          Q.    Was there -- do you know whether

123

1                        R. Mareuse

2    Orascom utilized the services of any

3    investment professionals in New York relating

4    to this 144 S filing or bond issue?

5                   MR. SULLIVAN:  Objection, vague as

6              to what investment professionals might

7              be.

8                   If you could understand that

9              question, Mr. Mareuse, you can --

10                  MR. TOLCHIN:  I mean legal

11             advisors, financial advisors,

12             accountants, underwriters, bookrunners,

13             merchant bankers, investment bankers,

14             I'm sorry?

15                  MR. CURRAN:  Tell us when the

16             question is over so the witness can

17             answer.

18                  MR. TOLCHIN:  The hint is, I get

19             done talking.

20                  MR. CURRAN:  Well, the problem is

21             it seems like you're getting done and

22             then there is additional.

23                  If that question is done, I think

24             the witness can answer.

25             A.   I said the investment bankers and

124

1                      R. Mareuse

2      the lawyers for the offering were all based in

3      London.

4              Q.    Who were they?

5              A.    They were Credit Suisse, Citi

6      Group, ABN Amro and Deutsche Bank and on the

7      legal side was White and Case and Allen and

8      Obery.

9              Q.    Allen and?

10             A.    Obery.

11             Q.    Do you know how to spell that?

12             A.    O-B-E-R-Y.

13             Q.    Do you know who at White and Case

14     Orascom Telecom Holdings dealt with?

15             A.    I don't remember his name now off

16     the top of my head.  I don't remember his

17     name, sorry.

18             Q.    Was it just one person?

19             A.    No, but I don't remember the team

20     leader on the White and Case side.

21             Q.    So there is a team leader in

22     London and a team leader in New York, is that

23     accurate?

24             A.    No.

25             Q.    I don't want to put words in your

REINIG REPORTING, INC.  (212) 684-7298

125

1                          R. Mareuse

2       mouth.

3              A.    No, no.

4              MR. CURRAN:   See there again you

5              Mr. Tolchin, you keep adding in stuff

6              after a question is over.

7              The witness can answer.

8              A.    No, no, no the team was basically

9       in London, from the bankers side and the legal

10      advisor side.

11             Q.    But as you sit here today, you

12      don't know, do you, whether any filings were

13      made with the Securities and Exchange

14      Commission in the United States relating to

15      this bond, is that correct?

16             A.    I don't think so, I don't think

17      so, but I'm not sure, it's not a public, it's

18      not a public offering in the United States, so

19      I don't think it has to be filed with the SEC,

20      and I'm pretty sure it is not, but I'm not a

21      hundred percent sure.

22             Q.    Were any steps necessary in order

23      for that bond to be listed with any exchanges

24      in the United states?

25             A.    No.

126

1                          R. Mareuse

2          Q.    What was the involvement of Allen

3    and Obery?

4          A.    They were the underwriters'

5    counsel.

6          Q.    And who was the underwriter or the

7    underwriters?

8          A.    As I said before, Credit Suisse,

9    Citi Group, ABN Amro and Deutsche Bank.

10         Q.    Now this -- was this road show

11   relating to the bond in January to February of

12   2007, was it -- was the format different from

13   the road shows we've discussed before?

14         A.    A little bit different because you

15   talking to bond investors, but not that much

16   different in the sense that you go and see

17   investors in their offices, you tell them the

18   story of the company, and then either they

19   like it or they don't like it.

20              MR. TOLCHIN:   I didn't hear the

21         last phrase of the answer.

22              (Whereupon, the record was read

23         back.)

24         Q.    How many investors did you meet

25   with in their offices?

REINIG REPORTING, INC.   (212) 684-7298

1                           R. Mareuse

2          A.    I would say probably, probably

3    eight in New York and we had, we had lunch

4    meeting in New York, I'd I said then eight and

5    then probably had a lunch of about ten people

6    so like 18, then we had a breakfast in Boston

7    of about six investors.

8          Q.    When you started out with this

9    bond issue was there a target of how many

10   dollars worth of this bond you hoped to sell?

11         A.    We started with target of 500

12   million dollars.

13         Q.    You testified earlier that you

14   sold 750 million dollars?

15         A.    That's correct.

16         Q.    What happened?

17         A.    The issue was very successful so

18   we increase the size from 500 to 750.

19         Q.    Now, of the 750 million dollars

20   worth of these bonds, what percentage were

21   sold directly due to your road show to Geneva,

22   Zurich, London, New York and Boston?

23              MR. CURRAN:  Objection as to form,

24         lacks foundation.

25              The witness may answer.

128

1                           R. Mareuse

2          A.    I can't remember precisely the

3    break down between the different investors.

4          Q.    During your meetings with the

5    various investors whom you met with on this

6    road show, did the investors tell you whether

7    they intended to purchase the bonds?

8          A.    Some of them did.

9          Q.    How many in New York told you that

10   they intended to purchase the bonds?

11         A.    I can't remember precisely, maybe

12   five.

13         Q.    And do you know whether those

14   investors did, in fact, purchase the bonds,

15   those five?

16         A.    I did not check.

17         Q.    I'm sorry?

18         A.    I did not check.

19         Q.    Does Orascom have records, to your

20   knowledge, as to who purchased each one of the

21   bond?

22         A.    Yes.

23         Q.    Do you, sir, know who purchased

24   all the bonds?

25         A.    I don't recall exactly who

129

1                         R. Mareuse

2       purchased the bond, I mean, I look at this

3       list, it was, you know a month or two ago, but

4       I don't remember precisely who bought these

5       bonds.

6             Q.    During your meetings, your eight

7       meetings in New York and the lunch with ten

8       investors, do you know how many of those

9       investors, those 18 investors purchased the

10      bonds?

11            A.    No.

12            Q.    Do you know how many dollars worth

13      of bonds were purchased by those 18 investors?

14                  MR. SULLIVAN:   Objection,

15            foundation.   There is no evidence that

16            he knows that they actually did invest,

17            but if you know, you can answer.

18            A.    No, I don't know, I don't

19      remember.

20            Q.    Do you know in order of magnitude

21      as to how many dollars worth of bonds were

22      sold to New York investors?

23            A.    No.   I mean, I tell you why it's

24      very difficult because a lot of this

25      institutions have offices in New York, in

130

```
 1                          R. Mareuse
 2      London, or in Geneva, so what you see is, you
 3      know who is the ultimate buyer is which
 4      institution, you don't know if it's New York,
 5      or London, or Geneva, bought these bonds, so
 6      you don't really, you know there is some
 7      investors and you don't know where they are
 8      based.
 9              Q.    Can you identify any of the
10      institutions who you -- that were investors
11      that you met with while you were in New York
12      in January to February of 2007?
13              A.    I'm sure if I had the names in
14      front of me I would remember them.
15              Q.    But as you sit here today do you
16      have any memory of who you met with a month
17      and a half ago?
18              A.    Frankly, no.
19              Q.    Other than meeting with those 18
20      investors in New York and six in Boston
21      relating specifically to the bond road show,
22      did you meet any other investors during your
23      visit to the United states in January to
24      February of 2007?
25              A.    No.
```

131

```
 1                    R. Mareuse
 2        Q.    Where did you stay when you came
 3   to New York in January to February of 2007?
 4        A.    At the New York Palace.
 5        Q.    And how long did you remain in the
 6   United states during that visit?
 7        A.    Two days.
 8        Q.    Where did you go after that visit?
 9        A.    London.
10        Q.    Did you bring any written
11   materials with you in connection with the bond
12   road show in January to February 2007?
13        A.    Yeah we brought investors
14   presentation and we brought prospectuses.
15        Q.    You brought the prospectus for the
16   bond issue?
17        A.    Yes.
18        Q.    Is that prospectus publicly
19   available anywhere, to your knowledge?
20        A.    No.  No, it's not publicly
21   available.
22             MR. TOLCHIN:  Maybe this would be
23             a break point if you wish.
24             MR. SULLIVAN:  I know it's late in
25             Cairo it's noon here, how much, just
```

REINIG REPORTING, INC.  (212) 684-7298

1                        R. Mareuse

2              MR. CURRAN:  No, we haven't

3          changed anything with respect to the

4          microphones on this end.

5              Q.  By the way, are there researchers

6    and analysts who follow Orascom Telecom

7    Holdings' stock or GDRs in New York?

8              A.  I don't think so.  I think we--

9    always based in London.

10             MR. TOLCHIN:  All what?

11             A.  All based in London.

12             MR. TOLCHIN:  That Sounds

13         horrible, we'll keep working but we're

14         having some technical glitch on this

15         end.

16             MR. CURRAN:  Can the reporter

17         please read back the last answer.

18             (Whereupon, the record was read

19         back.)

20             Q.  Are you aware that Orascom Telecom

21   Holdings conducts quarterly and annual

22   conference calls?

23             A.  Yes.

24             Q.  Do you participate in those

25   conference calls from time to time?

137

1                    R. Mareuse

2        A.    Yes.

3        Q.    And what is the purpose of those

4    conference calls?

5        A.    To comment the quarterly or yearly

6    financial results.

7        Q.    Who are participants in those

8    conference calls other than Orascom Telecom

9    Holdings personnel?

10              MR. CURRAN:  Objection, vague as

11          to whether participants mean those who

12          speak or those who merely listen, but

13          the witness can answer.

14              MR. TOLCHIN:  I'm referring to

15          those who listen.

16        A.    Research analysts and investors.

17        Q.    And are some of those research

18    analysts and investors located in the United

19    States?

20        A.    Some investors are located in the

21    United States.

22        Q.    And are some of those research

23    analysts and/or investors located in New York?

24        A.    Yes.

25              MR. CURRAN:  Objection as to form,

138

1                          R. Mareuse

2              that was compound.  Please proceed.

3          Q.    Do you know how many of those

4      conference call participants are located in

5      New York on average?

6          A.    No.

7          Q.    Do you know how many participants

8      there are, on average, in those conference

9      calls?

10         A.    I would say between 30 to a

11     hundred.

12         Q.    Are records kept in any way,

13     shape, or form as to who the participants are

14     in those conference calls?

15         A.    I believe Hatim El Gammal keep

16     these records.

17         Q.    Are those conference calls by

18     invitation only or can anybody whose

19     interested in Orascom participate?

20         A.    We send invitations and anyone can

21     participate except the press, we ask the press

22     not to participate.

23              MR. TOLCHIN:  Can you -- somehow

24         it got quiet again.

25         Q.    Why is it that you ask the press

200

1

2                    C E R T I F I C A T E

3

4       STATE OF NEW YORK    )
                              ) ss.:
5       COUNTY OF NEW YORK   )

6

7            I, SHAMONA ADDERLEY, a reporter and

8       Notary Public within and for the State of New

9       York, do hereby certify:

10           That RODOLPHE ALDO MARIO MAREUSE, the

11      witness whose deposition is hereinbefore set

12      forth, was duly sworn by me and that such

13      deposition is a true record of the testimony

14      given by such witness.

15           I further certify that I am not related

16      to any of the parties to this action by blood

17      or marriage, and that I am in no way

18      interested in the outcome of this matter.

19           IN WITNESS WHEREOF, I have hereunto set my

20      hand this 22nd day of March, 2007.

21

22                    _____

23                      SHAMONA ADDERLEY

24

25

1

1    SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK
2    -------------------------------------x

3    YARON UNGAR,

4                    Plaintiff,

5           -against-                        Index No.
                                             05521/05
6
     PALESTINIAN AUTHORITY,
7
                    Defendant.
8
     -------------------------------------x
9

10

11              DEPOSITION of NAGUIB SAWIRIS, a

12   Non-Party Witness, taken pursuant to Subpoena,

13   held at the law offices of WHITE & CASE, LLP,

14   1155 Avenue of the Americas, New York, New

15   York, on March 15, 2007, commencing at 8:12

16   a.m., before Jessica R. Berman, a Shorthand

17   Reporter and Notary Public within and for

18   the State of New York.

19

20           ┌─────────────────────────────┐
             │  Portions Designated As     │
21           │        Confidential         │
             └─────────────────────────────┘
22

23                REINIG REPORTING, INC.
                   192 Lexington Avenue
24                      Suite 1004
                 New York, New York   10016
25                   (212) 684-7298

32

```
 1                    N. Sawiris

 2          A    Yes, sir.

 3          Q    When you came to the United

 4   States on those two dates in October '05 and

 5   '06 in connection with the stock exchange

 6   advisory board, what did you do while you

 7   were here?

 8               MR. CURRAN:  I object on

 9          foundation.  I think technically it is

10          an advisory committee to the New York

11          Stock Exchange.

12               MR. TOLCHIN:  I just used the

13          witness's words.

14               MR. CURRAN:  The witness may

15          answer the question.

16          A    I attended the advisory board.

17   You know, usually they get some people from

18   the State Department and like that.  We talk

19   about the world, what is happening in the

20   world, and specifically I am always asked to

21   report on my area of the world.  So I tell

22   them what is happening in the Middle East

23   and how the Middle East is developing and so

24   on.  That's all I report on.

25               I might have gone to dinner the
```

REINIG REPORTING, INC.,  (212) 684-7298

44

```
 1                    N. Sawiris

 2     manages the whole GDR program of Egypt, do

 3     you mean to say the GDR program of Orascom

 4     Telecom Holding of Egypt or of the country

 5     of Egypt?

 6           A    No, I think as far as I

 7     understand, they are running -- I mean, I am

 8     not sure whether they do the whole program

 9     of Egypt, but they do a substantial part of

10     the GDR program of Egypt, you know.  I am

11     not an expert on that, but I think they do a

12     large part of that.

13           We are not the only company who

14     has a GDR program.  It depends who you

15     entrust with managing the shares, you know.

16     I think there is other banks, like Deutsche

17     Bank and so on, that do the same thing.

18           So, the GDR program is a program

19     between the London Stock Exchange and Egypt.

20     So, the Bank of New York is only -- let's

21     say it manages the traffic or the selling

22     and buying of the GDRs.

23           Q    Who actually holds the shares,

24     the Orascom Telecom Holding company shares

25     for which the GDR certificates are issued?
```

45

```
 1                   N. Sawiris

 2        A    I think it is the Commercial

 3    International Bank.  It is an Egyptian bank

 4    here.  It is the bank that has custody over

 5    our shares.

 6        Q    And they have an arrangement with

 7    Bank of New York?

 8             MR. CURRAN:  Objection, lacks

 9         foundation.

10             The witness may answer.

11        A    I guess so.

12        Q    Who is Khaled, K-H-A-L-E-D, Saba,

13    S-A-B-A?

14        A    He is the head of corporate

15    strategy.

16        Q    Of Orascom Telecom Holding?

17        A    Yes, sir.

18        Q    Do you know whether Mr. Saba has

19    visited the United States in connection with

20    Orascom Telecom Holding's business?

21        A    If you want me to answer every

22    time, every time it is the same answer.  I

23    am trying to tell you, sir, I am not

24    tracking our people's traveling habits.  I

25    would not know whether they did or not.
```

56

```
 1                    N. Sawiris

 2          proceed.  Thank you.

 3     BY MR. TOLCHIN:

 4          Q    Mr. Sawiris, do you know whether

 5     Orascom Telecom Holding will be

 6     participating in any road shows in the

 7     United States in 2007?

 8          A    I would -- we usually do one a

 9     year as a minimum and even sometimes two.

10     So the answer will be that it's quite -- the

11     answer is yes, I think they will do one this

12     year for sure.

13          Q    Do you know which road show

14     that's expected to be?

15          A    No, I think -- I don't know which

16     one they take, there is Citibank, there is

17     Merrill Lynch, there is Lehman, there is

18     HSBC.  I think they will select one and they

19     will go to one.  I don't know which one.

20          Q    Do you have an understanding,

21     sir, as to why Orascom chooses to

22     participate in these road shows?

23          A    We have a wide world

24     shareholder -- I mean, we have shareholders

25     from all over the world, you know, and we
```

REINIG REPORTING, INC.,  (212) 684-7298

57

1                        N. Sawiris

2       need to go -- we do road shows in London; we

3       do road shows in Europe; we do road shows

4       here in Egypt.

5                 It is an obligation to be

6       transparent and to explain your company to

7       all different kinds of shareholders.  So, it

8       is an act of transparency and it also acts

9       to simply maintain the interest of the

10      shareholders in the company.

11           Q    What benefit does Orascom Telecom

12      Holding achieve by participating in these

13      road shows?

14           A    It is mainly about transparency

15      and to get the interest that -- to get

16      shareholders interested in the company so

17      they would buy the stock or sell it if they

18      are not satisfied.

19           Q    Does Orascom Telecom Holding

20      maintain a Web site?

21           A    Yes.

22           Q    On Orascom Telecom Holding's Web

23      site, is it possible for people to sign up

24      to receive updates and e-mails about Orascom

25      Telecom?

59

```
 1                       N. Sawiris

 2            A    Yes, sir.

 3            Q    Do people in the United States

 4       participate in those conference calls?

 5            A    Yes, sir.

 6            Q    Do you know whether people in New

 7       York participate in those conference calls?

 8            A    Yes, sir.

 9            Q    Just to be clear, is it your

10       testimony, sir, that people in New York do

11       participate in those conference calls?

12            A    Yes, sir.

13            Q    Do you know how many people in

14       New York participate in those conference

15       calls?

16            A    No, sir, but you know the major

17       financial institutions who invest in our

18       company are mostly concentrated between New

19       York, Boston and the West Coast.  So it

20       cannot be out of there.  Hardly someone in

21       Kansas City or Oklahoma is following our

22       company.

23            Q    Do you know how many people

24       altogether participate in those conference

25       calls?
```

60

```
 1                    N. Sawiris
 2         A    No, but on average, we have
 3    something between 50 to 150, depending on
 4    the importance, you know, whether it's just
 5    a quarterly or end-of-year results, but the
 6    average would be from 50 to 150.
 7         Q    Do you personally participate in
 8    those conference calls?
 9         A    I try as much, sir, yes.
10         Q    What do you hope to achieve from
11    those conference calls when you participate
12    in them?
13         A    Just to answer all of the
14    questions and the worries of my
15    shareholders, to explain to them the
16    direction of the company, the strategy going
17    forward, to explain some of the recent
18    events.  The more transparent and the more
19    clear about your intentions and the business
20    of the company, the more the shareholders
21    feel comfortable and remain loyal
22    shareholders for the long term.
23         Q    Are you familiar with a bond
24    issue that Orascom Telecom Holding recently
25    sold?
```

61

```
 1                    N. Sawiris
 2        A    Yes, sir.
 3        Q    Do you refer to that bond issue
 4   by any particular name?
 5        A    No.  I think it was -- no, I
 6   don't remember a name.
 7        Q    Would you be comfortable calling
 8   those bonds the 2007 bonds?
 9        A    Yes, I don't mind calling it like
10   that, yes.
11        Q    Is it correct, sir, that Orascom
12   Telecom Holding sold $750,000,000 of those
13   2007 bonds?
14        A    Yes, sir.
15        Q    Were some of those bonds sold to
16   investors in New York?
17        A    I don't know, but I would guess
18   that definitely.  You know, New York is a
19   financial hub, so most investors are there
20   and I can hardly imagine that nobody in New
21   York bought a bond.  So you are most
22   probably right.
23        Q    Would you be able to estimate the
24   percentage of that, of those 2007 bonds that
25   were sold to investors in New York?
```

62

```
 1                    N. Sawiris

 2                    MR. CURRAN:  I object.  It

 3         calls for speculation.

 4                    The witness may answer.

 5         A      I don't know exactly, sir.

 6         Q      Do you know approximately?

 7         A      No, sir.  I am only interested in

 8    one fact, and one fact only is that our bond

 9    gets covered, and I am not very much

10    interested on the level of who bought it,

11    you know.  In the end, what we care for is

12    getting the money.  So if it's invested from

13    U.K., the Gulf or New York, our main

14    objective is to cover the bond.

15         Q      When you say to cover the bond,

16    what do you mean by the term to cover?

17         A      It's like when you ask for

18    $750,000,000, you get in the end

19    $750,000,000.  Bonds are usually

20    oversubscribed or undersubscribed.  So,

21    oversubscription means you got more money

22    than you needed, which was the case in our

23    bond; and undersubscription is that you

24    didn't get the amount you want, which is an

25    indication that -- which is not a positive
```

67

```
 1                    N. Sawiris
 2      want to harass someone, you are my best
 3      choice.
 4           Q    I will take that as a compliment.
 5           A    It is, I swear.
 6                MR. TOLCHIN:  Be careful, Chris.
 7                THE WITNESS:  It is meant as a
 8           compliment.  Okay?
 9                MR. CURRAN:  I won't play that
10           role.
11                MR. TOLCHIN:  I appreciate
12           that.
13           Q    Sir, when Orascom Telecom Holding
14      was selling these bonds, is it correct that
15      you did a road show that took you to Geneva
16      and Zurich, then London, and then New York,
17      then Boston; is that correct?
18           A    Yes, I think so, yes.
19           Q    At what point in that odyssey did
20      you make the determination to increase the
21      bond issue from 500,000,000 to 750,000,000?
22           A    This is after the end of the road
23      show and before we decide to close the book
24      and everything, which means when the road
25      show is finished and we were surprised by
```

68

```
 1                    N. Sawiris

 2        the demand, the high demand on the bond,

 3        then it's -- it is, let's say, it is good

 4        for us to go out and increase the amount

 5        because that saves us, as I said, many --

 6        besides the harassment, saves us also

 7        another road show and effort and time.  And

 8        as we are in need of the extra amount for

 9        our future investment, it is just the right

10        thing to do.

11             Q    So, you made the determination

12        after the road show finished in Boston?

13             A    Yes, sir.

14             Q    So, do you have a sense of where

15        the heavy demand for this bond was coming

16        from?  In other words, was it from the

17        European cities you visited or the United

18        States cities you visited or both?

19             A    As I told you before, sir, we

20        are -- this is very irrelevant for us.  The

21        $1 note looks the same whether it came from

22        London, the United States or the Middle

23        East.  It is the same green note, you know.

24        So, we really we don't care.

25             Q    You must have had a sense of what
```

REINIG REPORTING, INC.,  (212) 684-7298

69

```
 1               N. Sawiris
 2     the demand was for your bond after each of
 3     your road show stops, didn't you?
 4               MR. CURRAN:  Objection, lacks
 5         foundation.
 6               The witness can answer.
 7         A    No.  As I said, you know, at my
 8     level I am only interested at the end
 9     result.  I don't follow them point by point.
10     You know, if they called me during the road
11     show, which they didn't, but if they would,
12     they would just tell me, Well, it is going
13     well; it is not going well; we are getting
14     good reaction.  But we don't discuss
15     amounts, allocation and nationalities.
16         Q    Did Mr. Mareuse tell you that the
17     road show went very well in the United
18     States?
19         A    No, he said it went well
20     everywhere, not just in the United States.
21     He said it was very well received on the
22     whole trip.  He was not specific where it
23     went well.  He said it went very well
24     everywhere, and he just said it did very
25     well.  He did not mention where it went
```

70

```
 1                    N. Sawiris

 2    better or less.

 3         Q    Do you know what portion of

 4    Orascom Telecom Holding's stock, whether

 5    directly as stock or through GDRs, is owned

 6    by investors in the United States?

 7         A    As I said, I never made that

 8    exact -- I know that there is a good deal of

 9    investors from the United States.  Most of

10    the big funds are U.S. funds, like Capital,

11    Fidelity, Templeton.  These are the big guys

12    and they are mostly in the States.

13              So, I mean, if you were trying to

14    derive the fact that a large shareholder

15    base of our shareholders are U.S. based, I

16    would say that more or less that you are

17    most probably right.

18         Q    Sir, you said Templeton, Fidelity

19    -- what were the other names you mentioned?

20         A    I was just giving you examples of

21    the large funds of the United States.  So, I

22    said Capital, Fidelity and Templeton.  But I

23    am not sure that are my shareholders or not.

24    But what I am saying is these are big names.

25    Usually they have shares everywhere in the
```

166

1              **C E R T I F I C A T E**

2

3      STATE OF NEW YORK    )
                            :  SS
4      COUNTY OF NEW YORK   )

5

6           I, JESSICA R. BERMAN, a Shorthand

7      Reporter and Notary Public within and for

8      the State of New York do hereby certify:

9           That NAGUIB SAWIRIS, the witness

10     whose examination is hereinbefore set forth,

11     was duly sworn by me and that this

12     transcript of such examination is a true

13     record of the testimony given by such

14     witness.

15           I further certify that I am not

16     related to any of the parties to this action

17     by blood or marriage and that I am in no way

18     interested in the outcome of this matter.

19

20     IN WITNESS WHEREOF, I have hereunto set my

21     hand this 21st day of March, 2007.

22

23           _Jessica R. Berman_

24           JESSICA R. BERMAN

25

09/06/2006 16:29 FAX 2123036000    NEW YORK PALACE HOTEL    ☑059

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- X



LESLYE KNOX, individually, as the administrator of the
Estate of Aharon Ellis and as natural guardian of plaintiffs
Jordan Terrell Ellis, Reuven Carter, Shanon Carter,
Shayrah Carter, Yoshavyah Carter and Amitai Carter,
JORDAN TERRELL ELLIS, minor,
REUVEN CARTER, minor,
SHANON CARTER, minor,
SHAYRAH CARTER, minor,
YOSHAVYAH CARTER, minor,
AMITAI CARTER, minor,
by their next friend and guardian, Leslye Knox,
PRINCE SHALEAK,
MELLONEE ELLIS,
FRANCINE ELLIS,
LYNNE ELLIS,
YIHONADAV ELLIS,
TSAPHRIRAH ELLIS and
ARON CARTER,



**COMPLAINT
IN SUPPLEMENTAL
PROCEEDING**

                Plaintiffs-Judgment Creditors,

       -against-

ORASCOM TELECOM HOLDING S.A.E (a/k/a
"Orascom Telecom" a/k/a "OTH"),

            Defendant.

---------------------------------------------------- X

Plaintiffs-Judgment Creditors, complaining of the Defendant, by their attorneys,

JAROSLAWICZ & JAROS, allege for their complaint upon information and belief as follows:

## NATURE OF PROCEEDING AND RELIEF REQUESTED

1.     Plaintiffs-Judgment Creditors hold a final judgment in the amount of $192,740,660.13 that was entered by this Court against the Palestinian Authority ("PA") and the Palestine Liberation Organization ("PLO") on August 1, 2006.

2.     The PA and PLO have not honored the judgment, pursuant to their policy of refusal to recognize the authority of the courts of the United States.

3.     Defendant ORASCOM TELECOM HOLDING S.A.E. ("ORASCOM") owes debts due to judgment debtor PA.

4.     Plaintiffs therefore bring this supplemental proceeding for a judgment and order directing Defendant ORASCOM to turnover and pay to Plaintiffs-Judgment Creditors any and all debts owed, due and/or payable to the PA.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this matter pursuant to 18 U.S.C. §§ 2333 and 2338, 28 U.S.C. § 1331, the Court's ancillary enforcement jurisdiction, the Court's equity powers, and Fed. R. Civ. P. 69.

6.     This Court has jurisdiction over Defendant ORASCOM pursuant to Fed.R.Civ.P. 4(k)(1) and/or 4(k)(2).

7.     The Southern District of New York is the proper venue for this matter pursuant to 28 U.S.C. § 1391(b) and (d).

09/06/2006 16:29 FAX 2123036000    NEW YORK PALACE HOTEL    ☑061

## THE PARTIES

8.    Plaintiff-Judgment Creditor THE ESTATE OF AHARON ELLIS, which is represented in this action by a court-appointed administrator, Leslye Knox, holds a judgment against the PA and the PLO in the amount of $5,240,660.13.

9.    Plaintiff-Judgment Creditor LESLYE KNOX, who brings this action individually, as the administrator of the Estate of Aharon Ellis and as natural guardian of plaintiffs Jordan Terrell Ellis, Reuven Carter, Shanon Carter, Shayrah Carter, Yoshavyah Carter and Amitai Carter, holds a judgment against the PA and the PLO in the amount of $30,000,000.00.

10.    Plaintiffs-Judgment Creditors JORDAN TERRELL ELLIS, REUVEN CARTER, SHANON CARTER, SHAYRAH CARTER, YOSHAVYAH CARTER and AMITAI CARTER, minors, who bring this action through their mother and legal guardian Leslye Knox, each hold a judgment against the PA and the PLO in the amount of $15,000,000.00.

11.    Plaintiffs-Judgment Creditors PRINCE SHALEAK and MELLONEE ELLIS each hold a judgment against the PA and the PLO in the amount of $15,000,000.00.

12.    Plaintiffs-Judgment Creditors FRANCINE ELLIS, LYNNE ELLIS, YIHONADAV ELLIS, TSAPHRIRAH ELLIS and ARON CARTER each hold a judgment against the PA and the PLO in the amount of $7,500,000.00.

13.    Defendant ORASCOM TELECOM HOLDING S.A.E ("Orascom") is a corporation organized and existing pursuant to the laws of Egypt.

14.    Defendant ORASCOM, itself and through its agents, continuously and permanently does extensive, substantial business in the State of New York and throughout the United States.

15.    Defendant ORASCOM, itself and through its agents, maintains assets within the State of New York and the United States.

## STATEMENT OF FACTS

### I.    Background

16.    Plaintiffs-Judgment Creditors are the widow, children, parents, siblings and administrator of the estate of Aharon Ellis, an American citizen who was murdered in a terrorist machine-gun attack carried out by the PA and PLO at a Bat Mitzvah celebration on January 17, 2002, in Hadera, Israel.

17.    Plaintiffs-Judgment Creditors filed suit in this Court in 2003 against the PA and PLO under the Antiterrorism Act ("ATA") 18 U.S.C. § 2331 *et seq. Knox et al. v. The Palestine Liberation Organization et al.*, No. 03 Civ. 4466. (VM) (THK).

18.    On July 11, 2006, this Court gave a Decision and Order directing entry of final judgment against the PA and PLO and in favor of the Plaintiffs-Judgment Creditors in the total amount of $192,740,660.13 in damages. *Knox v. Palestine Liberation Organization,* ___ F. Supp. 2d ___, 2006 WL 2129527 (S.D.N.Y. 2006). Final judgment was entered in accordance with that Decision and Order on August 1, 2006.

19.    The PA and PLO have failed to satisfy the judgment entered in favor of Plaintiffs-Judgment Creditors because, as they have expressly notified this Court, they do not recognize the authority of this Court or of any other court of the United States. On July 15, 2005,

this Court ordered the PA and PLO to pay discovery sanctions in the amount of some $19,000 previously imposed upon them by this Court in the underlying action, and to answer the complaint, by no later than August 15, 2005. In response to that order, the PLO and PA sent a letter to this Court on August 15, 2005, stating that:

> [T]he defendants have instructed counsel to present only their position that U.S. courts have no jurisdiction over them and not to answer on the merits . . .
>
> This same position, that the Court has no jurisdiction over them, applies to the order for defendants to pay sanctions.

Letter from Ramsey Clark, Esq. to Marrero, J., August 15, 2005, *Knox v. Palestine Liberation Organization*, Civ. No. 4466 (VM).

## II.     Defendant ORASCOM is Indebted to Judgment-Debtor PA

20.     Defendant ORASCOM is an Egyptian telecommunications company that, upon information and belief, does extensive business in New York, and throughout the United States.

21.     As of January 1, 2003, the PA made, held and owned the following direct investments in Defendant ORASCOM (collectively hereinafter: "Direct Investments"):

a.     On December 10, 2002, the PA purchased 10 million shares of Defendant ORASCOM; and

b.     As of January 1, 2003, the PA owned 2 million Global Depository Receipts ("GDR") shares of Defendant ORASCOM traded on the London stock exchange; and

c.  On an unknown date or dates prior to January 1, 2003, the PA transferred approximately $107,500,000.00 to Defendant ORASCOM as an investment, in expectation of an increase in shareholder capital which did not take place.

22.  Upon information and belief, the Direct Investments have not been repaid to the PA, and Defendant ORASCOM remains indebted to the PA for the amount of the Direct Investments.

23.  Orascom Telecom Algeria (a/k/a "Djezzy") (hereinafter: "OTA") and Orascom Telecom Tunisia (a/k/a "Tunisiana") (hereinafter: "OTT") are telecommunication companies.

24.  Upon information and belief Defendant ORASCOM owns a majority ownership interest in OTT and OTA.

25.  On an unknown date or dates, the PA acquired direct and/or indirect stakes and/or shares and/or other interests in OTA and OTT (collectively hereinafter: "PA's OTA and OTT Stakes").

26.  On an unknown date or dates, Defendant ORASCOM agreed to purchase the PA's OTA and OTT Stakes for an unknown sum totaling hundreds of millions of dollars.

27.  On an unknown date or dates in late 2004 and/or early 2005, Defendant ORASCOM purchased and acquired the PA's OTA and OTT Stakes for an unknown sum totaling hundreds of millions of dollars (hereinafter: "Defendant ORASCOM's Acquisition of the PA's OTA and OTT Stakes").

28.     As a consequence and result of, and as consideration for, Defendant ORASCOM's Acquisition of the PA's OTA and OTT Stakes, Defendant ORASCOM is indebted to and owes the PA at least tens and probably hundreds of millions of dollars.

29.     The PA carried out all of the above-described transactions and investments in its own name and/or under the names of at least two shell entities: (i) The Palestinian Commercial Services Corporation (a/k/a "Palestine Commercial Services Company") (hereinafter: "PCSC") and (ii) The Palestine Investment Fund (a/k/a "Palestine Investment Fund Company", "Palestinian Investment Fund", "Palestinian Investment Fund Company" or "Sharekat Sundouk al-Istithmar al-Filistinee") (hereinafter: "PIF").

30.     The PCSC and PIF are shell entities wholly-owned and controlled by the PA with no purpose or business other than to act as investment vehicles for the PA. The PA established and uses the PCSC and PIF to conceal, hold, manage and invest the PA's assets.

31.     Any and all assets and property of any type designated or titled to, or held in, the name of the PCSC and PIF, are legally, beneficially and equitably owned by the PA.

32.     Any and all debts owed and/or due to, or payable in the name of, the PCSC and PIF, are legally, beneficially and equitably owned by, and constitute assets of, the PA.

33.     Indeed, in at least ten sworn affidavits submitted by the PA in civil proceedings pending in Israeli courts (copies of which are in Plaintiffs-Judgment Creditors' possession) the PA has identified the Direct Investments in Defendant ORASCOM and the PA's OTA and OTT Stakes—specifically by name—as assets owned by the PA and available for the satisfaction of judgments against the PA (hereinafter: "PA Affidavits"). The PA Affidavits constitute dispositive admissions.

34.    The PA Affidavits were submitted by the PA in support of successful motions filed by it in the Israeli courts to vacate or reduce the amount of prejudgment attachments that had been imposed on the PA by the Israeli courts in those proceedings. The PA is therefore judicially estopped from contesting or opposing the instant action.[1]

35.    Therefore, any amounts nominally owed, due or and/or payable from Defendant ORASCOM to the PCSC and PIF are legally, beneficially and equitably owed, due and payable to the PA, constitute assets of the PA, and are subject to turnover in satisfaction of Plaintiffs-Judgment Creditors' judgment against the PA.

## FIRST CLAIM FOR RELIEF

## TURNOVER PURSUANT TO CPLR § 5227

36.    Plaintiffs-Judgment Creditors repeat and reallege each of the foregoing allegations with the same force and effect as if they were more fully set forth herein.

37.    Plaintiffs-Judgment Creditors are judgment-creditors of the PA.

_____

[1] The PA, PCSC and PIF are hereby cautioned that if they file papers in this matter contradicting the sworn affidavits filed by the PA in the Israeli proceedings, Plaintiffs-Judgment Creditors will (1) seek all available sanctions under Fed.R.Civ.P. 11 and other relevant provisions; and (2) deliver copies of such contradictory papers to the chambers of the Israeli judges before whom the PA filed the sworn affidavits.

Plaintiffs-Judgment Creditors have suffered through three years of contumacious and dilatory litigation conduct at the hands of the PA and PLO, and the Court should tolerate no more. *See Knox v. Palestine Liberation Organization*, 229 F.R.D. 65 (S.D.N.Y. 2005) (finding that the PLO and PA "generat[ed] more than a year's delay and thousands of dollars in legal expenses" warning that the "Court will not tolerate such practices in the future, and will consider any unexplained repetition of them sufficient grounds for imposition of sanctions on Defendants' counsel personally as well as on Defendants" and imposing sanctions of estoppel and attorneys fees).

38.  Defendant ORASCOM is indebted to judgment-debtor PA.

39.  Plaintiffs-Judgment Creditors are therefore entitled to an order and judgment pursuant to New York State Civil Practice Law and Rules ("CPLR") § 5227 directing Defendant ORASCOM to turnover and pay to Plaintiffs-Judgment Creditors, up to the full amount of their judgment against the PA, all sums owed by Defendant ORASCOM and due to the PA, however titled.

## SECOND CLAIM FOR RELIEF

## TURNOVER UNDER A CREDITOR'S BILL/SUPPLEMENTAL BILL

40.  Plaintiffs-Judgment Creditors repeat and reallege each of the foregoing allegations with the same force and effect as if they were more fully set forth herein.

41.  Plaintiffs-Judgment Creditors are victims of a heinous terrorist attack carried out by the PA.

42.  The PA has notified this Court that it does not recognize the jurisdiction of this or any other court of the United States over the PA, and accordingly has failed to honor Plaintiffs' judgment.

43.  The PA is a foreign entity without assets in the United States sufficient to satisfy Plaintiffs' judgment.

44.  This Court has previously found that the PA intentionally delayed the underlying action.

45.  Therefore, in the event that for any reason Plaintiffs-Judgment Creditors are not entitled to relief at law under CPLR § 5227, this Court can and should afford them equitable relief.

46.     Plaintiffs-Judgment Creditors are therefore entitled to bring the instant action as a creditor's bill and/or a supplemental bill under the Court's equity powers, and to entry of an order and judgment thereon directing Defendant ORASCOM to turnover and pay to Plaintiffs-Judgment Creditors, up to the full amount of their judgment against the PA, all sums owed by Defendant ORASCOM and due to the PA, however titled.

**WHEREFORE**, the Plaintiffs-Judgment Creditors demand an order and judgment against Defendant ORASCOM:

(i)     Ordering Defendant ORASCOM to turnover and pay to Plaintiffs-Judgment Creditors, up to the full amount of their judgment against the PA and the statutory interest thereon, all debts owed, due and/or payable by Defendant ORASCOM to the PA, including without limitation all debts that are titled and/or payable in the names of the PA, PCSC or the PIF and all debts owed, due or payable as a consequence and result of, and/or as consideration for, the Direct Investments and Defendant ORASCOM's Acquisition of the PA's OTA and OTT Stakes, as defined herein; and

(ii)    Awarding Plaintiffs their costs, expenses, disbursements and attorney's fees in connection with this proceeding, together with such other and further relief that this Court deems just, proper and equitable.

Dated: New York, New York
        September 5, 2006

Yours,

JAROSLAWICZ & JAROS, ESQS.

*Attorneys for the Plaintiffs-Judgment Creditors*

by:

Robert J. Tolchin (RT3713)

150 William Street, 19th Floor
New York, New York 10038
(212) 227-2780

David Strachman, Esq.
MCINTYRE, TATE & LYNCH, LLP
*Attorneys for the Plaintiffs-Judgment Creditors*
321 South Main Street, Suite 400
Providence, Rhode Island 02903
(401) 351-7700

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

The Estate of Yaron Ungar, et al.,

   *Plaintiffs-Judgment*
   *Creditors,*

   v.

Orascom Telecom Holding S.A.E.,

   *Defendant-*
   *Garnishee.*

Civ. Action No. 07 CV 2572
(CM) (LMS)

---

## DECLARATION OF EMAD FARID

I, Emad Farid, hereby declare as follows:

  1. I am the Group Chief Operating Officer (COO) of Orascom Telecom Holding S.A.E. ("Orascom"). I submit this Declaration in support of Orascom's Motion to Dismiss in the above-referenced litigation. This Declaration is based upon my personal knowledge and upon information and belief.

  2. I have been employed at Orascom since January 2000. My duties as Orascom's COO include overseeing the operational activities of Orascom's subsidiaries including commercial, technical, strategic planning and regulatory activities.

  3. I was deposed in my individual capacity in connection with the U.S. litigation involving Orascom on March 13, 2007. At my deposition, I testified about some of the subject matter covered in this declaration.

  4. Orascom is a leading regional mobile telecommunications company, organized under the laws of Egypt and having its principal place of business in Egypt. Orascom has operations in the Middle East, Africa, and South Asia. Orascom does not have any operations in the United States.

5.    Orascom is a holding company, and as such, its primary functions are to hold interests in and provide operational support to its subsidiaries that operate Global System for Mobile Communications ("GSM") networks, provide internet services, and make retail sales of handsets to their customers.  Orascom's subsidiaries primarily use GSM technology and operate in seven emerging markets in the Middle East, Africa, and South Asia.  GSM is the most popular standard for mobile phones in the world, and is used for voice services and some data services.

6.    Orascom's principal corporate activity is to provide operational support to its telecommunications subsidiaries in the various different operational areas, such as technical, commercial, procurement, human resources, budgeting, strategic planning, regulatory, and revenue assurance.  Specifically, Orascom provides its subsidiaries with management services that add value to its operations by capitalizing on the experience gained in one market for the benefit of other markets, transferring know-how from one operation to another, and leveraging the group volume to get better prices and better services from vendors.  Included among the various management services Orascom provides to its subsidiaries are monitoring to ensure the subsidiaries are performing according to budget and other specified targets, and obtaining volume discounts and other types of discounts on behalf of its subsidiaries.  Orascom provides these management services to its subsidiaries in exchange for management fees and dividends.

7.    Another management service that Orascom provides to its subsidiaries from time to time is raising financing throughout the world.  I am not involved in the provision of this management service.  Raising financing is but one of many management services that Orascom provides to its subsidiaries and does not constitute Orascom's principal corporate activity.

8.      Orascom does not generate any revenue, make any sales, or provide any services to customers or clients in New York.  Orascom does not have any authorized business agents in New York.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in _Cairo_ , _Egypt_ , this _Monday_ day of September, 3 2007.


_[signature]_
Emad Farid

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

The Estate of Yaron Ungar, et al.,

         *Plaintiffs-Judgment*
         *Creditors,*

        v.

Orascom Telecom Holding S.A.E.,

         *Defendant-*
         *Garnishee.*

---

Civ. Action No. 07 CV 2572
(CM) (LMS)

## DECLARATION OF RODOLPHE ALDO MARIO MAREUSE

I, Rodolphe Aldo Mario Mareuse, hereby declare as follows:

1.     I am the Chief Financial Officer of Orascom Telecom Holding S.A.E. ("Orascom"). I submit this Declaration in support of Orascom's Motion to Dismiss in the above-referenced litigation. This Declaration is based upon my personal knowledge and upon information and belief.

2.     I have been employed at Orascom since October 2002. My duties as Orascom's CFO include overseeing corporate finance, treasury, accounting, budgeting, investor relations, and revenue assurance.

3.     I understand that the litigation in the United States involving Orascom concerns efforts by certain plaintiffs to collect on U.S. court judgments rendered in their favor against the Palestinian Authority ("PA") and the Palestine Liberation Organization ("PLO"). I further understand that these plaintiffs are pursuing Orascom as a potential garnishee. I was deposed in my personal capacity in connection with the U.S. litigation involving Orascom on March 14, 2007. At my deposition, I testified about some of the subject matter covered in this declaration.

4.    Orascom owns a majority interest in two telecommunications companies, Orascom Telecom Algeria ("OTA") and Orascom Telecom Tunisia ("OTT"), located in Algeria and Tunisia, respectively.

5.    In or about 2000, the Palestine Commercial Services Company ("PCSC") (which I understand is the predecessor of the Palestine Investment Fund ("PIF")) and the Palestinian Pension Fund for State Administrative Employees ("PPF") became indirect minority shareholders in OTA and OTT.  Neither the PA nor the PLO ever became a shareholder in either of these companies.  Upon information and belief, in or about 2003, the PCSC's OTA and OTT shares were transferred to the PIF.  No shares were ever transferred to the PA or the PLO.

6.    In or about February 2005, Orascom agreed to buy back the PIF and the PPF's shares in OTA and OTT pursuant to a share purchase agreement.  Neither the PA nor the PLO was a party to this agreement.  I participated in the negotiation and review of the terms of the share purchase agreement.

7.    Pursuant to the share purchase agreement, Orascom paid an initial installment to the PIF and the PPF into accounts of the PIF and PPF, at which time the shares that the PIF and the PPF held in OTA were duly transferred to Orascom.  Shortly thereafter, a disagreement between the PIF and Orascom arose whereby the PIF sought to renounce the deal.

8.    In or about March 2005 Orascom announced that it would seek to enforce its rights against the PIF in binding arbitration in Europe.

9.    Orascom and the PIF amicably resolved their disagreement surrounding the share purchase and entered into a settlement agreement in or about April 2005.  I participated in the negotiation and review of the terms of the settlement agreement.  The settlement agreement was executed between Orascom, represented by its chairman and CEO Mr. Naguib

Sawiris, and the PIF, represented by its then-chairman Dr. Salam Fayyad. Neither the PA nor the PLO was a party to the settlement agreement.

10.    Under the terms of the settlement agreement, Orascom agreed to pay the PIF and PPF a portion of Orascom's dividends as an OTA shareholder. It is my understanding, notwithstanding demands from the PIF, these dividends have not yet been paid to the PIF and PPF because of the litigation in the United States that has been ongoing for the past two years. Orascom does not hold any property belonging to the PA or the PLO, or owe any money to the PA or PLO.

11.    In connection with Orascom's purchase of the PIF and PPF shares in OTA and OTT, and the settlement related to that purchase, Orascom at all times negotiated with representatives of the PIF and the PPF.

12.    Orascom never negotiated with the PA or the PLO with respect to the share purchase agreement or the settlement agreement. Neither the share purchase agreement nor the settlement agreement was subject to the approval of the PA or the PLO.

13.    I separately understand that a question has arisen in the U.S. litigation as to whether Orascom's principal corporate activity consists of raising financing. It does not. Orascom provides various management services to support the operations of its operating subsidiaries. When the operating subsidiaries are in need of financing, Orascom also evaluates the best means to obtain such financing, whether through debt or equity. When the need arises, Orascom raises financing from sources located throughout the world, including London, Geneva, Zurich, Paris, Frankfurt, Amsterdam, Edinburgh, Hong Kong, Singapore, Kuwait City, Dubai, Boston, San Francisco, Laguna Beach and New York.

14.    Orascom conducts quarterly and annual conference calls with investors, financial analysts and other members of the financial community in order to update them on Orascom's performance and recent developments, to present and comment on Orascom's

quarterly or year-end financial results, to address investors' questions and concerns, and to communicate the Company's strategy going forward. Orascom does not promote particular investment opportunities or otherwise solicit investment on these conference calls, but rather communicates information about Orascom, its performance and its activities to investors and other interested members of the financial community.

15.    Orascom maintains a website (www.otelecom.com) that contains general information about Orascom and its telecommunications operations. Orascom does not enter into contracts or conduct any sales of shares, products or services through its website. The webpage www.otelecom.com/media/Register.aspx is limited to providing users with the option of signing up to receive updated Orascom news and financial reports by email.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in ___Paris___ , ___France___ , this __3rd__ day of September, 2007.


_____
Rodolphe Aldo Mario Mareuse

4