UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
THE ESTATE OF YARON UNGAR, et al.

        Plaintiffs-Judgment
        Creditors,

      - against -

ORASCOM TELECOM HOLDING S.A.E.,

        Defendant-Garnishee.

-----------------------------------------------------------x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/15/08

07 Civ. 2572 (CM)(LMS)

## DECISION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS AND DENYING PLAINTIFFS' CROSS-MOTION FOR JURISDICTIONAL DISCOVERY

McMahon, J.:

Plaintiffs, seeking to satisfy the judgment they obtained in the United States District Court for the District of Rhode Island, have been litigating this case for years. Currently, there are cases pending against various defendants and garnishees in several different courts. This particular case against Defendant-Garnishee Orascom Telecom Holding S.A.E. ("Orascom") has seen multiple iterations before this Court. In light of recent developments in related proceedings, it is now an appropriate time to render a decision on the motion pending before this Court. For the reasons that follow, Orascom's motion to dismiss for lack of subject matter jurisdiction is GRANTED.

## I.     Background and Procedural History

As Magistrate Judge Lisa Margaret Smith wrote in a previous related decision, this case "has a long and complex history of epic proportions." Estate of Ungar v. Palestinian Authority, 412 F. Supp. 2d 328, 329 (S.D.N.Y. 2006). Although the facts and procedural history of the

Ungar Estate's suit have been detailed extensively in prior decisions of this Court and several other courts, I summarize them here briefly, "for the purposes of clarity and completeness." Id.

## A. The Underlying Judgment

On June 9, 1996, Yaron Ungar, a United States citizen, and his pregnant wife Efrat were killed in a machine-gun attack in Israel that was carried out by Hamas. Plaintiffs are the orphaned children, parents, siblings, and administrator of the Estate of Yaron Ungar. In March 2000, Mr. Ungar's estate ("the Ungar Estate" or "the Ungars") filed suit in the United States District Court for the District of Rhode Island against, *inter alia*, the Palestinian Authority ("PA"), the Palestine Liberation Organization ("PLO"), and certain principal individuals. The suit sought damages under the Antiterrorism Act ("ATA"), 18 U.S.C. § 2333(a) (2000), which provides a cause of action for a U.S. citizen (or his estate) killed or injured due to an act of international terrorism.

After extensive procedural maneuvering, on July 12, 2004, the U.S. District Court for the District of Rhode Island (the "Rhode Island Court") entered default judgment for the Ungars against the PA and PLO, jointly and severally, in the amount of $116,409,123.00 plus fees; this judgment was subsequently upheld by the United States Court of Appeals for the First Circuit. *See* Ungar & Ungar ex rel. Strachman v. Palestine Liberation Org., 325 F. Supp. 2d 15 (D.R.I. 2004), *aff'd sub nom.* Ungar v. Palestine Liberation Org., 402 F.3d 274 (1st Cir. 2005). The PLO and the PA have refused to satisfy the default judgment voluntarily. *See* No. 07-cv-2572, Dkt. #12, Am. Compl. ¶ 21; Ungar, 412 F. Supp. 2d at 334 (noting that the Ungars are faced with "an elusive ... judgment debtor"). As a result, "Plaintiffs are pursuing enforcement of the default judgment issued by the District Court of Rhode Island through several legal avenues, including registering the default judgment in both this District and in the Supreme Court of the

State of New York, County of New York." Id. at 331.

### B.    Proceedings Through April 2008

#### 1.    The "Ungar Miscellaneous" and "Ungar I" Actions in the Southern District of New York

In May 2005, the Ungars registered their judgment in the Southern District of New York, *see* 28 U.S.C. § 1963, in pursuit of domestic assets controlled by the PLO and PA. *See* Estate of Ungar v. Palestinian Authority, 18 MS 302 (S.D.N.Y.) (the "Ungar Miscellaneous Action"). In September 2005, the Ungar Estate filed a turnover action in this Court. *See* Estate of Ungar v. Orascom Telecom Holding S.A.E., No. 05-cv-7765 (S.D.N.Y.) ("Ungar I").

The Ungars are pursuing Defendant Orascom as a garnishee, alleging that Orascom owes assets that are "nominally titled" to the Palestine Investment Fund ("PIF") but that actually belong to the PA, Plaintiffs' judgment debtor. (Am. Compl. ¶¶ 28, 30, 31.) According to Plaintiffs, Orascom is indebted to the PA for "at least 45 million dollars," and this asset could be used to satisfy the default judgment, in part. (Id. ¶ 27.) The Ungars seek an order requiring Orascom to turn over those assets pursuant to N.Y. C.P.L.R. § 5227. (Id. ¶ 47.)

Orascom – an Egyptian corporation with its principal place of business in Cairo – is a telecommunications company that operates mobile and satellite telecommunications services in the Middle East, North Africa, and Southeast Asia. Orascom operates through numerous wholly and partially owned regional subsidiaries.

The Ungar Estate has attempted several times to obtain discovery relating to Orascom's alleged debt to the PA and Orascom's jurisdictional contacts with New York. For example, in June 2005, the Ungars issued federal subpoenas to Khaled Bichara – a director of Orascom – in the Ungar Miscellaneous Action. Plaintiffs personally served Mr. Bichara while he was present in the Southern District for an unrelated criminal proceeding. This Court held that personal

3

service on Mr. Bichara did not confer personal jurisdiction over either Bichara or Orascom. *See* Estate of Yaron Ungar, et al. v. The Palestinian Authority, et al., 396 F. Supp. 2d 376, 381-82. (S.D.N.Y. 2005).

In August 2005, Plaintiffs directed subpoenas to Hatim El-Gammal (a director of Orascom) and Zouhair Khaliq (a high-level officer of Orascom) in their official and personal capacities. On November 7, 2005, this Court quashed the subpoena served on Mr. Khaliq in his official capacity. *See* Estate of Yaron Ungar v. Palestinian Authority, 400 F. Supp. 2d 541, 551-52 (S.D.N.Y. 2005). I found that Plaintiffs had not met their burden of establishing that Orascom had the minimum contacts with New York necessary to establish personal jurisdiction over the company in this district. Plaintiffs had not made a prima facie case entitling them to jurisdictional discovery of Orascom. *See* id. at 549, 552. I also determined that Orascom was not subject to personal jurisdiction by virtue of service on Mr. Khaliq because Orascom was a nonparty. However, I upheld the subpoenas served on Mr. Khaliq and Mr. El-Gammal in their individual capacities.

Two months later, Magistrate Judge Smith entered an order granting the Ungars' motion to issue a subpoena to Orascom's Chairman and CEO, Naguib Sawiris, pursuant to 28 U.S.C. § 1783. Ungar, 412 F. Supp. 2d at 328 (S.D.N.Y. 2006). This order compelled the deposition of Mr. Sawiris in his personal capacity, but did not compel him to produce corporate documents that were only in his possession by virtue of his position as Chairman of Orascom. Id. at 335.

The Ungars appealed this Court's November 7, 2005 decision quashing the subpoena on Orascom. Orascom moved to dismiss the appeal on the ground that this finding was not a final order, since this Court had indicated that it might revisit the question of Orascom's personal jurisdiction following the deposition of Mr. Sawiris. *See* id. at 334. Although the Second Circuit

4

Court of Appeals did not dismiss the appeal, it did not address the merits either; instead, it stayed the appeal pending further proceedings in this Court. (No. 07-cv-2572, Dkt. #15, Pls.' Ex. 39.) The Ungar I proceedings in this Court were stayed pending completion of jurisdictional discovery in the Ungar Miscellaneous Action.

To date, the Ungars have obtained discovery from Orascom's officers in their personal capacity. In December 2006, Messrs. El-Gammal and Khaliq submitted their responses to information subpoenas. Mr. Sawiris sat for a deposition via video conference in March 2007.

## 2.      Turnover Proceedings in New York State Supreme Court

Orascom has also participated in state court garnishment proceedings that are virtually identical to those in federal court. In June 2005, Plaintiffs commenced a state court turnover action by docketing the default judgment from Rhode Island in New York Supreme Court, New York County. Estate of Ungar v. Orascom Telecom Holding S.A.E., Index No. 108090/05. The state court turnover petition alleged that Orascom owed property or debt to the PIF and the Palestine Pension Fund for the State Administrative Employees ("PPF"). Plaintiffs asserted that these funds are shell funds of the PA. To support their turnover petition, Plaintiffs cited Orascom press releases that described the share-buyback transaction between Orascom and the PIF. (Def.'s Mem. at 3.) Orascom moved to dismiss, principally on the basis of lack of personal jurisdiction.

In January 2006, the Ungars obtained a stay of briefing on personal jurisdiction in the state court proceedings pending completion of federal discovery. In February 2007, in conjunction with the state court enforcement proceedings, the state court permitted the Ungars to depose and obtain documents from two Orascom officers solely in their individual capacities. These depositions were taken via video conference in March 2007.

### 3.     The Connecticut Action

Also in June 2005, the Ungars registered the Rhode Island default judgment in the

District Court for the District of Connecticut ("the Connecticut Court").  *See* Estate of Yaron

Ungar, et al. v. Palestinian Authority, et al., No. 05-mc-208 (D. Conn. 2005).  This lawsuit

sought turnover of PA funds allegedly held in the name of the PIF by a Connecticut investment

house.

### 4.     The Dispute over the Ownership of the PIF, and Relevant Developments in Related Proceedings

In September 2006, the Rhode Island Court entered judgment in a creditor's bill

proceeding, granting a motion acknowledging the Ungars as the new management and ownership

of the PIF (the "New PIF").  In their new capacity as owners of the PIF, the Ungars then replaced

the PIF's directors and officers and retained the law firm of Jaroslawicz & Jaros— the same

counsel representing the Ungars.  The New PIF filed with this Court, pursuant to Federal Rule of

Civil Procedure 68, an offer to allow judgment in Ungar I.  In October 2006, the original PIF's

attorneys ("LeBoeuf") moved to intervene to challenge the ownership, control, and legal

representation of the New PIF.  I denied without prejudice LeBoeuf's motion and the New PIF's

request for a consent judgment, stating that "NO final judgment will be signed until the

RELEVANT courts have sorted out the corporate control matters."  (*See* Ungar I, Orders of

November 1 and November 2, 2006; Dkt. #35.)

Similarly, the New PIF appeared in the Connecticut action and consented to the relief

sought.  LeBoeuf purported to appear on behalf of the PIF and moved to dismiss the proceedings

in name of the original PIF (hereinafter, the "Original PIF").  (*See* D. Conn. 05-mc-208, Dkt.

#96, 97.)  Both the New PIF and the Original PIF are currently before the Connecticut Court.

### 5. The Knox Action

In September 2006 – after the Ungar turnover proceedings in state and federal court were already underway – the Knox plaintiffs (who are represented by the same counsel as the Ungar Plaintiffs) instituted garnishment proceedings against Orascom in the Southern District of New York. Although the Knox suit involved different plaintiffs, the assets at issue and the relevant legal theories were substantially the same as those present in the action currently before this Court. On March 12, 2007, Judge Marrero dismissed the Knox complaint for lack of subject matter jurisdiction. *See* Knox v. Orascom Telecom Holding S.A.E., 477 F. Supp. 2d 642 (S.D.N.Y. 2007), *motion for reconsideration denied*, 242 F.R.D. 251 (S.D.N.Y. 2007). On May 21, 2007, the Knox plaintiffs appealed Judge Marrero's decision to the Court of Appeals for the Second Circuit. (*See* 2d Cir. No. 07-2168.)

### 6. The "Ungar II" Action

On March 28, 2007, Plaintiffs filed the instant action, Estate of Yaron Ungar, et al. v. Orascom Telecom Holding S.A.E., No. 07-cv-2572 (S.D.N.Y.) ("Ungar II"), voluntarily dismissing their federal and state court turnover proceedings against Orascom in favor of this action. The earlier lawsuits were ordered dismissed against Orascom by the respective courts on April 11 and May 17, 2007. (*See* Ungar I, Dkt. #40; N.Y. Sup. Ct. No. 108090/05, Order of May 17, 2007.)

In "the interest of finality," Orascom waived service of process of the Summons and Complaint in Ungar II, and on May 30, 2007, it moved to dismiss the present Complaint in its entirety with prejudice. (*See* Def.'s Mem. at 8.) On July 16, 2007, I issued a memo-endorsed order placing the Ungar II case on suspense until after the Second Circuit rendered its decision in

7

the Knox appeal. However, due to a clerical error, this order was not docketed – and the case was not placed on suspense – until March 6, 2008. (*See* Ungar II, Dkt. # 36.) The Knox appeal was still pending at that time.

## C.     Proceedings Since April 2008

### 1.     Dismissal of the Knox Appeal for Failure to Prosecute

On April 1, 2008, the Second Circuit Court of Appeals dismissed the Knox appeal, *sua sponte*, "due to appellant's failure to file the brief by the date specified in the scheduling order." (*See* 2d Cir. No. 07-2168-cv.) In other words, the Knox appeal was dismissed because the Knox plaintiffs – who are represented by the same counsel as the Ungars – failed to prosecute their appeal. The Second Circuit's mandate was certified on May 29, 2008, and was transmitted to Judge Marrero on June 2.

### 2.     Proceedings in This Court Following Dismissal of the Knox Appeal

On April 4, 2008, counsel for Orascom sent a letter notifying this Court of the Second Circuit's order dismissing the Knox appeal. Plaintiffs' counsel (Jaroslawicz & Jaros) responded to this letter on April 8, requesting that, in the interest of judicial efficiency, Ungar II remain on this Court's suspense docket – even though the Knox appeal had been dismissed – until the outcome of similar proceedings pending in the Connecticut action. Plaintiffs based their request on the argument that a determination of the validity of the Rhode Island Court's transfer of ownership of the PIF to the Ungars is central to this case, and that the relevant parties (*i.e.*, the Original PIF and the New PIF) are both before the Connecticut Court, which will decide this issue. The Ungars maintain that this determination is germane to these proceedings because the assets at issue involve the PIF. According to Plaintiffs, if the New PIF prevails on this issue,

counsel for the New PIF (Jaroslawicz & Jaros) will come before this Court to formally confirm that Orascom's debt is the property of the PA. If this occurs, Plaintiffs assert, Orascom's subject matter jurisdiction challenge in this case would disappear.

In an April 11 letter, Orascom asserted that there was no reason to further suspend the Ungar II garnishment proceedings. Although Orascom noted that this Court "understandably" placed this matter on suspense pending the Second Circuit's review of Judge Marrero's dismissal of Knox – a "virtually identical turnover action" involving the same assets and same Plaintiffs' counsel – Orascom argued that, because Plaintiffs have not obtained a judgment declaring that the PIF and the PA are the same entity, any further restraint on Orascom's assets is unjustified. (The Connecticut Court had not ruled on the transfer of ownership issue as of that time, nor has it ruled on the issue since then, as I explain below.) Orascom's letter also set forth additional arguments: the PIF is not a party to the Ungar II action now before this Court, so Plaintiffs should resort to the Ungar I proceedings (in which Orascom was voluntarily dismissed) – where the PIF remains a party – if they wish to apply a disposition by the Connecticut Court as to the PIF's ownership status. Orascom also argues that Plaintiffs' assertions regarding the new ownership of the PIF are dubious – and there is a risk of conflicting judgments – since the Original PIF has sued Orascom in Egypt for payment of the debt that is restrained in this action.

On April 14, 2008, I conducted a telephone conference to address the issues raised in the letters described above. After the parties were heard, I held that, in light of the Second Circuit's dismissal of the Knox appeal, this case would be taken off the suspense docket. (Ungar II, Minute Entry of 4/15/2008.)

### 3.    Recent Developments in Other Proceedings

#### a.    The Rhode Island and Connecticut Actions

On April 4, 2008, the Rhode Island Court held a hearing on a motion filed by the PA and

the PLO in December 2007 seeking relief under Federal Rules 55(c) and 60(b) from that court's

$116 million default judgment of July 2004, based on "extraordinary circumstances that warrant

vacatur." (D.R.I. No. 00-105L, Dkt. #408, 12/28/2007 Def.'s Mem. at 49.)[1]  The Rhode Island

Court took the matter under advisement. (Id., Minute Entry of 4/4/2008.)

Two weeks later, non-party entities in the Connecticut action (the "Canaan Entities")

moved to stay the Connecticut proceedings pending final disposition of the defendants' motion

to vacate the default judgment in the Rhode Island Court.[2]  On May 2, 2008, the Connecticut

Court issued an order granting the Canaan Entities' motion, staying the "motions which can

purportedly determine the ownership and officerships of PIF . . . pending resolution of the legal

efficacy of plaintiffs' judgment and its vesting with the indicia of PIF ownership by the Rhode

Island District Court." (D. Conn. No. 05-mc-208, Dkt. #158.)  The Connecticut Court's order

noted the following: the "complexity" of the Ungars' effort to effectuate satisfaction of the $116

million Rhode Island judgment; the attempt by Dr. Mohammad Mustafa – purported CEO of the

PIF – to intervene in the Connecticut action to assert the interest of the Palestinian people in the

assets held by the PIF; and the fact that Plaintiffs' enforcement effort in Connecticut might be

---

[1] On March 31, 2008, the defendants notified the Rhode Island Court of a decision and order issued in the Knox proceedings, in which Judge Marrero granted the motion of the PA and the PLO, pursuant to Federal Rule 60(b)(6), to vacate the default judgment of more than $192 million that had been entered in August 2006 against the PA and the PLO, on the condition, *inter alia*, that the defendants post security in the full amount of the judgment. (No. 00-105L, Dkt. #430.)  On July 23, 2008, Plaintiffs brought to the court's attention the D.C. District Court's decision in Biton v. Palestinian Authority, 2008 WL 2796469 (D.D.C. July 21, 2008), which denied the defendants' Rule 55(c) motion to vacate the default judgment in that case. (No. 00-105L, Dkt. #43.)

[2] The Canaan Entities' stay motion cited the fact that Judge Marrero had conditionally granted the motion of the PA and the PLO to vacate the default judgment in the Knox case.

10

thwarted by the motion in the Rhode Island Court to vacate the original default judgment that spawned the subsequent enforcement proceedings.

On May 9, the Connecticut Court (Dorsey, *J.*) denied plaintiffs' motion for clarification and reconsideration of the stay order, stating, "The previously entered order clearly articulates the intention to stay the matter *until a final decision of all appeals of the pending motion in Rhode Island*." (D. Conn. No. 05-mc-208, Dkt. #160. (emphasis added).) On May 13, the Ungars filed a notice of appeal as to Judge Dorsey's orders granting the Canaan Entities' stay and denying plaintiffs' motion for clarification and reconsideration. (Id., Dkt. #164.) This appeal will not be heard by the Second Circuit until November at the earliest. (*See* 2d Cir. Dkt. No. 08-2475.)

### b.     New York State Court Proceedings

On June 5, 2008, New York State Supreme Court Justice Shirley W. Kornreich ruled that Strachman v. Palestinian Authority, No. 102101/2006 (N.Y. Sup. Ct.), would proceed to trial. This state court turnover proceeding is yet another action instituted by the Ungar Plaintiffs in an attempt to collect on the $116 million judgment issued by the Rhode Island Court. In this proceeding, Plaintiffs allege that several defendants, including the Palestinian Pension Fund of the State Administrative Employees and the Palestinian Pension Fund for the State Administrative Employees of the Gaza Strip (the "Gaza Fund"), are alter egos of the PA. Plaintiffs seek to execute against assets held in the name of the Gaza Fund in NY. The Fund moved for summary judgment, arguing that its assets could not be used to satisfy the judgment because it was a separate legal entity from the PA. Justice Kornreich denied the parties' cross-motions for summary judgment.

## II.    Orascom's Motion to Dismiss Presently Before the Court

### A.    Facts and Allegations

The following is based on Plaintiffs' presentation of the facts relating to Orascom's debt at issue.

The Palestinian government previously used the Palestinian Commercial Services Corporation ("PCSC") as an investment vehicle. (Pls.' Opp. Mem. at 4, citing Ex. 12 (Sawiris Dep.) at. 98-99). The PCSC was capitalized by the PA using the PA's tax revenues. (Pls.' Ex. 47 at 11, 33.) In 2002, the PCSC was superseded by the PIF. (Id. at 33-35; Pls.' Ex. 48 at 101 (September 2003 IMF Report).) According to Plaintiffs, the "decree establishing the PIF made it illegal for the PA to conduct any commercial activity or hold commercial assets outside of PIF," and the PA assets held by the PCSC were transferred to the PIF.[3] (See Ex. 48 at 101; Ex. 47 at 33-35; Ex. 52.)

The PCSC had held ownership stakes in two Orascom subsidiaries, Orascom Telecom Algeria ("OTA") and Orascom Telecom Tunisia ("OTT"). These stakes were subsequently transferred to the PIF. (See Ex. 52 at 200-64; Ex. 12 at 84-115.) In February 2005, a share purchase agreement was executed between Orascom and the PIF, whereby Orascom agreed to purchase the OTA/OTT stakes. (See Exs. 25-27, 61.) A dispute between Orascom and the PIF regarding the share purchase agreement was settled in April 2005. This settlement agreement required, *inter alia*, that Orascom pay the PIF $45 million at a future date. (See Exs. 36, 49.) According to Mr. Sawiris, as a result of the Ungar enforcement proceedings, Orascom has not

---

[3] Because Plaintiffs assert that the PCSC's rights in the Orascom investment were subsequently assigned to the PIF, this Court's discussion of the Orascom investments and debts refers only to the PIF.

made this payment to the PIF.  (Ex. 12 at 111.)[4]  The asset against which the Ungars seek to enforce their judgment is the debt owed by Orascom to the PIF.

Plaintiffs argue that this debt constitutes an asset of the PA.  Their argument is premised on the assertion that the PCSC investments, which were later transferred to the PIF, were made using PA funds, and that the OTA/OTT stakes listed in PIF's portfolio are assets of the PA.  (*See* Pls.' Opp. Mem. at 7-9 (citing, *e.g.*, Ex. 21 at 20-22; Ex. 47 at 33, 35; Ex. 48 at 101; Ex. 51 at 6, 38).)  Plaintiffs claim that Orascom has acknowledged that the debt at issue is an asset of the PA.  Plaintiffs also claim that, in foreign civil proceedings, the PA has identified the OTA/OTT stakes as assets that it owns, that are available for satisfaction of judgments against the PA. (*See* Colthof Decl. ¶¶ 9-17.)  The document on which Plaintiffs rely reveals only that Orascom acknowledges payments due the PIF, not the PA.

To ensure a clear understanding of the basis for the turnover proceedings against Orascom, it is useful to quote Judge Marrero's description in Knox:

> [T]he instant turnover proceeding against Orascom . . . seek[s] monies in Orascom's possession that Orascom allegedly owes or is holding for the PA. . . . Plaintiffs allege that as the result of direct investments by the PA in Orascom, the PA acquired direct and/or indirect stakes and/or shares and/or interests in two Orascom subsidiaries, [OTA and OTT].  Subsequently, Orascom agreed to purchase the PA's OTA and OTT Stakes . . . .  Plaintiffs allege that Orascom . . . is currently indebted to the PA for sums due as a result of this acquisition. * * * . . . Plaintiffs allege that the PA carried out all of the above-described transactions and investments [through the PCSC and the PIF].  Plaintiffs assert that the PCSC and PIF . . . [have] no purpose or business other than to act as investment vehicles for the PA. [Thus,] assets . . . designated or titled to . . . [the] PIF . . . [are allegedly] owned by the PA.

---

[4]  Q: Has Orascom Telecom Holding made the $45,000,000 payment to the PIF?
    A: No, Sir.  Once we were advised by the U.S. court to hold the amount, although we don't acknowledge jurisdiction, we still decided to keep the money at our end and not to distribute.
    Q: Does Orascom dispute that this $45,000,000 is owed to the PIF?
    A: No, Sir.

477 F. Supp. 2d at 644 (internal quotations and citations omitted).

## B. The Parties' Arguments

Orascom makes four arguments in support of its motion to dismiss: (i) this Court lacks subject matter jurisdiction over this turnover proceeding; (ii) this Court lacks personal jurisdiction over Orascom; (iii) this Court lacks territorial jurisdiction over the assets at issue; and (iv) Plaintiffs fail to state a claim for turnover pursuant to N.Y. C.P.L.R. § 5227.

Orascom maintains that this Court should apply the reasoning of Knox and dismiss this action for lack of subject matter jurisdiction, since the allegations in this action are substantially similar to those in the Knox turnover action. Its subject matter jurisdiction challenge is based on the argument that this Court cannot order turnover of Orascom debt without first making a determination about the relationship between the PIF and the PA— a determination that would exceed this Court's ancillary enforcement jurisdiction. (*See* Def.'s Mem. at 18 (citing Epperson v. Entm't Express, Inc., 242 F.3d 100 (2d Cir. 2001)).)

Plaintiffs argue that Judge Marrero's decision in Knox is inapposite because the Ungar II Amended Complaint is free of the deficiencies that were in the Knox complaint, and because the Ungars presented evidence in this case – not considered in Knox – establishing that the debt owed by Orascom is actually property of the PA. According to Plaintiffs, once the new ownership of the PIF is deemed valid by the Connecticut Court, the PIF will confirm that the assets at issue belong to the PA. It is for this reason that Plaintiffs urged this Court to keep Ungar II on the suspense docket pending the disposition of relevant proceedings in the Connecticut action.

However, Plaintiffs also take the position that subject matter jurisdiction exists under

Epperson, irrespective of the outcome of the Connecticut proceedings.  According to Plaintiffs,

the allegations in the Amended Complaint do not require an alter-ego or veil-piercing

determination.


### III.   Discussion

#### A.   Standard

This Court has the discretion to choose which jurisdictional challenge to consider first.

*See* Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 587-88 (1999).  "Determining the existence

of subject matter jurisdiction is a threshold inquiry . . . ."  Arar v. Ashcroft, 532 F.3d 157, 168

(2d Cir. 2008).  "Customarily, a federal court first resolves any doubts about its jurisdiction over

the subject matter of a case before reaching the merits or otherwise disposing of the case."

Cantor Fitzgerald, L.P. v. Peaslee, 88 F.3d 152, 155 (2d Cir. 1996).  Accordingly, I turn first to

the issue of subject matter jurisdiction.  Because this issue is dispositive, I need not address the

other grounds for dismissal raised by Orascom and briefed by the parties.

On a motion to dismiss for lack of subject matter jurisdiction, the party asserting

jurisdiction bears the burden of establishing that the court has subject matter jurisdiction.  Arar,

532 F.3d at 168; Boyd v. AWB Ltd., 544 F. Supp. 2d 236, 242 (S.D.N.Y. 2008).  "It is to be

presumed that a cause of action lies outside [the federal courts'] limited jurisdiction and the

burden of establishing the contrary rests upon the party asserting jurisdiction."  Kokkonen v.

Guardian Life Ins. Co., 511 U.S. 375, 377 (1994) (citations omitted).  The Court accepts as true

the uncontroverted material factual allegations in the complaint, but "argumentative inferences

favorable to the party asserting jurisdiction should not be drawn."  Atlantic Mut. Ins. Co. v.

Balfour Maclaine Int'l Ltd., 968 F.2d 196, 198 (2d Cir. 1992); *see also* Shipping Fin. Servs.

15

Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998) ("[W]hen the question to be considered is one involving the jurisdiction of a federal court, jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it."). In resolving a motion to dismiss for lack of subject matter jurisdiction, the Court may consider evidence outside the pleadings. Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).

### B.    Analysis:  Ancillary Enforcement Jurisdiction

Plaintiffs allege that this Court has subject matter jurisdiction under 28 U.S.C. § 1963, which provides for registration of judgments for enforcement in other districts.  Federal Rule of Civil Procedure 69(a) provides that judgment creditors may use any execution method consistent with the practice and procedure of the State in which the district court sits.  In this turnover proceeding, Plaintiffs cite N.Y. C.P.L.R. § 5227, which permits "a special proceeding commenced by the judgment creditor, against any person who it is shown is or will become indebted to the judgment debtor . . . ."  (See id.; Am. Compl. ¶ 47.)

A district court's "ancillary enforcement jurisdiction is well-established."  S.E.C. v. Antar, 120 F. Supp. 2d 431, 439 (D.N.J. 2000).  The Supreme Court has noted that without "the use of ancillary jurisdiction in subsequent proceedings for the exercise of a federal court's inherent power to enforce its judgments . . . the judicial power would be incomplete and entirely inadequate to the purposes for which it was conferred by the Constitution."  Peacock v. Thomas, 516 U.S. 349, 356 (1996) (internal quotation omitted).  However, the Supreme Court has "never authorized the exercise of ancillary jurisdiction in a subsequent lawsuit to impose an obligation to pay an existing federal judgment on a person not already liable for that judgment."  Id. at 357.

16

In Peacock, the judgment creditor had obtained an ERISA judgment against Tru-Tech Corporation. When Tru-Tech could not satisfy the judgment, the plaintiff brought a supplemental proceeding in federal district court, seeking to pierce the corporate veil and recover from Peacock, a Tru-Tech officer and shareholder. The suit against Peacock alleged civil conspiracy and fraudulent transfer of Tru-Tech's assets, but no claims relating to ERISA. The Supreme Court found that ancillary jurisdiction could not properly be exercised, because the supplemental proceeding against Peacock was "founded not only upon different facts than the [original] suit, but also upon entirely new theories of liability." Id. at 358. The Court stated that, "[o]ther than the existence of the [underlying] judgment itself," the subsequent proceeding had "little connection to" the litigation that produced the judgment. Id. at 359. "When a party has obtained a valid federal judgment, only extraordinary circumstances, if any, can justify ancillary jurisdiction over a subsequent suit like this," the Court said. Id. at 359.

The seminal case in this Circuit interpreting Peacock is Epperson v. Entertainment Express, Inc., 242 F.3d 100 (2d Cir. 2001). In Epperson, the judgment creditors brought an action against the purported transferees of the judgment debtor's assets, seeking to recover against the third parties on a fraudulent conveyance theory. See id. at 103. The district court dismissed the action, citing Peacock and holding that plaintiffs' fraudulent conveyance claims fell outside the court's ancillary jurisdiction; they were not asserted in the original complaint and so required an independent basis for jurisdiction. Id. The Second Circuit Court of Appeals reversed. Although the Circuit noted that an independent basis for subject matter jurisdiction is required when the supplemental proceeding presents "a substantive theory seeking to establish liability on the part of a new party not otherwise liable," id. at 107, it distinguished Peacock based on the nature of the supplemental proceeding. According to the Second Circuit, "Peacock

does not hold that fraudulent conveyance claims brought in a subsequent action require an independent jurisdictional basis." Id. at 105.

Plaintiffs argue that the PA never conveyed assets to the PIF, and that the PIF's role was custodian for the PA's investment portfolio. (*See* Pls.' Opp. Mem. at 10, 12 (citing Am. Compl. ¶ 29, 32.) Plaintiffs seek an order compelling Orascom to turn over to Plaintiffs the assets Orascom owes to the PIF in order to satisfy the judgments against the PA, under the theory that the assets at issue are only "nominally titled" to the PIF, but are actually owned by the PA. (*See* Am. Compl. ¶¶ 28, 30.)

Orascom argues that Plaintiffs' turnover action is premised on a theory that was not essential to the original proceedings that resulted in the entry of the default judgment against the PA. According to Orascom, the theory that the assets are titled to the PIF, but owned by the PA, was not inherent in the ATA claim that triggered the default judgment, and so requires that there be an independent basis for subject matter jurisdiction. Orascom also points out that the Amended Complaint itself repeatedly alleges that Orascom's debt is "titled to" the PIF. (*See* Am. Compl. ¶ 28 (stating that Orascom's debt is "nominally titled to" the PIF); ¶ 30 (same); ¶ 32 (Orascom's debt is "titled to the PIF").)

"In determining the reach of the federal courts' ancillary jurisdiction," the Supreme Court has "cautioned against the exercise of jurisdiction over proceedings . . . where the relief [sought is] of a different kind or on a different principle than that of the prior decree." Peacock, 516 U.S. at 358 (internal quotation omitted).

In Knox v. Orascom Telecom Holding S.A.E., Judge Marrero granted Orascom's motion to dismiss for lack of subject matter jurisdiction, finding that the plaintiffs' allegations required the court to engage in an analysis for which it lacked an independent basis of federal jurisdiction.

*See* 477 F. Supp. 2d at 643 (S.D.N.Y. 2007); 242 F.R.D. 251, 253-54 (S.D.N.Y. 2007) (denying motion for reconsideration). The Ungar II action before me now similarly requires such an analysis. Despite Plaintiffs' clever drafting of the Amended Complaint in this case – seemingly in an attempt to distinguish it from the complaint in Knox and to fit it within Epperson – the Complaint is identical to the Knox complaint in that both allege that the assets against which the plaintiffs seek to enforce their judgment are the property of the PA, but are "titled to" the PIF. (*Compare* Knox Compl. ¶ 31 (alleging that assets "titled to" the PIF are "owned by the PA"), *with* Ungar II Am. Compl. ¶¶ 28, 30, 32 (alleging that Orascom's debt is "nominally titled to" or "titled to" the PIF, but is "owned by the PA").) Plaintiffs have not provided a compelling basis for me to depart from Judge Marrero's sound analysis in Knox.

Just like the Knox plaintiffs, the Ungars argue they are not proceeding on an alter ego theory, and that this action is like Epperson in that they do not seek to hold the PIF liable for the judgment because the debt at issue is allegedly owed to the PA itself. (*See* Pls.' Opp. Mem. at 12; Am. Compl. ¶¶ 41, 43.) According to Plaintiffs, subject matter jurisdiction exists over this action because they simply seek to collect a judgment by tracing the judgment debtor's assets into the hands of a third party. (*See* Pls.' Opp. Mem. at 10 (citing UFCW Local 174 Commercial Health Care Fund v. Homestead Meadows Foods Corp., 425 F. Supp. 2d 392, 393 (S.D.N.Y. 2005)).) There is some merit to this argument, *see* Knox, 477 F. Supp. 2d at 646, but "if this Court's enforcement jurisdiction would not extend to the PIF, it would be illogical for it to reach Orascom, whose only connection to the PA's judgment debt is that Orascom holds funds due to the PIF." Id. at 648.

The fact of the matter is that the assets sought by Plaintiffs in this proceeding are monies owed to the *PIF*, not the PA. (*See, e.g.*, Pls.' Ex. 27 (4/24/05 press release discussing transaction

between Orascom and PIF); Ex. 61 (2/27/05 share purchase agreement between Orascom and
PIF).) Plaintiffs' allegations continue to acknowledge – as they must – that these assets are
"nominally titled to" the PIF. As Judge Marrero noted, "While Plaintiffs artfully attempt to
diminish the significance of PIF's role in this action by describing its entitlement to the amounts
due from Orascom as 'nominal[],' it is nevertheless an undisputed material allegation in
Plaintiffs' complaint that the assets held and debts owed by Orascom at issue in the proceeding
are in fact due to the PIF, not the PA." Knox, 242 F.R.D. at 253-54. Such allegations require
this Court to make a determination about the relationship between the PA and the PIF— a
determination that, for purposes of assessing ancillary enforcement jurisdiction under relevant
precedent, is not unlike an alter-ego determination.

Although Plaintiffs attempt to craft their pleadings around Knox by disclaiming, in a
conclusory fashion, any allegations of veil piercing, alter ego or third party liability, those empty
statements do not satisfy Plaintiffs' burden of establishing that this court has subject matter
jurisdiction. In order to grant Plaintiffs the relief that they seek, this Court would necessarily be
disregarding the PIF's corporate form if it ordered Orascom to turn over assets it owes to the PIF,
in order to satisfy Plaintiffs' judgment against the PA. "Whether the PIF is simply an
investment vehicle for the PA, it is nonetheless a separate corporate entity." Knox, 477 F. Supp.
2d at 647. Plaintiffs' own exhibits demonstrate that the PIF is a separate entity. As this Court
has previously noted, no judgment has been entered against the entity to whom Orascom actually
owes the assets at issue (*i.e.*, the PIF), and "absent strong evidence of corporate impropriety," a
judgment "may not be enforced against third parties' subsidiaries such as the . . . PIF." *See*
Estate of Ungar v. Palestinian Authority, 400 F. Supp. 2d 541, 548 (S.D.N.Y. 2005) (citation
omitted). Plaintiffs' assertions would require this Court to "treat the corporate form of [PIF] as a

complete nullity—to look through its legal identity to the partying standing behind it—and to do so under the guise of making a factual determination necessary to determine [this Court's] subject matter jurisdiction over this case." Futura Dev. of Puerto Rico, Inc. v. Estado Libre Asociado de Puerto Rico, 144 F.3d 7, 12 (1st Cir. 1998), *cited in* Knox, 477 F. Supp. 2d at 647.

Indeed, Judge Marrero was cognizant of the fine line Plaintiffs have attempted to draw here, as they did in Knox. Plaintiffs' motion for reconsideration argued that the Knox decision misconstrued the complaint by presuming the existence of an alter ego claim, and that, rather, the complaint simply alleged that the assets are subject to turnover because they are owned by the PA. In denying the motion for reconsideration, Judge Marrero stated that the Knox decision, "while fully aware of Plaintiffs' position," ultimately concluded that the turnover proceeding required a "determination by the Court . . . with respect to the relationship between the PA and the PIF in order to accept for jurisdictional purposes Plaintiffs' allegation of the PA's ownership of the assets and debts at issue." Knox, 242 F.R.D. at 253.

The court in Knox "did not discount Plaintiffs' allegations that the assets are in fact owned by the PA." Id. at 254. Nor do I. But this Court "also [can]not ignore the inconsistent allegation that from Orascom's perspective, the assets are due the PIF."[5] Id. at 254-55.

In support of their arguments, Plaintiffs also rely heavily on Epperson. Had the PA fraudulently conveyed assets to Orascom, or had it purposefully transferred the Orascom debt to the PIF in an effort to avoid satisfying the Rhode Island judgment, then Epperson might govern

---

[5] Plaintiffs allege that "Orascom itself freely acknowledges . . . that its debt is an asset of the PA." (Pls.' Opp. Mem. at 8; *see also* Am. Compl. ¶ 33 ("In written correspondence with the PIF recently obtained by the plaintiffs, Orascom admitted that Orascom's Debt is an asset owned by the PA.").) The passage quoted by Plaintiffs to support this allegation does not appear in the document cited by Plaintiffs (Ex. 62 at 2), but rather at Exhibit 63. Moreover, when the excerpted passage is read in the context of the entire letter, it is clear that Plaintiffs' allegation is a mischaracterization. The letter refers to Orascom's agreement with (and obligation to) the *PIF* no fewer than *six* times. The Court rejects Plaintiffs' allegation.

here. However, this case does not involve a fraudulent conveyance. The assets at issue are, and always have been, held by Orascom in favor of the PIF. Thus, the cases cited by Plaintiffs – cases that involve fraudulent conveyances or wrongful transfers – are inapposite. (*See* Pls.' Opp. Mem. at 10 n.6, 11 n.8 (citing cases).)

Although the holding of Epperson is not expressly limited to fraudulent conveyance claims, Epperson's reasoning is explicitly premised on the fact that "no court should be powerless to enforce its own judgment when a defendant *fraudulently conveys* assets to avoid that judgment." *See* 242 F.3d at 107 n.10 (emphasis added). Thus, despite the Ungars' reliance on Epperson, that decision does not obligate me to rule in their favor on the issue of subject matter jurisdiction. As Judge Marrero stated:

> The rationale for finding enforcement jurisdiction in Epperson does not appear to directly support Plaintiffs' assertion of ancillary enforcement jurisdiction in this action as there is no allegation that the PA fraudulently conveyed the funds at issue to Orascom, or to the PIF, in order to avoid paying Plaintiffs' judgment.

Knox, 477 F. Supp. 2d at 647; *see also* Knox, 242 F.R.D. at 254 (reiterating that "the reasoning supporting the Second Circuit's determination in Epperson that a fraudulent conveyance claim is an action to collect a judgment, does not support finding jurisdiction in the present action").

In an apparent effort to fit themselves within Epperson, Plaintiffs seem to argue that this action involves a determination touching upon the notion of fraudulent conveyance, in that the assets titled to the PIF were never purported to have been conveyed to the PIF. But a judgment debtor's *failure* to convey assets is not the same as a debtor's affirmative attempt to avoid a judgment by fraudulently conveying or purposefully transferring assets to another party. Accordingly, Peacock and Epperson do not hold that this Court must exercise ancillary enforcement jurisdiction to determine that the PA *failed* to convey assets to the PIF.

Finally, in their opposition to Orascom's motion to dismiss, Plaintiffs state: "If the PA's ownership of the asset were ever contested in this case, the Ungars would assert theories of trust, resulting trust, constructive trust and fraudulent conveyance . . . ." (Pls.' Opp. Mem. at 11 n.8.) This statement echoes Plaintiffs' bare and unsupported allegation: "To the extent, if any, that plaintiffs will be required to assert legal theories in this action, they intend to assert theories of trust, resulting trust, constructive trust, and (in the alternative) fraudulent conveyance." (Am. Compl. ¶ 40.) This Court need not engage in an analysis of hypothetical assertions, raised in one sentence in a footnote of an opposition brief, that echo an empty allegation in the complaint. *See* Kern v. Oesterreichische Elektrizitaetswirtschaft Ag, 178 F. Supp. 2d 367, 379 (S.D.N.Y. 2001) (noting that, on a motion to dismiss for lack of subject matter jurisdiction, the district court is under no obligation to accept conclusory allegations). Plaintiffs had ample opportunity to raise these arguments in their papers. The decisions in Knox (and the discussions of Epperson and Peacock contained therein) were issued well before Plaintiffs filed their opposition brief in this case, yet Plaintiffs have provided no basis for me to conclude, for example, that the funds at issue were fraudulently conveyed in an attempt to avoid satisfaction of the $116 million judgment. This fact is significant given the reasoning underlying the Second Circuit's decision in Epperson, which was "based in large part on how a fraudulent conveyance is regarded under the law of this Circuit." Knox, 477 F. Supp. 2d at 647. Plaintiffs cannot satisfy their burden of establishing subject matter jurisdiction with bare assertions and placeholder arguments.

It is true that the Ungar II Amended Complaint differs from the Knox complaint, in that, *inter alia*, the present Complaint explicitly alleges that the PA established the PIF to serve as a custodian of assets. (*See* Am. Compl. ¶¶ 29, 32.) Plaintiffs assert that this distinction is

dispositive. However, Judge Marrero did not indicate that the inclusion of such an allegation would cure the jurisdictional deficiencies in Knox. He simply noted that the Knox complaint did not allege an agency or trust relationship between the PA and the PIF, nor did it assert these theories in opposition to the motion to dismiss. Plaintiffs in this case (represented by the same counsel as the Knox plaintiffs) do not present substantially new or different arguments than those presented in Knox. Simply because Plaintiffs tailored their allegations in the Amended Complaint around Judge Marrero's observations in Knox does not render that decision inapposite.

To summarize, this turnover proceeding – like Knox – does not merely seek to enforce a judgment by tracing the assets of the judgment debtor into the hands of a third party. It presents issues different from those underlying the judgment. Plaintiffs' vigorous assertion that the PA's assets are only "nominally titled" to the PIF (but owned by the PA) is similar, for jurisdictional purposes, to an allegation that the PIF was an alter ego of the PA, "despite Plaintiffs' disavowal of such an allegation." *See* Knox, 242 F.R.D. at 254. If Plaintiffs were to prevail in this action, assets that would have been due from Orascom to the PIF would be transferred instead to the Plaintiffs to satisfy their judgment against the PA. Such a result can only happen if this Court decides that the PIF and the PA are really one and the same. *Cf.* Knox, 242 F.R.D. at 253 n.1 (stating that the complaint "did ultimately require a determination that the PA and the PIF were legally indistinguishable"). As Judge Marrero stated:

> [T]he question of whether [ancillary enforcement] jurisdiction should be exercised may well vary with the nature of the underlying basis for federal jurisdiction and the nature of the postjudgment claims made. * * * Here, the underlying judgment against the PA was based on the ATA . . . . Plaintiffs now seek to recover that judgment by indicating that assets held by an Egyptian telecommunications company at least 'nominally' due to a foreign

24

> investment company can be seized to satisfy the judgment. While
> Plaintiffs assert that these assets are . . . owned by the PA, in light
> of the other allegations in the complaint, the Court is not persuaded
> that Plaintiffs have met their burden of establishing jurisdiction."

Knox, 242 F.R.D. at 255 (internal quotations and citations omitted).

I agree with Judge Marrero. Because this action requires me to make a determination that

was not part of the underlying ATA action, *see* Knox, 242 F.R.D. at 255, I find that the exercise

of ancillary enforcement jurisdiction in this action would be inappropriate.

## C.    The Disposition of This Case in the Context of Related Litigation

As was previously mentioned, the PIF is not before the Court in this case (nor was it

before the court in Knox). During the April 14, 2008 telephone conference, Plaintiffs suggested

– as if it were a foregone conclusion – that the Connecticut Court would determine the ownership

issue in their favor, and then, if necessary, the New PIF would appear in this Court to formally

confirm that Orascom's debt is the property of the PA. But there are serious questions now as to

the legal ownership of the PIF, let alone the validity of the underlying judgment, as evidenced by

the recent proceedings in the Rhode Island and Connecticut Courts. (*See supra* Part I.C.3.a.)

Contrary to the Plaintiffs' suggestion that the Connecticut Court would perfunctorily

confirm the ownership of the New PIF, it has not done so. A motion to vacate the underlying

$116 million judgment is currently pending, the Connecticut Court has stayed its proceedings

until there is finality on the motion to vacate, and Plaintiffs' appeal of the Connecticut Court's

stay order will not be heard by the Second Circuit until months from now at the soonest. Dr.

Mohammad Mustafa – purported CEO of the PIF – has moved to intervene in the Connecticut

action to assert the interest of the Palestinian people in the assets held by the PIF. And the

Original PIF has sued Orascom in Egypt for payment of the funds that are restrained in this

action.

This state of affairs only supports my conclusion that it would be inappropriate for this Court to assert ancillary enforcement jurisdiction in this case. Moreover, "the Court should be particularly hesitant to overlook the PIF's 'nominal' title" to the assets at issue, since "exercising jurisdiction and executing on the assets at issue leaves Orascom vulnerable to a claim from the PIF that it turned over funds clearly and legally due that entity." Knox, 242 F.R.D. at 255.

It should be noted that this Court's decision does not leave Plaintiffs without recourse to seek satisfaction of the default judgment.[6] The "operative deficiency here is only one of federal jurisdiction." *See* Ellis v. All Steel Constr. Inc., 389 F.3d 1031, 1037 (10th Cir. 2004). There are several proceedings still underway. Indeed, the Ungars' case against the Palestinian Authority is headed for trial in New York state court, pursuant to Justice Kornreich's decision of June 5, 2008. (*See supra* Part I.C.3.b.) The state court action involves the same Plaintiffs and the same underlying judgment, but the defendant is the Palestinian Authority itself, not a third party garnishee. Not to mention, Ungar I remains an open case, and the PIF is still a defendant in that action. Moreover, "a dismissal for want of subject matter . . . jurisdiction is not a decision on the merits. Consequently, upon such a dismissal the plaintiff is free to institute the suit anew in a jurisdiction or under circumstances supporting jurisdiction." Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 n.4 (2d Cir. 1994).

---

[6] In our April 11, 2007 letter to all counsel, in which Ungar I was dismissed against Orascom, Judge Smith and I noted: "As far as we can tell, Ungar has twenty years to collect its judgment against the defendant in the Rhode Island action, and it is free to institute as many actions as it wishes during that period in order to accomplish its desired result." (Ungar I, Dkt. #40.)

26

## III.    Conclusion

For the foregoing reasons, Orascom's motion to dismiss for lack of subject matter jurisdiction is GRANTED.  Because the Court finds subject matter jurisdiction is lacking, it is unnecessary to address the other arguments raised in the briefs, including arguments pertaining to personal jurisdiction.  Accordingly, Plaintiffs' motion for additional discovery on personal jurisdiction is DENIED.

This constitutes the decision and order of the Court.

Dated: September 12, 2008

U.S.D.J.

27